Joe Johnson v. Warden                        CV07 - 4417 JF (PR)

Joe Johnson V - 46926
Attorney Per Se
CSP - CTF
P.O. Box 705
Soledad, CA 93960

*FILED*

*JUN 1 8 2008*

*RICHARD W. WIEKING*
*CLERK U.S. DISTRICT COURT*
*NORTHERN DISTRICT OF CALIFORNIA*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOE RANDEL JOHNSON, | ) | CV 07 - 4417 JF (PR) |
| Petitioner, | ) | |
| | ) | **TRAVERSE TO RESPONDENT'S** |
| V. | ) | **ANSWER TO HABEAS CORPUS** |
| ANTHONY KANE, Warden, | ) | |
| Respondent. | ) | |

PETITIONER, **JOE JOHNSON** an inmate at California State Prison in Soledad,

California and the petitioner in the Petition for Writ of Habeas Corpus wishes to inform the court

that any delay in filing this Traverse was as direct result of the lockdown of the prison in which

he resides. The present lockdown has made it nearly impossible to receive timely mail of any

type and no possible to do any research of any type on his Traverse, therefore, in light of these

circumstances beyond his control Petitioner prays that this court accepts his Traverse in the

interest of justice. A request for extension of time to file Traverse was granted up to and

including **June 30, 2008**.    Petitioner alleges:

Section 1 of Respondent's Answer is True.

Section 2 of Respondent's Answer is NOT TRUE AND IS DENIED BY PETITIONER.

Section 3 of Respondent's Answer is Not True as the Habeas clearly shows that the state courts

denials were based on DECISIONS contrary to the federal law and precedents.

Section 4 of Respondent's Answer is True and is entitled to an evidentiary hearing per federal habeas statute and Supreme Court decisions.

PETITIONER HEREBY INCORPORATES BY REFERENCE THE LODGED DOCUMENTS OF RESPONDENT AND RESUBMITS HIS WRIT OF HABEAS CORPUS.

**Petitioner request an appointment of a court appointed attorney** to assist him in this level of appeal since he is NOT an attorney and need the assistance of a legal professional to more effectively submit the constitutional issues presented in his Writ of Habeas Corpus.

**WHEREFORE,** Petitioner prays that the Petition be GRANTED with out qualifications or hindrances.

Dated 6-17-2008

Respectfully submitted,

Joe Johnson V - 46926
Attorney Per Se
CSP - CTF
P.O. Box 705
Soledad, CA 93960

Joe Johnson v. Warden                 CV07 - 4417 JF (PR)

Joe Johnson V - 46926
Attorney Per Se
CSP - CTF
P.O. Box 705
Soledad, CA  93960

# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| JOE RANDEL JOHNSON, | ) | CV 07 - 4417 JF (PR) |
| Petitioner, | ) | |
| | ) | **TRAVERSE TO RESPONDENT'S** |
| V. | ) | **ANSWER TO HABEAS CORPUS** |
| ANTHONY KANE, Warden, | ) | **MEMORANDUM OF POINTS AND** |
| Respondent. | ) | **AUTHORITIES** |

PETITIONER JOE, respectfully submits that the Procedural History as presented by Respondent is correct and INCORPORATE those statement in this Traverse below.

### STATEMENT OF THE FACTS

Petitioner accepts the Statement of the Case as presented by Respondent, except where they conflict with defense's version of the facts in support of his petition for writ of habeas corpus as presented in full with this Traverse.

### PETITIONER'S CONSTITUTIONAL CONTENTIONS

Petitioner also agrees with the presentation of his constitutional violations and claims as stated in the Respondent's Answer.

I.

## STANDARD OF REVIEW OF AEDPA AND 28 U.S.C. 2241 AND 2254

Petitioner asserts that he is indeed entitled to habeas corpus relief due to the fact that the relevant Habeas corpus statutes are 28 U.S.C. 2241 and 2254, Section 2241 (c) [411 U.S. 475, 483] provides that "the writ of Habeas corpus shall not extend to a prisoner unless ...(3) he is in custody in violation of the Constitution or laws of the treaties of the United States..." Section 2254 provides in pertinent part":

"(a)    The Supreme Court, Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of Habeas corpus in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States.

"(b)    An application for a writ of Habeas corpus in behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner. "

FEDERAL COURT'S AUTHORITY TO REVIEW STATE ACTIONS

It is clear, not only from the language of 2241 (c)(3) and 2254 (a), but also from the common-law- history of the writ, that the essence of Habeas corpus is an attack by a person in custody upon the legality of the that custody and that the traditional function of the writ is to secure release from illegal custody.

The United States Supreme Court set aside death penalties indicating in two separate decisions that despite the sharp restrictions imposed on federal courts by the 1996 Anti-Terrorism Writ reform law, that federal courts. THIS COURT. still have a major role to play in

reviewing the quality of Justice administered by the state courts. In Michael Williams vs John
Taylor No. 99-6615 decided by the court 4/18/00 the court decided that the petitioner was
entitled to a hearing in the United States District Court to present evidence THAT HAD NOT
FULLY DEVELOPED IN HIS EARLIER STATE COURT PROCEEDINGS. Basically,
petitioner asserts that this decision lends itself to all of his present issues.   At the minimum an
evidentiary hearing is in order.

Most importantly, in another case Terry Williams vs John Taylor No 98-8384 Decided by
the U.S. Supreme Court 4/18/00, the court ruled THAT THE SCOPE OF THE FEDERAL
COURTS' ABILITY TO RETAIN THE AUTHORITY TO REVIEW STATE COURTS
DECISIONS AND JUDGMENTS SHOULD NOT BE DIMINISHED BY THE REFORM LAW
OF 1996 (AEDPA). Petitioner also asserts that this petition for a writ of habeas corpus IS THE
PROPER AND ONLY RECOURSE AVAILABLE TO HIM TO SEEK REDRESS UNDER THE
LAWS OF THE UNITED STATES. FURTHER, THE NORMAL APPEAL PROCESS
AVAILABLE TO HIM DID NOT PRESENT HIS ISSUES IN THEIR CONSTITUTIONAL
LIGHT.

## DEFERENCE SHOULD NOT BE GIVEN TO THE STATE COURTS MERITS
## DETERMINATIONS SINCE THEY WERE NOT FULLY OBJECTIVE.

Respondent is of the opinion that the state courts decision should be given deference AND
no matter what that court decide. Further, the Respondent is in error when he says that the decision is
in "conflict" with "circuit" law, the state decision is in conflict with recent decisions of the United
States Supreme Court.

The petitioner wish to emphasize that the Respondent apparently has saw fit not to notice the
recent supreme court ruling on the federal courts ability and duty to review state court decisions that
may be OBJECTIVELY UNREASONABLE and that the U.S. Supreme Court ruled that "federal
courts ability to retain the authority to review state courts decisions and judgments SHOULD NOT BE
DIMINISHED BY THE ANTITERRORISM LAW.

The United States Supreme Court set aside death penalties indicating in two separate

Joe Johnson v. Warden                    CV07 - 4417 JF (PR)

decisions that despite the sharp restrictions imposed on federal courts by the 1996 Anti-Terrorism Writ reform law, that federal courts. At the minimum an evidentiary hearing is in order.          In Stephens v. Kemp, 469 U.S. 1043 (1984) the court stated "...there was no doubt no that the Due Process Clause requires at a minimum that adjudication's affecting an individual's life, liberty, or property be preceded by the (1) notice "reasonably calculated, under all the circumstances," to inform the aggrieved party of the nature of the proceedings him; and (2) a meaningful hearing" appropriate to the nature of the case."' Armstrong v. Manzo, 380 U.S. 545, 550, 1190 (1965), quoting Mullane v Central Hanover Bank & Trust Co. 339 U.S. 306, 313, 656 (1950).        Further in Kemp, the court stated that"... the habeas statutes themselves require federal courts to follow minimum procedural safeguards in resolving petitioner's' claims...the procedures surrounding an evidentiary hearing must "allow development, for purposes of the hearing, of the hearing, of the facts relevant to disposition of a habeas corpus petition." And habeas petitioners must receive a **"full opportunity for presentation of the relevant facts."** Harris v. Nelson, 394 U.S. 286, 298, 1090 (1969)(emphasis added). The ultimate question must always be whether the hearing, **accorded a defendant was in fact a "fair and meaningful evidentiary hearing**." Harris v. Nelson, Ibid. Based on the above AEDPA and the arguments already presented in my Petition, relief is warranted.

## ARGUMENTS

## I

### THE COURT ERRED IN DENYING A MOTION TO SEVER THE BELL AND ARZADON CASES

#### A. The Procedural Context

The two cases had initially been filed separately, and on September 11, 2003, the court granted the prosecutor's motion to consolidate the two cases. (CT 95-96, 110-111.) On February 17, 2004, the first day of trial, Mr. Johnson renewed a motion to sever the two cases, which motion was denied. (CT 189-192.)

Counsel stated the primary basis for the motion as follows: "Your Honor, at this time I'm going to renew my motion to sever. The reason I'm renewing my motion to sever is I still feel the district attorney has joined two week cases together in order to make one single case that is stronger, and that is an impermissible reason for joinder of the cases." (1 RT 47.)

Counsel noted that statements made recently had made the district attorney's case weaker. (1 RT 47.) Counsel emphasized his belief that both the Bell and Arzadon incidents presented weak cases, and he noted there was no cross-admissibility of evidence between the two cases. (1 RT 48.)

Counsel urged the court to sever the Bell incident from the Arzadon incident so that Mr. Johnson could get a fair trial. (1 RT 49.) Counsel

noted the risk that a jury presented with one weak case could acquit but the joinder of two weak cases could cause a jury to convict upon hearing of two incidents whereas it might acquit if it heard evidence of only one. (1 RT 49.)

The prosecutor countered with an assertion the "parallels between these two incidents are numerous and striking." (1 RT 50.) He summed up by stating the two cases were "connected together factually in that they are the same MO, and there would be a huge savings of time and trouble to try these cases together." (1 RT 51.) The court then denied the motion without expressing its reason for so ruling. (1 RT 51.)

### B. The Court Erred In Denying The Motion

For over one hundred years, the fundamental principle that the court must not permit the defendant to be embarrassed in his defense by a multiplicity of charges embraced in one indictment has been recognized. (*Pointer v. United States* (1894) 151 U.S. 396, 403-404 [38 L.Ed. 208].) Although a trial court's improper denial of a defendant's motion to sever counts does not in itself violate the federal constitution, misjoinder rises to the level of a constitutional violation when the prejudice to the defendant is so great as to deny him his fundamental Fifth Amendment right to a fair trial and due process of law. (*United States v. Lane* (1986) 474 U.S. 438, 446, fn. 8 [88 L.Ed.2d 814]; accord, *Williams v. Superior Court* (1984) 36

Cal.3d 441, 447, 452; *Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073, 1084.)

Where the misjoinder does not rise to the level of a federal constitutional error, the party seeking severance must "clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." (*People v. Davis* (1995) 10 Cal.4th 463, 508, citing *Frank v. Superior Court* (1989) 48 Cal.3d 632, 639; accord, *People v. Arias* (1996) 13 Cal.4th 92, 127.) The burden is on the defendant to show prejudice. (*People v. Bean* (1986) 46 Cal.3d 919, 938-939.) Motions for severance are evaluated in light of the showings then made and the facts then known. (*People v. Johnson* (1988) 47 Cal.3d 576, 590; *People v. Balderas* (1985) 41 Cal.3d 144, 171.)

Even if the ruling was correct when made, the judgment must be reversed where the defendant shows that joinder actually resulted in "gross unfairness," amounting to a denial of due process. (*People v. Johnson, supra*, 47 Cal.3d 576, 590; accord, *People* v. *Sandoval* (1992) 4 Cal.4th 155, 174, *People v. Arias, supra*, 13 Cal.4th at 127.)

Penal Code section 954, which is the statutory authority for joinder of offenses, provides in pertinent part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of

17

the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated."

Nevertheless, Penal Code section 954 by its terms authorizes severance, as follows: "[T]he court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

Certain criteria have emerged to provide guidance on this issue. The *Williams* court found the most useful mode for analysis to be that set out in *Coleman v. Superior Court* (1981) 116 Cal.App.3d 129, 137-140. (*Williams v. Superior Court, supra*, 36 Cal.3d at 452.) The *Williams* court applied the following four factors found in *Coleman*: (1) evidence in the crimes did not share sufficient common distinctive marks, and therefore would not be cross-admissible in separate trials; (2) certain of the charges were highly inflammatory and might have a very serious prejudicial effect on the jury on the remaining charges; (3) a relatively "weak" case had been joined with a "strong" case or with another "weak" case, so that the "spill-over" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) a conviction on the weak

18

case carried the death penalty. (*Williams v. Superior Court, supra*, 36 Cal.3d at 452-453.) The Supreme Court has repeatedly applied these criteria. (See, e.g., *People v. Bradford* (1997) 15 Cal.4th 1229, 1315; *People v. Mayfield* (1997) 14 Cal.4th 668, 721; *People v. Memro* (1995) 11 Cal.4th 786, 849-850; *People v. Sandoval, supra*, 4 Cal.4th 155, 172-173.)

"Proposition 115, adopted by the voters in June 1990, included several new constitutional and statutory provisions on the subject of joinder and severance." (*People v. Arias, supra*, 13 Cal.4th 92, 126.) California Constitution, article I, section 30, subdivision (a), added "This Constitution shall not be construed by the courts to prohibit the joining of criminal cases as prescribed by the Legislature or by the people through the initiative process." Penal Code section 954.1 added in pertinent part: "In cases in which two or more different offenses of the same class of crimes or offenses have been charged together in the same accusatory pleading, or where two or more accusatory pleadings charging offenses of the same class of crimes or offenses have been consolidated, evidence concerning one offense or offenses need not be admissible as to the other offense or offenses before the jointly charged offenses may be tried together before the same trier of fact." These changes have not been perceived to have materially changed the law in this area. (*People v. Arias, supra*, 13 Cal.4th at 126, fn. 7; *Belton v. Superior Court* (1993) 19 Cal.App.4th 1279, 1281, 1285.)

10

Although *Williams* set forth the standard for review of severance rulings in the context of a pretrial review, the *Williams* analysis was adopted intact by the Supreme Court in its post-trial review of a severance ruling in *People v. Balderas, supra,* 41 Cal.3d 144, 170-178. (*People v. Smallwood* (1986) 42 Cal.3d 415, 425, fn. 6.) The reviewing court not only determines whether the trial court abused its discretion in denying the pre-trial motion for severance, but when the issue is raised, as here, on appeal after trial the court must also consider the actual impact at trial of the joinder. (*People v. Bean, supra,* 46 Cal.3d 919, 940 (citing *Pointer v. United States, supra,* 151 U.S. at 403-404); *People v. Kelly* (1928) 203 Cal.128, 134.) This requires a look to the evidence actually introduced at trial to determine whether "a gross unfairness has occurred such as to deprive the defendant of a fair trial or due process of law." (*People v. Turner* (1984) 37 Cal.3d 302, 313; accord, *People v. Bean, supra,* 46 Cal.3d at 940.)

In our case, at the time the motion was heard and denied on February 17, 2004, the court had the representations of counsel as to the first and third *Williams/Coleman* factors, as described in Part A, namely whether evidence was cross-admissible and whether two weak cases were joined. In addition, the court had the prosecutor's trial brief, filed on January 30, 2004, in which the basic facts of the incidents were outlined. (CT 168-169.)

That summary, which of course was from the prosecutor's perspective,[8] suggested that in March 2003 [sic: 2002][9] Mr. Johnson went alone to the home of Mr. Bell and used force to try to collect a debt, taking the phone as he left the house. (CT 168-169.) Then, more than a year later, in April 2003, Mr. Johnson went with others to the home of Mr. Arzadon and used force to try to collect a debt, with someone named Yvonne having taken the phone so police could not be called. (CT 169.)

The use of force to collect a debt, and taking or disabling a phone after committing a crime so police cannot be called, are events so common in cases seen in the criminal justice system that the prosecutor could have had no realistic expectation that these events could be admissible, each in the trial of the other, under Evidence Code section 1101. That is, from interviews of Mr. Johnson by police officers the prosecutor knew that in regard to the Bell incident Mr. Johnson claimed self-defense (CT 555-557) and that in regard to the Arzadon incident Mr. Johnson claimed he was not in the house when any offenses occurred against Mr. Arzadon occurred (CT 593-595). Indeed, these were precisely his defenses at trial. (See 5 RT 907, 909, 915, 927, 929.) Thus, with identity at issue in regard to the Arzadon

---

[8] As reflected in the Statement of Facts, the testimony at trial departed substantially from the summary in this trial brief.

[9] From the information filed in the case the court would have known the correct date was March 2002.

incident, the prosecutor simply could not have proved up sufficient similarity between the two incidents to make them cross-admissible. (See *People v. Kraft* (2000) 23 Cal.4th 978; *People v. Ewoldt* (1994) 7 Cal.4th 380.)

Thus, defense counsel was correct in arguing the incidents were not cross-admissible, the first prong of the four-part test under *Coleman*, and the prosecutor was wrong when he argued there were numerous and striking similarities which made the two incidents cross-admissible. Defense counsel was also proved to be correct that both cases were weak, the third part of the test, and the prosecutor made no compelling argument to the contrary at the hearing. Because the first and third prongs were established by the defense, the court erred in denying the motion to sever. Further, using the post-trial perspective, a point which will be discussed in more detail in the separate but similar argument raised in part D, the denial was error because these were indeed two weak cases and the outcome may well have been influenced to Mr. Johnson's detriment by the joinder.

## C. The Erroneous Ruling Was Prejudicial

In *United States v. Ragghianti* (9th Cir. 1975) 527 F.2d 586, 587, the Court, citing Wright, *Federal Practice and Procedure, Criminal*, § 222 (1969), noted three possible kinds of prejudice which can grow out of joinder of similar offenses not arising out of the same transaction: 1) the jury may consider that the defendant must be bad to have been charged with

so many things; 2) inadmissible proof of one offense may be admissible

through a joined offense; and 3) the defendant may wish to testify on one

count but not another. The first two of these factors is clearly present here.

But, even more applicable in the instant case, it has long been observed that

joinder should not be permitted where the crimes charged are of such a

nature that the jury might regard one as corroborative of the other, when, in

fact, no corroboration exists. (See *Kidwell v. United States* (1912) 38

App.D.C. 566, 570; *Drew v. United States* (D.C. Cir. 1964) 331 F.2d 85;

*United States v. Foutz* (4th Cir. 1976) 540 F.2d 733, 736-739; *United States*

· *v. Ragghianti, supra,* 527 F.2d 586.)

Such bootstrapping in our case of these two separate incidents with

their cross-corroborative effect was highly prejudicial and compels reversal.

(See *Kidwell v. United States, supra,* 38 App.D.C. at 570; *Drew v. United*

*States, supra,* 331 F.2d 85; *United States v. Foutz, supra,* 540 F.2d at

736-739; *United States v. Ragghianti, supra,* 527 F.2d 586.)

As recently reaffirmed by the Ninth Circuit in *Bean v. Calderon,*

*supra,* 163 F.3d 1073, 1084: "[T]here is 'a high risk of undue prejudice

whenever . . . joinder of counts allows evidence of other crimes to be

introduced in a trial of charges with respect to which the evidence would

otherwise be inadmissible.' *United States v. Lewis,* 787 F.2d 1318, 1322

(9th Cir. 1986) (citation omitted). In *Lewis,* we explained this by observing

23

that 'it is much more difficult for jurors to compartmentalize damaging information about one defendant derived from joined counts, than it is to compartmentalize evidence against separate defendants joined for trial,' and by recognizing studies establishing 'that joinder of counts tends to prejudice jurors' perceptions of the defendant and of the strength of the evidence on both sides of the case.' *Id.* at p. 1322.

"These concerns resonate with particular force here: not only did the trial court join counts for which the evidence was not cross-admissible, but the State repeatedly encouraged the jury to consider the two sets of charges in concert, as reflecting the modus operandi characteristic of [the defend-ant's] criminal activities. Thus, the jury could not 'reasonably [have been] expected to "compartmentalize the evidence" so that evidence of one crime [did] not taint the jury's consideration of another crime,' *United States v. Johnson*, 820 F.2d 1065, 1071 (9th Cir. 1987), when the State's closing argument and the import of several of the instructions it heard urged it to do just the opposite."

In *Bean v. Calderon*, *supra*, as here, the instructions did not speci-fically admonish the jurors that they could not consider evidence of one set of offenses as evidence establishing the other. Also, as in *Bean*, the prosecutor took advantage of the improper joinder in his argument to the jury. Whereas in *Bean* the conviction was reversed only as to one incident

24

because as to the other the improper joinder had no substantial injurious effect in influencing the jury's verdict, in the Johnson case the damage was sufficient as to each incident that the convictions as to both should be reversed.

In this case, the prosecutor's central theme, with which he began his opening argument to the jury, was that Mr. Johnson was either a loan shark or a drug dealer who loaned money to people and then went to collect the debts. (5 RT 860-863.) That is, he used evidence from one incident to bolster his case as to the other incident by arguing both incidents were part of a pattern of behavior of Mr. Johnson, precisely the kind of character evidence precluded by Evidence Code section 1101 in the absence of the kind of foundation never established in this case. (See *People v. Kraft, supra,* 23 Cal.4th 978; *People v. Ewoldt, supra,* 7 Cal.4th 380.)

Because the evidence of both incidents was weak, as will be discussed in more detail in part D, the denial of the severance motion was prejudicial error because it permitted the use of evidence which otherwise was not cross-admissible, without a proper limiting instruction, and with the prosecutor able to utilize the evidence for its improper purpose in his argument to the jury, so as to lead to convictions as to two incidents in which an acquittal as to each incident was a real possibility had the two cases been tried separately.

## D. Even If The Ruling Was Correct, A Fair Trial Was Denied

In *People v. Grant* (2003) 113 Cal.App.4th 579, as here, two cases had been filed separately but were joined on the prosecution's motion. Prior to trial, as here, the defendant moved to sever the counts relating to the two incidents, arguing the evidence was not cross-admissible and the joinder would be prejudicial to the defendant. Although the Court of Appeal found no error at the time of the ruling on the motion to sever, the court reversed the conviction because the joint trial deprived the defendant of a fair trial, summarizing its holding as follows:

"We conclude that the trial court did not abuse its discretion in denying defendant's motion to sever. Nevertheless, the joinder substantially prejudiced defendant and denied him a fair trial. Our conclusion is based on the non-cross-admissibility of the evidence on counts 1 and 2, the similarity of the evidence on counts 1 and 2, and the relative weakness of the evidence on count 1 in relation to count 2 in conjunction with prosecutorial and instructional errors. In combination, these factors had a substantial and injurious effect or influence on the jury's verdicts. Accordingly, the judgment must be reversed." (*Id.*, at 583-584.)

Citing, inter alia, *United States v. Lane, supra*, 474 U.S. 438, the *Grant* court observed that even if a motion to sever was properly denied at the time the motion was made, a conviction must be reversed if the joinder

proves to have been actually prejudicial in having a substantial and injurious effect or influence in determining the jury's verdict. (*People v. Grant, supra*, 113 Cal.App.4th at 587.) In finding such prejudice in the case before it, the *Grant* court noted the similarity between that case and *Bean v. Calderon, supra*, 163 F.3d 1073. (*Grant*, at 588.)

The *Grant* court further found the same factors as in *Bean* to have been present in the case before it, as follows: "First, the evidence on counts 1 and 2 was not cross-admissible. Second, the prosecutor urged the jury to draw the impermissible inference that, because defendant possessed stolen computer equipment (count 2), he burgled the school for computer equipment (count 1). Third, the trial court refused defendant's request for an instruction on the non-cross-admissibility of the evidence on counts 1 and 2, and the trial court's other instructions did not ameliorate these errors. Fourth, the evidence on counts 1 and 2 was considerably similar, and the evidence on count 1 was not strong. It is therefore likely that the jury used the evidence that defendant received and was concealing computer equipment stolen from a school (count 2) to infer he burgled the school for computer equipment (count 1)." (*Grant*, at 588.) As will be shown below, the *Grant* court's assessment of the individual factors relating to the propriety of joinder or severance of counts based on separate incidents shows a case remarkably similar to our case.

27

First, in regard to cross-admissibility the *Grant* court made the following observation: "Based on the facts before us, the only suggested basis for admitting the evidence on count 1 in relation to count 2, and vice versa, was to show a modus operandi, or common plan. 'To be admissible to demonstrate a distinctive modus operandi, the evidence must disclose common marks or identifiers, that, considered singly or in combination, support a strong inference that the defendant committed both crimes. [Citations.]' [Citation.] 'In order to be relevant as a common design or plan, "evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.'" [Citation.]' [Citation].") (*People v. Grant, supra,* 113 Cal.App.4th at 589.) The evidence in *Grant* was that in 1998 the defendant admittedly possessed computer equipment stolen from a school, resulting in a charge of possession of stolen property, and that someone stole computer equipment from a school in 2001, leading to a charge of burglary against the defendant. (*Ibid.*) The Court of Appeal noted that although the evidence as to these two counts was quite similar, it was not sufficiently so that the evidence of both of the two incidents would have been admissible in separate trials because of the lack of common marks to create the inference the defendant committed both crimes. (*Ibid.*)

Similarly, as discussed in parts B and C, above, the evidence in our case was not cross-admissible because the evidence did not support the prosecutor's argument the two incidents were sufficiently similar as to be cross-admissible to show modus operandi.

Second, in *Grant* the prosecutor argued to the jury that the jury should draw the impermissible inferences, such as that the evidence the defendant possessed a computer stolen from a school was circumstantial evidence that he had committed the school burglary to steal computer equipment. (*People v. Grant, supra,* 113 Cal.App.4th at 589-590.) In our case, the prosecutor made a comparable argument in urging the jury to find Mr. Johnson guilty as to both incidents because was either a loan shark or a drug dealer who loaned money to people and then went to collect the debts (5 RT 860-863), and that is what he did in regard to both Mr. Bell and Mr. Arzadon, as discussed in part C, above.

Third, in *Grant* the court noted the trial court had refused to give a limiting instruction and its instructions did not otherwise inform the jury it should not consider evidence of one incident when evaluating the evidence as to the other incident. (*Grant,* at 591-592.) In our case, the defense apparently did not request a limiting instruction, but the net effect on the jury was the same in this case as in *Grant* because the court's other instructions did not inform the jury they should not make cross-admissible

use of the evidence relating to the two separate incidents regarding Mr. Bell and Mr. Arzadon.

Fourth, in *Grant* the evidence was similar as the two counts, and the evidence of the burglary charge was weak relative to the other count. (*People v. Grant, supra*, 113 Cal.App.4th at 593.) In our case, the evidence regarding the two incidents was similar, and not only was the evidence of the Bell incident weak relative to the Arzadon incident but also both were relatively weak cases in the larger scheme of things.

That is, the evidence at trial, notwithstanding some impeachment of witnesses with statements given earlier, overwhelmingly established that when Mr. Johnson was unable to collect the money owed to him by Mr. Bell, Mr. Johnson was leaving the house when Mr. Bell attacked him with a hammer. Only after he had been assaulted did Mr. Johnson engage Mr. Bell in mutual combat until the fight was broken up by Mr. Collins. The jury's conviction of Mr. Johnson of only the lesser offense of misdemeanor assault in regard to this incident reflects the jury's view this was a weak case, and further suggests the risk this verdict rather than a not guilty verdict flowed from the jury's consideration of the evidence of the Arzadon incident as urged by the prosecutor in his argument to the jury.

The evidence of the Arzadon incident was stronger only because two witnesses testified for the prosecution as to these events, but in fact this was

a weak case also. As noted the Statement of Facts, Mr. Matthews acknow-
ledged he was drunk at the time of the incident, although he claimed he
knew what he was doing (3 RT 507), and Mr. Arzadon was high from
smoking crack cocaine, strung out from using crack over a period of days,
and probably hallucinating because of his extensive use of crack cocaine (3
RT 588-589, 592; 4 RT 641-643, 659-660, 696-697). These two men
obviously were not reliable witnesses.

Further, their lack of ability to perceive and recall was demonstrated
by their divergent testimony on important points. For example, Mr.
Matthews recalled that Yvonne had left about ten minutes before the
incident began (3 RT 508-511) whereas Mr. Arzadon testified she was in
the house at the time (3 RT 594-596.) Mr. Arzadon claimed to have been
hit by a chair (3 RT 597) but Mr. Matthews saw no such thing (3 RT 533) .
Mr. Arzadon said a man came to the door several times looking for Yvonne
(3 RT 590-592) but Mr. Matthews made no mention of any such visits when
he described other people coming and going. Even though this incident
happened soon after midnight, according to Mr. Matthews (3 RT 508-511),
and he recalled the police were called 20 to 30 minutes later (3 RT 524-
526), when Officer Richard Diaz was dispatched in response to the call he
arrived at about 4:45 a.m. (3 RT 459-461). In short, this was a flaky case,
and the spillover from the Bell incident likely influenced the verdict.

Thus, just as in *People v. Grant, supra,* 113 Cal.App.4th 579, a retrospective look at this trial shows that Mr. Johnson was deprived of his right to a fair trial and due process of law under the Fourteenth Amendment due to the joinder of these two incidents for trial and the denial of the motion for severance of the two incidents. As a result, the judgment of conviction should be reversed as to all counts relating to these incidents.

II

## SENTENCE ON THE DRUG COUNT SHOULD BE VACATED FOR PROP. 36 CONSIDERATION

If the judgment is reversed as to all counts relating to the Bell and Arzadon incidents, as discussed in Argument I, the sentence on the drug count (count 9 as renumbered for sentencing) should be vacated because depending upon the outcome of the other counts after remand Mr. Johnson may be entitled to consideration of the application to this count of Proposition 36, now Penal Code section 1210 et seq. That is, since he possessed only a small amount of crack cocaine, a "$10 rock" weighing 0.1 gram (4 RT 774), even though he was convicted of transportation because he was in a moving vehicle when stopped with the contraband in the sweat band of his hat, if he is not re-convicted of an offense which would disqualify him he should be entitled to the provisions of Proposition 36. (See *People v. Canty* (2004) 32 Cal.4th 1266 [person convicted of transportation of

22

methamphetamine was disqualified from Proposition 36 treatment only because she was also convicted in the same proceeding of misdemeanor driving under the influence of drugs].)

III

## THE "IN CONCERT" FINDING ON COUNTS 1 AND 2 SHOULD BE VACATED BECAUSE OF INSUFFICIENT EVIDENCE

In initially-charged counts 1 and 2, Mr. Johnson was convicted of the lesser offense of attempted first degree robbery in concert.  (CT 229, 233.) The "in concert" finding should be vacated because the evidence is insufficient to support the necessary element that the attempted robbery was committed by Mr. Johnson "acting in concert with two or more other persons" as required by the terms of Penal Code section 213, subdivision (a)(1)(A).

### A.  The Standard Of Review

The appellate standard of review of a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the elements of the offense to be present beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 576; also see *Jackson v. Virginia* (1980) 443 U.S. 307 [61 L.Ed.2d 560].)  While this court will presume in support of the verdict the existence of every fact the trier could reasonably deduce from the evidence, the court must resolve the issue in light of the entire record, and it must find

not just "some" evidence, but "substantial" evidence, of every essential element. (*People v. Johnson, supra*, 26 Cal.3d at 576-577.)

"As an appellate court, we look to whether there is substantial evidence in the record in support of the questioned element of the charged offense. [Citations.] It is not our function to decide whether the evidence proves the existence of that element beyond a reasonable doubt, as that finding and weighing of the evidence has already been performed by the trier of fact at the trial level. [Citations.] We review the whole record in the light most favorable to the judgment and presume in support of the judgment every fact the trier could reasonably deduce from the evidence. [Citations.] 'Substantial evidence' is evidence which is reasonable, credible, and of solid value, and it is such that a reasonable trier of fact could find a defendant guilty beyond a reasonable doubt. [Citation.]." (*People v. Gallardo* (1994) 22 Cal.App.4th 489, 492.)

### B. The Jury Determines The Facts

As noted in the quote just above from *Gallardo*, the reviewing court relies upon the findings of fact made by the trier of fact at the trial level because that trier of fact has already performed the functions of finding and weighing the evidence. (See also *People v. Jones* (1968) 268 Cal.App.2d 161, 165: "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts

upon which a determination depends.")  Since convictions but not acquittals are the stuff of which appeals are made, this typically means that the evidence is viewed on appeal in the light most favorable to a judgment of conviction, as noted above.  However, a necessary corollary of the principle that the reviewing court does not re-weigh the evidence but accepts the facts as necessarily found by a jury is that when the jury makes a finding favoring the defendant, that finding should also be the subject of deference by the reviewing court unless it is irrational; in other words, on the issue on which the jury has acquitted, the reviewing court must defer to the jury and view in the evidence on that issue in the light most favorable to the acquittal.

For example, by analogy, upon a new trial of a case, the doctrine of collateral estoppel precludes relitigation of facts necessarily found against the prosecution in a first trial.  (See, e.g., *Ashe v. Swenson* (1970) 397 U.S. 436 [25 L.Ed.2d 469]; see also *People v. Santamaria* (1994) 8 Cal.4th 903, where the Supreme Court discussed the concept but found the fact at issue had not necessarily been resolved against the prosecution at the first trial.)  Appellant is not suggesting that the doctrine of collateral estoppel is applicable here but merely cites this theory as an example of appellate deference given to a jury's finding.

This point is pertinent to the jury's acquittal of Mr. Allen as to counts 1 and 2, reflecting the jury's finding that he was not a person acting

33

in concert with Mr. Johnson as to those two counts because he was not involved in the offenses charged in those two counts. This is not a case of inconsistent verdicts, where an acquittal of one defendant is factually irreconcilable with a conviction of another defendant, a situation in which both results are permitted to stand. (See, e.g., *United States v. Powell* (1984) 469 U.S. 57 [83 L.Ed.2d 461]; *People v. Pahl* (1991) 226 Cal.App.3d 1651.) Rather, the two verdicts here are not necessarily inconsistent. That is, the logical explanation is that the jury was satisfied that Mr. Johnson was involved but believed Mr. Arzadon's testimony that Mr. Allen was not involved (4 RT 611).

### C. The Evidence Was Insufficient

According to Mr. Matthews, Yvonne left the house before the incident, accidentally failing to close the door all the way when she left. (3 RT 509-511.) About five or ten minutes later two Black men entered, and a third Black man come into the house later. (3 RT 511, 514-515.) Although Mr. Arzadon obviously did not know any of the three men and told police he could not recognize any of them (3 RT 511, 515-516, 527-528), if Mr. Arzadon's testimony was correct that one was Mr. Johnson and one was Mr. Allen, this leaves one unidentified man, which is consistent with Mr. Arzadon's testimony that the man who kept inquiring about Yvonne was also present. (3 RT 593-596; 4 RT 610.)

.6

Mr. Arzadon testified that Mr. Allen was not involved, and in fact Mr. Allen was saying to get off him, and that two men were on top of him when someone's hands went through his pocket, at which time he was in a somewhat blackout state. (3 RT 600-602; 4 RT 611.)

Thus, under any reasonable interpretation of the synthesis of the testimony by Mr. Matthews and Mr. Arzadon, only two people were acting together in the attempt to rob Mr. Arzadon, not the required defendant plus two others. Further, Mr. Matthews was quite specific that only two men attempted to rob him. (3 RT 516-521.) As a result, the "in concert" finding should be vacated as to both count 1 and count 2, which counts were renumbered as counts 2 and 4, respectively, for the purposes of sentencing.

### Argument

## PETITIONER WAS DENIED A FAIR TRIAL AND DUE PROCESS WHEN TRIAL JUDGE RUSSELL SCOTT DECIDED WITHOUT A COMPETENCY HEARING AND EXPERT TESTIMONY WHETHER OR NOT PETITIONER, WHO HAD DOCUMENTED BRAIN DAMAGE, WAS COMPETENT TO STAND TRIAL AND THAT HE WAS NOT COMPETENT TO STAND TRIAL OR UNDERSTAND THE CHARGES AGAINST HIM.

Once again Petitioner thanks that Respondent for his research on this matter and bringing to this court's attention support for on his main constitutional claims. During the Marsden motion as discussed in the Respondent's Answer, the Petitioner made it as clear as he could that HE DID NOT UNDERSTAND THE COURT PROCEEDINGS, THE CHARGES, HOW TO WORK WITH HIS ATTORNEY AND ANYTHING ELSE going on around him. Of course the Respondent took all of the admonishments to the court by Petitioner out of context to make it apper that he was ONLY concern with the perjury of the victim, that was ultimately proven and admitted to by the victim. Petitioner and his family had presented information the court and to the defense attorney that clearly WARRRANTED A COMPETENCY HEARING.

As a veteran Petitioner was under the care of the Veteran's administration. As result of that care he was deem PERMANENTLY UNFIT TO CARE FOR HIMSELF (see letter dated 9/17/90) AS FAR BACK AS 1980. **The court was made more aware of this fact and the mental state of the petition via letter from the Veterans Administration sent directly to the Judge Scott on March 27, 2004.** But for the already demonstrated bias of the court, any responsible person would have halted any proceeding to be sure that the accused was in fact competent to stand trial before proceeding farther. Definitely, since Petitioner often complained of his lack of understanding of the proceedings.

The Respondent makes it clear that Judge Scott acting as an EXPERT WITNESS IN THE COURT ROOM, just as he acted as a grand jury earlier, declared that Petitioner was competent to stand trial (see Respondent's Answer page 5 lines 21 to 28). PETITIOENR FINDS

THIS EXORDINARY WHEN THE JUDGE DOES NOT EVEN TRY TO SEEK EXPERT

ADVICE ON SUCH A MATTER WHEN HE HAS IN HAND AND BEFORE HIM EVIDENCE

THAT SUCH ADVICE IS AT HAND. The Judge said that the Petitioner had "some brian

damage" as result of an injury. Notwithstanding the already existing mental problems he was

being treated for at the Veterans Administration.

Petitioner is at a lost as to what he would have done to implore the court to act and allow

a competency hearing. THEN THE COURT ALLOWED THE PUBLIC DEFENDER TO

MAKE A PSYCHIATRIC DECISION AS TO THE COMPETENCE OF THE PETITIONER

(Respondent's Answer page 6 Line 6 - 7). This is more than extraordinary, which shows that now

the Public Defender was has been shown to be ineffective at trial is now asked to be a mental

health professional and HIS assessment of the mental condition of the Petitioner was

ACCEPTED by the trial judge.

## PRECEDENTS IN SUPPORT OF AN EVIDENTIARY HEARING ON THIS CLAIM

### UNITED STATES SUPREME COURT

**Cooper v. Oklahoma, 517 U.S. 348 (1996)**
Oklahoma's statute requiring criminal defendants to prove their incompetency by clear and
convincing evidence imposes a significant risk that defendants *who have already demonstrated
that they are more-likely-than-not incompetent will be erroneously found competent and thus
violates due process.*

**Drope v. Missouri, 420 U.S. 162 (1975)**
*The trial court violated Drope's due process rights when it failed to suspend his trial for a
competency hearing in the face of accumulating evidence of incompetency,* including an attack
on his wife and a suicide attempt. A *nunc pro tunc,* or retrospective, determination of
competence, which is difficult under the best of circumstances, would not be adequate in this
case inasmuch as Drope was absent during a critical stage of his trial and thus was not observed
by the court or counsel.

**Pate v. Robinson, 383 U.S. 375 (1966)**
*The trial court's failure to grant a competency hearing deprived Robinson of his right to a fair*

*trial, where there was uncontradicted testimony of his history of irrational behavior, defense experts testified that he was insane and the only evidence supporting his competency was Robinson's demeanor at trial* and the stipulated testimony of a state expert who did not make a determination as to Robinson's sanity. A retrospective determination of competency would be too difficult because (1) the jury would not be able to observe the subject of their inquiry, (2) the testimony of experts would have to be based solely on information in the printed record and (3) six years had passed since the trial.

## Westbrook v. Arizona, 384 U.S. 150 (1966) (per curiam)

Although defendant received hearing on the issue of his competence to stand trial, he was entitled to hearing or inquiry into issue of his competence to waive his constitutional right to assistance of counsel and to proceed to conduct his own defense. Remand to Arizona Supreme Court to determine if the trial court fulfilled its "protecting duty" to the defendant. *But see Godinez v. Moran*, 113 S.Ct. 2680 (1993), which denies that there are separate standards of competency to stand trial and to waive counsel, and interprets *Westbrook* as holding that the trial court failed to determine if defendant's waiver of counsel was knowing and voluntary.

## Dusky v. United States, 362 U.S. 402 (1960)

The information on the record was insufficient to support a finding of competency. The District Court erred in limiting its inquiry to whether the defendant is oriented to time and place and has some recollection of events. *The proper "test must be whether he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding -- and whether he has a rational as well as factual understanding of the proceedings against him."* A retrospective hearing would have been difficult because of the "doubts and ambiguities regarding the legal significance of the psychiatric testimony."

# UNITED STATES COURTS OF APPEALS

## Lounsbury v. Thompson, 374 F.3d 785 (9th Cir. 2004)

Petitioner's substantive incompetency claim was properly exhausted even though his petition for review to the Oregon Supreme Court raised a procedural argument that the lower court applied an incorrect burden of proof. "Lounsbury worded his petition for review as a procedural challenge, *but the clear implication of his claim was that by following a constitutionally defective procedure, the state court erred in finding him competent.* Where the substantive and procedural claims are as intertwined as they are here, we hold that Lounsbury made a fair presentation to the state courts of his claim that he was not competent to stand trial." The case is remanded to the district court for merits consideration of the substantive incompetency claim.

## Johnson v. Norton, 249 F.3d 20 (1st Cir. 2001)

In a non-capital case, the court analyzed a *Pate* claim under AEDPA standards; the trial judge should have held a competency hearing *sua sponte* where Petitioner was hit on the head shortly before trial and became unconscious a few hours after trial began, raising a question of his competency during jury selection.

## McGregor v. Gibson, 248 F.3d 946 (10th Cir. 2001) (en banc)

In capital 2254 proceeding, the court addressed the question "when may a defendant found competent to stand trial under an unconstitutional 'clear and convincing evidence' burden of proof and then convicted succeed in habeas on a procedural competency claim?"; since

Petitioner's competency at trial was assessed under the standard found unconstitutional in *Cooper v. Oklahoma*, 517 U.S. 348 (1996), the court reviews the trial as if no competency hearing was held at all; a procedural competency claim such as that raised by Petitioner is held to a lower burden of proof than a substantive competency claim; the court holds that in order to succeed on a procedural competency claim after a trial in which a petitioner was found competent under an unconstitutional burden of proof, *the petitioner must establish that a reasonable judge should have had a bona fide doubt as to his competence at the time of trial; a petitioner establishes a bona fide doubt by showing a reasonable judge should have doubted whether the petitioner met the Dusky standard*; the claim is assessed under a totality of the circumstances approach; in this case, the trial court should have had such a doubt; the court also concluded that a retrospective competency determination could not be made and therefore ordered Petitioner's conviction vacated.

### Odle v. Woodford, 238 F.3d 1084 (9th Cir. 2001)
In capital 2254 proceeding, *court held that state trial court should have conducted a competency hearing because the information before the judge about Petitioner's extensive mental impairments*, including the fact that he was missing a piece of his brain the size of a grapefruit, raised a bona fide doubt about Petitioner's competency; the court also found the record sufficient for the state court to conduct a retrospective competency determination; case remanded to district court with directions to grant the writ unless the state trial court conducts a hearing within 60 days to determine Petitioner's competency at the time of trial.

### Torres v. Prunty, 223 F.3d 1103 (9th Cir. 2000)
In non-capital 2254 proceeding, the state appealed the district court's finding of a *Pate* violation; the court analyzed the claim under AEDPA standards, *finding the state courts' rejection of the claim was an "unreasonable determination of the facts" under 2254(d)(2); the court equated the "unreasonable determination" provision to the "clearly erroneous" standard; the information before the trial court raised a bona fide doubt about Petitioner's competency; writ granted.*

### Trotter v. Bunnell, 163 F.3d 607 (9th Cir. 1998)(unreported opinion)
Federal habeas corpus petitioner was arguably entitled to evidentiary hearing on claim that he was incompetent at time of guilty plea. Petitioner presented report of mental health expert indicating he had low IQ and an inability to apply information, and that his use of language could lead someone to erroneous impression that petitioner has greater understanding than he actually possessed. District court was correct that the latter finding by petitioner's expert defeated petitioner's procedural due process claim because it indicated the trial court would not have had grounds for doubting petitioner's competency at time of the plea. But district court erred in concluding that the expert's evidence was not relevant to petitioner's substantive due process claim that petitioner was in fact incompetent to enter plea.

### United States v. Heywood, 155 F.3d 674 (3rd Cir. 1998)
*Defendant's procedural due process rights were violated when district court failed to conduct a hearing on defendant's competency after receiving report that defendant, who had been found incompetent, had been rendered competent* through "substantial doses of antipsychotic medication" that had to be continued. Due process requires a "record-based judicial determination of competence in every case in which there is reason to doubt the defendant's competence to stand trial." Remanded for hearing to determine whether a (disfavored) retrospective competency determination was possible. If no such determination was possible, or a retrospective determination indicated defendant was not competent, defendant would be entitled

Joe Johnson v. Warden                    CV07 - 4417 JF (PR)

to a new trial.

### United States v. Loyola-Dominguez, 125 F.3d 1315 (9th Cir. 1997)

Defendant's due process rights violated by failure of district court to grant a competency hearing following defendant's attempted suicide in a jail cell on the eve of trial. The timing of the suicide attempt, and defendant's desire to "get out of here" as his sole objective, raised a bona fide doubt as to defendant's competence that required a hearing.

### United States v. Williams, 113 F.3d 1155 (10th Cir. 1997)

Williams' *courtroom behavior and other evidence created a bona fide doubt about Williams' competency to stand trial and should have moved the trial court to order a competency hearing.* Williams often interrupted the proceedings, speaking rapidly and "hysterically," urged one of her several attorneys (having fired or caused many to withdraw) to behave improperly (such as to ask cross-examination questions while the prosecutor was still conducting direct examination), testified nonresponsively, cried in front of the jury and informed the court on the second day of trial that she had not taken the medication she required for depression. The trial court's error was not cured when he ordered a post-verdict psychological evaluation at the urging of Williams' fourth attorney. The evaluator's finding that she was competent to participate in sentencing does not inspire confidence that she was actually competent during her trial. The Circuit Court vacates the conviction and directs the District Court to conduct a hearing into Williams' competency to stand trial.

### James v. Singletary, 957 F.2d 1562 (11th Cir. 1992), cert. denied, 114 S.Ct. 262 (1993)

*Defendant who presented clear and convincing evidence creating a real, substantial and legitimate doubt as to his competence at the time of his trial was entitled to an evidentiary hearing.* No state court had ever made a determination of competency, and defendant presented the conclusion of an expert that defendant would have been found lacking in several areas of competency. A defendant alleging a substantive due process violation (incompetence in fact), rather than a procedural due process violation (failure of the state court to hold a required competency hearing) is not barred by his failure to raise his claim at trial or on direct appeal.

### United States v. Hoskie, 950 F.2d 1388 (9th Cir. 1991)

Government did not meet burden of demonstrating competence by a preponderance of the evidence where defendant had verbal IQ of approximately 62, where defense expert testified that defendant was incompetent, where government's expert focused too narrowly on competency in basic skills of daily life, and where the court itself expressed frequent doubts about defendant's competence and *appeared motivated to find competency out of a fear that the defendant would be a danger to the community if released.*

Respondent states that the Trial court's mental analysis was a "factual finding" (Page 6 line 28) unless "rebutted by clear and convincing evidence" (Respondent Ans. Page 6,7)

PETITIONER PRESENTS THAT EVIDENCE NOW, AND DID AT THE TIME OF TRIAL , SHOWS THAT HE WAS ENTITLED AT LEAST TO A COMPETENCY HEARING. PRAYS THAT THIS COURT IS PREPARED TO ALLOW A HEARING AT THIS TIME OR GRANT HIS WRIT.



**DEPARTMENT OF VETERANS AFFAIRS**
**Regional Office**
**1301 Clay Street**
**Oakland CA 94612-5209**

*3.27-04*

In Reply Refer To: *343 /2165*
*YC 5-647-636*

'The Honorable Russell Scott
Superior Court, Monterey County
240 Church Street
PO Box 1131
Salinas, CA 93902

Honorable Judge Scott:

Mrs. Gloria Williams has requested that I write to you regarding her son, Joe R. Johnson. With limited education and financial resources, Mrs. Williams has done her best to care for her two mentally retarded adult sons and her currently cancer ridden husband, Mr. Williams. I have known this family professionally for about ten years.

In my capacity as Field Examiner for the VA Regional Office in Oakland, I cover Santa Clara into Monterey County. My case load consists of incompetent beneficiaries with fiduciaries receiving their VA payments. Mr. Joe R. Johnson and his brother, Anthony, are recipients of VA payments because their deceased father, Mr. Leo Johnson, was a disabled veteran and his two sons were disabled before age 18.

It is not my intention to interfere with court proceedings. I am not an attorney nor was I present for Mr. Johnson's trial. However, in spite of the charges against him, you may wish to refer to the attached VA Rating dated August 11, 1987. Over the years, his mental disability may not have contributed to a wholesome lifestyle. I know he is not a saint (neither am I!) but I believe this man's mental deficiency may warrant Your Honor's consideration when it comes time for his sentencing.

Should you need additional information, please feel free to contact me.

Respectfully yours,


Michael C. Acton, FE
(510) 520-8224  cell
(510) 637-6335  office

attachment
cc: VARO PGF
    Mrs G Williams
    Sam Luton Attorney

**Veterans**
**Administration**

September 17, 1990

In Reply Refer To:
343/2713
XC 05 647 636
Johnson, Leo

Mr. Joe R. Johnson
1736 Lowell St
Seaside, CA 93955

Dear Mr. Johnson:

This is to certify that according to the evidence contained in the
records of the U.S. Department of Veterans Affairs, Joe R. Johnson
born on July 22, 1963 who became permanently incapable of self-
support prior to July 23, 1981 by reason of physical and mental
disability (Helpless Child) is the dependent child of Leo Johnson
whose Social Security Number is 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 who was honorably
discharged from the military service and was rated by the VA as being
100 percent disabled due to service-connected causes at the time
of his death on October 9, 1973.

Sincerely yours,

MARTIN F. BLESKEY
Veterans Services Officer

Joe Johnson v. Warden                          CV07 - 4417 JF (PR)

## Argument

## PETITIONER DID RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL.

In Ground Three, Petitioner asserts that trial counsel was ineffective in violation of his Sixth Amendment right to effective assistance of counsel for failing to push for a competence hearing and presentation of expert witnesses to that end. It obvious from the materials here in presented and thay presented at the preliminary that a hearing was necessary and that the petitioner was not fit to stand trial.

The Petitioner and his family did all they could to present evidence from the VA, other medical professionals to show that there was an issue of incompetence and the defense attorney did not pursue the proper investigation so that a hearing could be called. There was (reversible error when state court failed to ask defendant prior to plea whether he had taken his medication, and thus failed to hold competency hearing, because doctors' reports warned that defendant's competency depended on antipsychotic medication which he often refused to take and jail records showed defendant had not taken medication for two weeks prior to plea) and Sena v. New Mexico State Prison, 109 F.3d 652, 655 (10th Cir. 1997) (reversible error when trial court failed to hold competency hearing prior to plea because court had judged defendant incompetent one year earlier, made no determination that defendant's mental condition had since changed, and instead relied on a hospital report indicating defendant was only marginally competent). All of the aforementioned research was available to the defense attorney for use but was not used in petitioner defense and much more. Petitioner was on medication in the jail and this was not presented in trial. Petitioner is not an attorney and he feels that his defense attorney could have done more to protect his rights.

Petitioner wish to re-iterate the following on the current state of law on effective assistance of counsel. The right to effective assistance of trial counsel is guaranteed by the United States Constitution and by corresponding articles of the California constitution. (United States Const.

Amends. 6th and 14; People Ledevia 43 Cal. 3d. 171 (1987); Powell v. Alabama, 288 U.S. 45, 68 (1932).

Effective assistance is that which means and objective standard of reasonableness under prevailing professional norms. Strickland v. Washington 466 U.S. 668, 688 (1984). A criminal defendant has a right to not only counsel appeal but to competent counsel on appeal. The Supreme Court has set forth some specific duties which appointed counsel must fulfill to meet his or her obligations as a competent advocate. These include the duty to prepare a legal brief containing citations to the appellant record and appropriate authority, and setting forth all arguable issues (People V Harris [1993] 19.cal App. 4th 709) It is appropriate to raise an issue of ineffective assistance (in re Smith [1970] 3 cal 3d 192, 202, 203). The defendant need not show he was entitled to a reversal, but only that inexcusable failure of counsel to raise a crucial assignment of error occurred, which arguably might have resulted in reversal (5 Nitkin and Epstein Cal Criminal Law [2nd Ed. 1989]).

Trial Counsel's first duty is to thoroughly research and raise all arguable issues (People V Harris [1993] 19 cal App 4th 709) (Mason V Hanks 97 F 3d 887, 894 [7th Cir 1996]) (ineffective assistance of counsel when counsel failed to raise obvious issues without legitimate strategic purpose).

Thus, the claims should not be deemed waved by the failure of petitioner to raise them in prior appeal since the fault resulted from ignorance and inadvertence of trial counsel and not from a deliberate tactical decision. Where a constitutional claim is so novel that it's legal basis is not reasonably available to counsel a defendant has cause for his failure to raise the claim in accordance with state procedures (Estelle V Smith 451 US 454 101 s. ct, 1866, 681 ed. 2d 359 [198]). In appropriate cases the principles stated in the above and finality that inform the concepts of cause and prejudice must yield to eh imperative of correcting a fundamentally unjust incarceration (Murray V Carrier 477 US. 495 106 s. ct) (Engle V Issac 456 US at 136).

The United States Supreme Court stated in a recent decision, Paul Glover v. U.S., On

Cert to the USSC, decided 1/9/2001, that the an inmate need not show that the harm did to him

was "significant" in nature to cause the errors of the trial counsel to come under the Sixth

Amendment. Petitioner asserts that the errors of his trial counsel resulted in his enhanced

sentence and did him significant harm and he begs for reversal or remand.

<u>Standard for determining Incompetence of Counsel:</u>   To establish ineffective assistance

of counsel sufficient to justify issuance of a writ of habeas corpus, the courts have held that it

must be demonstrated that counsel's performance fell below an objective standard of

reasonableness under the prevailing professional norms and that the counsel's deficient

performance prejudiced the defendant's case. A ' reasonable probability' is not showing that a

'counsel's conduct more likely than not altered the outcome in the case' but ' simply 'a

probability sufficient enough to undermine confidence in the outcome'. <u>Strickland v.</u>

<u>Washington, Supra, 466 U.S. at 693-694; In re Cordero ( 1988) 46 Cal. 3d. 161, 180.)</u>

**Brown v. Sternes, 304 F.3d 677 (7th Cir. 2002)**
Trial counsel was ineffective for failing to investigate non-capital defendant's mental illness and
in permitting the court appointed experts to evaluate defendant with inadequate data. *Prejudice is
shown, in part, because the medical records counsel neglected to obtain showed defendant
suffered from chronic schizophrenia and raised a "bona fide doubt" regarding his competence.*

**Matheny v. Anderson, 253 F.3d 1025 (7th Cir. 2001)**
Indiana death row inmate was entitled to an evidentiary hearing on (1) whether he was competent
to stand trial, (2) whether trial counsel was ineffective for failing to pursue an initial request for a
competency hearing, and (3) *whether the state court was obligated to hold a competency hearing
sua sponte; since the failure to develop the facts in state court was not attributable to petitioner,
the court evaluated the request for an evidentiary hearing under pre-AEDPA standards.*

**Barnett v. Hargett, 174 F.3d 1128 (10th Cir. 1999)**
*Pro se federal habeas petitioner's claim that his appellate counsel was ineffective for not raising
on rehearing a claim that the record was insufficient to support a finding that a competency
hearing had occurred prior to sentencing,* was construed by the federal courts as a claim that the
state had violated petitioner's right to procedural due process by not conducting a competency
hearing in accordance with the proper, post-*Cooper v. Oklahoma,* legal standard. Federal courts
would not afford presumption of correctness to state-court determinations of competency where
the state court applied the wrong, pre-*Cooper,* legal standard. The court treated petitioner's
*Cooper* claim as analogous to a case where no competency hearing had occurred at all. Thus,
petitioner was entitled to relief because his history of psychiatric problems, including being

Joe Johnson v. Warden                    CV07 - 4417 JF (PR)

found incompetent to stand trial twice in this case, raised a bona fide doubt about his competency.

## Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997)

*The evidence of which Williamson's counsel was aware triggered a duty to investigate Williamson's competency to stand trial and to move for a competency hearing. Counsel knew that Williamson had a long history of mental problems (including diagnoses of severe bipolar disorder and paranoid and borderline personality disorders), that* Williamson was being medicated, and perhaps overmedicated, for mental disorders, that Williamson behaved bizarrely in jail and in the courtroom (such as by tipping over counsel table), that Williamson had been found incompetent in connection with an earlier criminal charge, and that he was awarded disability benefits on the basis of his mental condition. Had counsel conducted an investigation he would have uncovered a wealth of additional information casting doubt on Williamson's competence. For instance, he would have learned that the psychiatrist who opined that Williamson was competent was himself severely mentally disordered. *There is a reasonable probability that but for counsel's ineffectiveness, Williamson would have been found incompetent.*

Petitioner is not an attorney but it seems that the present state of law on ineffective

assistance of counsel indicate that if a prima facie case cane be made then the an evidentiary

hearing is required to decide the facts.

## Argument

## PETITIONER WAS DENIED DUE PROCESS BY A BAISED TRIAL JUDGE.
## PETITIONER WAS DENIED DUE PROCESS BY THE ADMISSION OF ARZODON'S
## TESTIMONY

Petitioner thanks the Respondent for the research that was done on this issue. However,

Petitioner thinks that respondent had to really search to find the two cases cited *Ortiz* and *Larkin*

that supported his contention that my judge, my trial judge was not biases or that I did not meet

my burden in showing same. I do agree that as stated in In Re Murchison, that I was entitled to a

"fair and impartial Judge". Further in Larkin, I also agree that I must show that their was a lack

of "honesty and integrity" on the part of my judges at trial. THIS IS INTEND TO SHOW the

only way I can by public admonishments directed toward the judges that judged my trial. I am

not an attorney but I and the many others that had to come before these judges in Monterey

county has and continue to suffer untold constitutional violations.

Arazdon the supposed victim in the alleged crime testify that Petitioner was involved but

later under oath and via notarized statement on August 10, 2004 clearly stated that he lied and

committed perjury on the stand in Judge Scott's courtroom. This explosive exculpatory

information and evidence was submitted to the Judge, who already knew of the perjury of the

"victim" and the Judge said that it did not matter. He mad this clear in trial and after the trial.

This type of action was and continued to be par for course for Judge Scott. He was biased and

did not care if anyone knew it. He felt that Monterey county was a fiefdom that he controlled

form the bench. Arazdon statement AND newspaper articles concerning the "HONESTY AND

INTERGRITY OF JUDGE SCOTT ARE BEHIND THIS PAGE FOR THE COURT AND

RESPONDENTS REVIEW. There are hundreds of articles and thousands of words of print

complaining about the biases of this judge. The CA Supreme Court, Bar Association and

Judicial Council have all received complaints about the bias attitude of this particular judge.

As an inmate and wrongly accused person I can only present the facts as I am limitedly

able to secure them. This court can do far more. It can give me an evidentiary hearing to allow

me to present ALL of the evidence. I do NOT claim anything that is not evident by the "media

investigations" and JUDICIAL INVESTIGATIONS on the "bad" judges in Monterey county. I

can only pray that some court provide me with proper legal counsel to explore and prove this

allegation.

In another claim in this Traverse it will be discussed the many other instances of

unconstitutional treatment received under the hand of Judge Scott and his cohorts in trial court.

The judge int hat instance clearly had evidence presented to him that Petitioner was mentally ill

and should not stand trial BUT he was determined to maintain his "hanging" judge reputation

and disregard the expert advice or to call a hearing as is mandated by precedent in that instance.

In re Murchinson as presented in Respondent's Answer, the court made issue with the

fact this in the Michigan court a judge had taken it upon himself to act as a "one man grand jury"

then turned around and acted as a trial judge on the same charges that he presented. Even thought

the judge could act in this way according to the Michgan Constitution, HOWEVER, THE United

States in overturning these actions stated the following:

"...*This interpretation of the Michigan Constitution is binding here. As to the
second challenge, Page 349 U. S. 136 the trial judge held that due process did not forbid
him to try the contempt charges. He also rejected other constitutional contentions made
by petitioners. The State Supreme Court sustained all the trial judge's holdings, and
affirmed. [Footnote 4] Importance of the federal constitutional questions raised caused
us to grant certiorari. [Footnote 5] The view we take makes it unnecessary for us to
consider or decide any of those questions except the due process challenge to trial by the
judge who had conducted the secret "one-man grand jury" proceedings...A fair trial in a
fair tribunal is a basic requirement of due process. Fairness, of course, requires an
absence of actual bias in the trial of cases. But our system of law has always
endeavored to prevent even the probability of unfairness. To this end, no man can be a
judge in his own case, and no man is permitted to try cases where he has an interest in
the outcome. That interest cannot be defined with precision. Circumstances and
relationships must be considered. This Court has said, however, that "Every procedure
which would offer a possible temptation to the average man as a judge . . . not to hold the*

Joe Johnson v. Warden

CV07 - 4417 JF (PR)

*balance nice, clear, and true between the State and the accused denies the latter due process of law." Tumey v. Ohio, 273 U. S. 510, 273 U. S. 532.* **Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But, to perform its high function in the best way, "justice must satisfy the appearance of justice." Offutt v. United States, 348 U. S. 11, 348 U. S. 14.**

It is clear from Murchison that the US Supreme Court takes a very dim view of a judge that seems to have his own interest at heart in trial proceeding and that there school be NO ...repeat NO appearance of bias in a trial from the Judge. In this case the "media investigations" some of which are presented here, should be explored by this court can only be done BY the court in as result of Petitioner's claims.

Respondent is mistaken that he felt bias as result of being ruled against that is and NEVER WAS the issue. Judge Scott was and is a "bad" judge in the bias area and many other areas. *Litely v US* as stated is NOT applicable due to the fact that it was NOT "judicial ruling" that lend themselves to a "valid basis for a bias or partiality motion". WHA RIGHT IS RIGHT AND WHAT IS WORNG IS WRONG, Judge Scott was wrong in most of his rulings and for his treatment of the defense in Petitioner's case in ALL parts of trial. The media investigations wer NOT started ONLY because of Petitioner's trial. They had nothing to do with petitioner, they showed a patter of biasness from the judges in Monterey County, especially Judge Scott.

**Petitioner prays that this court agrees with him and allows him an evidentiary hearing or grant his petition.**

Joe Johnson v. Warden                    CV07 - 4417 JF (PR)

# PETITIONER WAS DENIED DUE PROCESS BY A BAISED TRIAL JUDGE.
## PETITIONER WAS DENIED DUE PROCESS BY THE ADMISSION OF ARZODON'S TESTIMONY

Petitioner thanks the Respondent for the research that was done on this issue. However, Petitioner thinks that respondent had to really search to find the two cases cited *Ortiz* and *Larkin* that supported his contention that my judge, my trial judge was not biases or that I did not meet my burden in showing same. I do agree that as stated in In Re Murchison, that I was entitled to a "fair and impartial Judge". Further in Larkin, I also agree that I must show that their was a lack of "honesty and integrity" on the part of my judges at trial. THIS IS INTEND TO SHOW the only way I can by public admonishments directed toward the judges that judged my trial. I am not an attorney but I and the many others that had to come before these judges in Monterey county has and continue to suffer untold constitutional violations.

Arazdon the supposed victim in the alleged crime testify that Petitioner was involved but later under oath and via notarized statement on August 10, 2004 clearly stated that he lied and committed perjury on the stand in Judge Scott's courtroom. This explosive exculpatory information and evidence was submitted to the Judge, who already knew of the perjury of the "victim" and the Judge said that it did not matter. He mad this clear in trial and after the trial. This type of action was and continued to be par for course for Judge Scott. He was biased and did not care  if anyone knew it. He felt that Monterey county was a fiefdom that he controlled form the bench. Arazdon statement AND newspaper articles concerning the "HONESTY AND INTERGRITY OF JUDGE SCOTT ARE BEHIND THIS PAGE FOR THE COURT AND (**APPENDIX**) RESPONDENTS REVIEW. There are hundreds of articles and thousands of words of print complaining about the biases of this judge. The CA Supreme Court, Bar Association and Judicial Council have all received complaints about the bias attitude of this particular judge.

As an inmate and wrongly accused person I can only present the facts as I am limitedly able to secure them. This court can do far more. It can give me an evidentiary hearing to allow

10

Joe Johnson v. Warden                          CV07 - 4417 JF (PR)

me to present ALL of the evidence. I do NOT claim anything that is not evident by the "media investigations" and JUDICIAL INVESTIGATIONS on the "bad" judges in Monterey county. I can only pray that some court provide me with proper legal counsel to explore and prove this allegation.

In another claim in this Traverse it will be discussed the many other instances of unconstitutional treatment received under the hand of Judge Scott and his cohorts in trial court. The judge int hat instance clearly had evidence presented to him that Petitioner was mentally ill and should not stand trial BUT he was determined to maintain his "hanging" judge reputation and disregard the expert advice or to call a hearing as is mandated by precedent in that instance.

In re Murchinson as presented in Respondent's Answer, the court made issue with the fact this in the Michigan court a judge had taken it upon himself to act as a "one man grand jury" then turned around and acted as a trial judge on the same charges that he presented. Even thought the judge could act in this way according to the Michgan Constitution, HOWEVER, THE United States in overturning these actions stated the following:

"...*This interpretation of the Michigan Constitution is binding here. As to the second challenge, Page 349 U. S. 136 the trial judge held that due process did not forbid him to try the contempt charges.* He also rejected other constitutional contentions made by petitioners. *The State Supreme Court sustained all the trial judge's holdings, and affirmed.* [Footnote 4] **Importance of the federal constitutional questions raised caused us to grant certiorari.** [Footnote 5] *The view we take makes it unnecessary for us to consider or decide any of those questions except the due process challenge to trial by the judge who had conducted the secret "one-man grand jury" proceedings...A fair trial in a fair tribunal is a basic requirement of due process. Fairness, of course, requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness.* To this end, no man can be a judge in his own case, and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "Every procedure which would offer a possible temptation to the average man as a judge . . . not to hold the balance nice, clear, and true between the State and the accused denies the latter due process of law." Tumey v. Ohio, 273 U. S. 510, 273 U. S. 532. **Such a stringent rule may**

*sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But, to perform its high function in the best way, "justice must satisfy the appearance of justice." Offutt v. United States, 348 U. S. 11, 348 U. S. 14.*

It is clear from Murchison that the US Supreme Court takes a very dim view of a judge that seems to have his own interest at heart in trial proceeding and that there school be NO …repeat NO appearance of bias in a trial from the Judge. In this case the "media investigations" some of which are presented here, should be explored by this court can only be done BY the court in as result of Petitioner's claims.

Respondent is mistaken that he felt bias as result of being ruled against that is and NEVER WAS the issue. Judge Scott was and is a "bad" judge in the bias area and many other areas. *Litely v US* as stated is NOT applicable due to the fact that it was NOT "judicial ruling" that lend themselves to a "valid basis for a bias or partiality motion". WHA RIGHT IS RIGHT AND WHAT IS WORNG IS WRONG, Judge Scott was wrong in most of his rulings and for his treatment of the defense in Petitioner's case in ALL parts of trial. The media investigations wer NOT started ONLY because of Petitioner's trial. They had nothing to do with petitioner, they showed a patter of biasness from the judges in Monterey County, especially Judge Scott.

**Petitioner prays that this court agrees with him and allows him an evidentiary hearing or grant his petition.**

My Name is Emmanuel Anzaldo and I am writing this statement of my own volition, in my own handwriting and with a clean sober mind. I have not been coerced, intimidated, forced or influenced in anyway to write the following statement retracting the testimony I made against Joe Randall Johnson in the presence of the honorable Judge Scott, and Assistant District Attorney and a jury of twelve the statement I made to the police and especially the District Attorney concerning the event of Feb. 3, 2003 were while feeling very threatened by law enforcement as well as the District Attorney of Monterey County office. I did knowingly commit an act of purgery while testifying before the jury in Judge Scott Courtroom during the case of the State of Calif. V.S Joe Randall Johnson a.k.a Joseph Randall Randall a.k.a JoJo (Action Number SS030945 SS030945A). I did so out of extreme duress and while under the influence of Narcotics that at the time I testified before the jury in Judge Scott Courtroom (Depart. 5) I was [struck out]

See attached                    x [signature]

HALLUCINATING AS WELL & HEARING VOICES THAT WHERE NOT THERE THE TESTIMONY I GAVE WAS COMPLETELY untruthful AS I HAVE NO IDEA of WHAT I WAS SAYING. I WAS COACHED AS TO WHAT TO SAY BY THE PROSECUTION IN REGARD TO MY TESTIMONY BECAUSE OF MY IMPAIRED MENTAL CONDITION AS WELL AS MY ADDICTIONS TO NARCOTICS I WAS EASILY COERCED, AND MANIPULATED BY THE PROSECUTION TO GIVE FALSE TESTIMONY REGARDING MY NARCOTICS DEALINGS WITH JOE. R. JOHNSON.

ADDITIONALLY, BECAUSE OF MY PAST AND THE FACT THAT I WAS AT THE TIME ON PROBATION IT WAS MADE CLEAR TO ME BY LAW ENFORCEMENT AS WELL AS THE ASSIST. DISTRICT ATTORNEY PROSECUTING JOE R. JOHNSON THAT ANY "LACK" OF COOPERATION WOULD BE DETRAMENTAL TO MY FREEDOM. JOE R. JOHNSON IS MY FRIEND THAT I WOULD NEVER HURT HIM NOR WOULD HE OR HAS HE EVER HURT ME. PHYSICALLY,

x _____

WE did HAVE A Mutual ConBAT But Only
the Brother and friend usually Do, But
THARE WAS NO Robberg Nothing was Taken
from ME. I'M EXTREMELY UPSET THAT
My Good friend WAS Convicted of
Crimes THAT he did NOT COMMENT
Commit so much So THAT I CANNOT SLEEP
At Night And I PRAY FOR Ha's Release
Now THAT I'M Drug free I would Like
The Oppurtunite To TESTIFy As To The
facts For The DEFENSE.

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of ___Monterey___ } ss.

On ___8-10-04___ before me, ___Heidi Castillo___
Date                          Name and Title of Officer (e.g., "Jane Doe, Notary Public")

personally appeared ___Emmanuel Arzadon___
                          Name(s) of Signer(s)

[X] personally known to me
[ ] proved to me on the basis of satisfactory
evidence

**HEIDI CASTILLO**
Commission # 1275524
Notary Public - California
San Benito County
My Comm. Expires Aug 31, 2004

to be the person(s) whose name(s) is/are
subscribed to the within instrument and
acknowledged to me that he/she/they executed
the same in his/her/their authorized
capacity(ies), and that by his/her/their
signature(s) on the instrument the person(s), or
the entity upon behalf of which the person(s)
acted, executed the instrument.

WITNESS my hand and official seal.

_____
Signature of Notary Public

──────────────── **OPTIONAL** ────────────────
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _____

Document Date: _____    Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer

Signer's Name: _____

[ ] Individual
[ ] Corporate Officer — Title(s): _____
[ ] Partner — [ ] Limited [ ] General
[ ] Attorney-in-Fact
[ ] Trustee
[ ] Guardian or Conservator
[ ] Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

© 1999 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.nationalnotary.org    Prod. No. 5907    Reorder: Call Toll-Free 1-800-876-6827

On 2/3/03, at 0443 hours, myself along with Sgt. Olson and Officer. Nowak were dispatched to _____ reference a robbery which had occurred approximately 30 minutes prior. I arrived on scene and contacted ARZADON, the victim. ARZADON told me that at approximately 0400 hours, he was in his house with JUAN MATTHEWS and a female known to him as YVONNE. He told me that he heard a knock at the door. YVONNE opened the door and an unknown black male was standing in the doorway. ARZADON described the male in the doorway as a black male in his 30's, approximately 5'7" tall with a thin build, wearing a blue and white sweatshirt. ARZADON said as he approached the doorway, two more males forced their way into his house. ARZADON said he recognized one of the males as an acquaintance known to him as "JO JO." ARZADON said JO JO is a black male between 35 and 38 years old approximately 6'2" tall with a thin build. ARZADON said JO JO was wearing a gray hooded sweatshirt. ARZADON described the third suspect as a black male in 30's, approximately 5'7" tall, wearing a green sweater. ARZADON said that JO JO came into his house and picked up a chair from the dining room, which is adjacent to the front door. He said JO JO then hit him with the chair on his arm and shoulder. ARZADON said then he ran into the kitchen and the two other subjects grabbed a hold of him. He said they held him as JO JO began to hit him with his hands. He said JO JO then picked up a vacuum cleaner, which was in the kitchen and hit him with the vacuum on the right shoulder. ARZADON said after he had been hit with the vacuum, he fell to the floor and was in a daze. He said that JO JO then began going through his pockets. He said that JO JO took approximately $100.00 from his two rear pants pockets. ARZADON said that he believed that all of the bills were $20.00 bills. He then took the telephone from the kitchen. ARZADON described the phone as a purple Sony telephone valued at approximately $50.00. ARZADON said he began to yell at the top of his lungs so that his neighbors would hear. As ARZADON began to yell, he said he believed he frightened the suspects and he ran out of the house. ARZADON did not see in which direction they ran. ARZADON waited approximately 40 minutes before walking to his friend's house up the street to call the police.

ARZADON told me that he knows JO JO as JO JO is a drug dealer and ARZADON is a drug addict. ARZADON told me that he believes that JO JO had come to rob him because he owed JO JO money. ARZADON told me that JO JO drives an older model gray Dodge Conversion van. ARZADON said the Monterey Police had talked JO JO on the morning of 2/2/03, in front of [_____] ARZADON was unable to provide any further information about JO JO.

Officer Nowak contacted MATTHEWS. MATTHEWS said that earlier that morning, ARZADON had obtained drugs from a male known to him as JO JO. He said ARZADON had not paid JO JO for the drugs. He said ARZADON had used the drugs and had been arrested for being under the influence of a controlled substance. He said after ARZADON was released from jail at approximately 1930 hours, that JO JO came to [_____] to collect his money for the drugs. ARZADON told JO JO that he did not have the money yet and that he would pay him later. JO JO and ARZADON began to argue about when the money was due. JO JO told ARZADON that he would be back later to collect the money. At approximately 0300 hours, JO JO returned to [_____] to collect the money from ARZADON. MATTHEWS said that he and ARZADON were seated in the house when JO JO knocked on the front door. ARZADON yelled through the closed door that he did not have the money and was not going to pay him. JO JO then found that the door was unlocked and entered the residence with two or three other suspects. MATTHEWS said all four of the suspects began to hit ARZADON. ARZADON began to run towards the kitchen. Two of the suspects grabbed a hold of ARZADON and JO JO began to strike him. MATTHEWS attempted to stop the fight and two suspects turned and began to hit him. He said that the two suspects then removed his black leather jacket which he valued at $700.00. The suspects then fled the residence. MATTHEWS did not see which direction they have gone.

MATTHEWS said that he had told ARZADON not to call the police. He said that they waited approximately an hour and a half prior to calling the police. MATTHEWS said that he knows the identity of JO JO, however he would not cooperate with police in identifying him. He said however if he was subpoenaed into court, he would identify him in court.

Sgt. Olson contacted DURNY. DURNY is a friend of ARZADON. DURNY said that she is an acquaintance with a male known to her as JO JO. She said that she does not have any way to contact him. She said that she had

# Police Report

male'known to her as JO JO. She said that she does not have any way to contact him. She said that she had seen JO JO at ARZADON's residence earlier that morning when the Police were talking to him. DURNY did not see any of this incident.

ARZADON told me that he could identify JO JO. He told me that he was not sure if he could identify the other suspects. He said that he wanted JO JO to be arrested. I photographed ARZADON's shoulder. I also photographed ARZADON's residence. I attempted to photograph MATTHEWS' injuries, however he was uncooperative.

EVIDENCE:

5 polaroid photographs depicting ARZADON's right shoulder, a broken window in the dining room, ARZADON's kitchen, the chair with which ARZADON was struck and a broken window in the kitchen.

DISPOSITION:

Recommend this case be forwarded to Investigations for follow-up.

End of report.

DIAZ/159/gma/kw   02/03/03

CC: ENTIRE CASE TO:
DISTRICT ATTORNEY
COURT

SUMMARY:
This supplemental report outlines my follow-up to the initial investigation.

INVESTIGATION:
On 2/03/03, on my arrival at work, I saw that EMMANUEL ARZADON had reported being the victim of a robbery at his home, ▮▮▮▮▮▮▮ in Monterey. On 2/02/03, ARZADON had been arrested by Officer Roberts at this address for 11550 H&S, being under the influence of crack cocaine. I had responded to MPD Jail at this time and completed a drug influence evaluation on ARZADON (reference CR #03-0624). There had also been several people in ARZADON's house on 2/02/03, and most of them, if not all, had prior drug-related arrests.

I saw from Officer Diaz' initial robbery report that the primary suspect was a BM, with a nickname "JO JO." I know from previous contacts that JO JO is JOSEPH RANDOLPH JOHNSON. JOHNSON was also identified outside ARZADON'S home on 2/02/003 in his maroon Dodge Ram van, with CALIC #1GDT232. JOHNSON is on conditional probation with a search and seizure waiver (MS179605).

On 2/03/03, at 1415 hours, Det. PASQUAROSA, of Seaside Police Department, and I contacted ARZADON at his home. ARZADON was in a great deal of pain from an injury to his right shoulder/upper arm area, and could barely move it. I could also see that ARZADON had some swelling and light abrasions to his left temple, where he said he had been punched during the robbery.

I asked ARZADON to tell me what took place. ARZADON, who admitted to a crack cocaine problem, told me that on 2/02/03, around 1900 hours, he had arrived at his house and was told by neighbor, PAM DURAY, that two BMs and an unknown female had been around his home earlier that evening. DURAY made sure that no one was inside the home and turned off the lights.

ARZADON was then at his home when the BM he knows as JO JO (later positively identified as JOHNSON) as well as another BM named JAMES ALLEN, and an unknown Puerto Rican female named YVONNE, came over to his home. JOHNSON was demanding $160 in cash from ARZADON for crack cocaine that JOHNSON had previously supplied when all the subjects were at ARZADON'S house earlier in the morning on the same date (when police later arrived and arrested ARZADON).

ARZADON got in a verbal argument with JOHNSON at this time, as he felt that other people owed JOHNSON money and not him. ARZADON had to call 911 to get the three subjects to leave (Dispatch showed that this 911 call came in at 1926 hours).

At approximately 2200 hours, ARZADON'S friend, JUAN MATTHEWS, came over to the home. Sometime later YVONNE called and asked ARZADON if she could come over because she was not with either JOHNSON or ALLEN. ARZADON described YVONNE as a Puerto Rican female with long black hair who was a prostitute. YVONNE arrived around 0030 hours on 2/03/03. YVONNE and ARZADON smoked some crack cocaine that YVONNE had brought with her. ARZADON said that MATTHEWS does not smoke crack cocaine but does use alcohol.

Later that night, someone began knocking on ARZADON'S front door. ARZADON told the people that they could not come in. MATTHEWS then opened the door to tell the subjects himself to leave, and they forced their way in. ARZADON saw that it was ALLEN, and a second unknown BM, who was wearing a black sweatshirt with a white horizontal stripe. These two males confronted ARZADON in the dining room and were asking him for the money that he owed JOHNSON. YVONNE grabbed ARZADON'S portable phone at this point and held it so that he could

Joe Johnson v. Warden                    CV07 - 4417 JF (PR)

## CONCLUSION

In light of the arguments presented in my petition and the aforementioned

embellishments, I pray that this court grant my Petitioner for Writ of Habeas Corpus petition or

in the alternative, grant me an evidentiary hearing to prove my claims and assign me an attorney.

DATED:        _6 / 7_____2008

Respectfully Submitted,

Joe Johnson V - 46926
Attorney Per Se
CSP - CTF
P.O. Box 705
Soledad, CA 93960

ATTACHMENT A

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  ARTHUR P. BEEVER
   Deputy Attorney General
6  State Bar No. 242040
    455 Golden Gate Avenue, Suite 11000
7   San Francisco, CA  94102-7004
    Telephone: (415) 703-5865
8   Fax: (415) 703-1234
    Email: Arthur.Beever@doj.ca.gov
9
   Attorneys for Respondent
10
                    IN THE UNITED STATES DISTRICT COURT
11
                 FOR THE NORTHERN DISTRICT OF CALIFORNIA
12
                            SAN JOSE DIVISION
13

14 | JOE RANDEL JOHNSON,                    | C 07-4417 JF (PR)

15 |                          Petitioner,

16 |              v.

17 | ANTHONY KANE, Warden,

18 |                          Respondent.

19

20

21    **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ANSWER**

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

2

Page

3  STATEMENT OF THE CASE                                                                          1

4  STATEMENT OF FACTS                                                                             2

5  STANDARD OF REVIEW                                                                             4

6  ARGUMENT                                                                                       4

7      I.    PETITIONER WAS NOT DENIED DUE PROCESS BY THE
             TRIAL COURT FINDING HIM COMPETENT TO STAND
8            TRIAL                                                                                4

9      II.   PETITIONER WAS NOT DENIED DUE PROCESS BY THE
             ADMISSION OF ARZADON'S TESTIMONY                                                     8
10
       III.  PETITIONER DID NOT RECEIVE INEFFECTIVE
11           ASSISTANCE OF COUNSEL                                                                8

12     IV.   PETITIONER WAS NOT DENIED DUE PROCESS BY A
             BIASED TRIAL JUDGE                                                                   9
13
       V.    PETITIONER WAS NOT DENIED DUE PROCESS BY THE
14           TRIAL COURT'S REFUSAL TO SEVER HIS TWO CASES                                         10

15     VI.   PETITIONER WAS NOT DENIED DUE PROCESS WHEN THE
             TRIAL COURT DID NOT SENTENCE HIM UNDER
16           CALIFORNIA'S PROPOSITION 36                                                          12

17     VII.  PETITIONER WAS NOT DENIED DUE PROCESS WHEN THE
             TRIAL COURT SENTENCED HIM FOR COMMITTING
18           ATTEMPTED ROBBERY IN CONCERT                                                         12

19  CONCLUSION                                                                                    15

20

21

22

23

24

25

26

27

28

1                              **TABLE OF AUTHORITIES**

2                                                                              **Page**

3    **Cases**

4    *Allen v. Woodford*
     395 F.3d 979 (9th Cir. 2005)                                                8
5
     *Boyde v. Brown*
6    404 F.3d 1159 (9th Cir. 2005)                                               6

7    *Brecht v. Abrahamson*
     507 U.S. 619 (1993)                                                        11
8
     *Christian v. Rhode*
9    41 F.3d 461 (9th Cir. 1994)                                                12

10   *Davis v. Woodford*
     384 F.3d 628 (9th Cir. 2003)                                                7
11
     *Davis v. Woodford*
12   384 F.3d 628 (9th Cir. 2004)                                               11

13   *Dennis v. Budge*
     378 F.3d 880 (9th Cir. 2004)                                                7
14
     *Dusky v. United States*
15   362 U.S. 402 (1960)                                                         6

16   *Early v. Packer*
     537 U.S. 3 (2002)                                                          14
17
     *Fry v. Pliler*
18   127 S.Ct. 2321 (2007)                                                      11

19   *Godinez v. Moran*
     509 U.S. 389 (1993)                                                         6
20
     *Hernandez v. Small*
21   282 F.3d 1132 (9th Cir. 2002)                                               2

22   *Hernandez v. Ylst*
     930 F.2d 714 (9th Cir. 1991)                                             6, 7
23
     *In re Murchison*
24   349 U.S. 133 (1955)                                                        10

25   *Jackson v. Virginia*
     443 U.S. 307 (1979)                                                    13, 14
26
     *Juan H. v. Allen*
27   408 F.3d 1262 (9th Cir. 2005)                                              13

28

# TABLE OF AUTHORITIES (continued)

|  | Page |
|---|---|
| *Liteky v. United States*<br>510 U.S. 540 (1994) | 10 |
| *Lockyer v. Andrade*<br>538 U.S. 63 (2003) | 4 |
| *Maggio v. Fulford*<br>462 U.S. 111 (1983) | 7 |
| *Medina v. California*<br>505 U.S. 437 (1992) | 7 |
| *Napue v. Illinois*<br>360 U.S. 264 (1959) | 8 |
| *Ortiz v. Stewart*<br>149 F.3d 923 (9th Cir. 1998) | 10 |
| *Park v. California*<br>202 F.3d 1146 (9th Cir. 2000) | 11 |
| *Pate v. Robinson*<br>383 U.S. 376 (1966) | 6 |
| *People v. Floyd*<br>31 Cal.4th 179 (2003) | 12 |
| *People v. Johnson*<br>26 Cal.3d 557 (1980) | 14 |
| *People v. Marsden*<br>2 Cal.3d 118 (1970) | 4-7 |
| *People v. Stankewitz*<br>32 Cal.3d 80 (1982) | 6 |
| *Schriro v. Landrigan*<br>127 S.Ct. 1933 (2007) | 4 |
| *Strickland v. Washington*<br>466 U.S. 668 (1984) | 9 |
| *Torres v. Prunty*<br>223 F.3d 1103 (9th Cir. 2000) | 7 |
| *United States v. Agurs*<br>427 U.S. 97 (1976) | 8 |
| *United States v. Hernandez*<br>203 F.3d 614 (9th Cir. 2000) | 6 |

**TABLE OF AUTHORITIES** (continued)

Page

*United States v. Lane*
474 U.S. 438 (1986) ........................................... 11

*United States v. Leggett*
162 F.3d 237 (3d Cir. 1998) ................................. 7

*United States v. Myers*
993 F.2d 713 (9th Cir. 1993) ................................ 7

*United States v. Timbana*
222 F.3d 688 (9th Cir. 2000) ................................ 7

*United States v. Unruh*
855 F.2d 1363 (9th Cir. 1987) .............................. 11

*Withrow v. Larkin*
421 U.S. 35 (1975) ............................................ 10

*Woodford v. Visciotti*
537 U.S. 19 (2002) ........................................... 4, 9

**Constitutional Provisions**

United States Constitution
    Fifth Amendment ........................................ 11

**Statutes**

United States Code, Title 28
    § 2254 (d)(1) ............................................. 4
    § 2254 (d)(2) ............................................. 7
    § 2254 (e)(1) ............................................. 2, 7

California Health and Safety Code
    § 11351.5 ................................................. 1
    § 11352 .................................................... 1
    § 11370 .................................................... 2
    § 11370.2 ................................................. 2

California Penal Code
    § 211 ...................................................... 1, 2
    § 213(a)(1)(A) .......................................... 1, 2
    § 240 ...................................................... 2
    § 245(a)(1) .............................................. 1
    § 459 ...................................................... 1
    § 591 ...................................................... 1
    § 664 ...................................................... 2
    § 667.5(b) ............................................... 2

TABLE OF AUTHORITIES (continued)

Page

§ 1170.12                                                    2
§ 1210.1, subd. (a)                                        12
§ 1210.1(b)(1) and (2)                                     12
§ 1367                                                      6
§ 1368                                                      6

**Other Authorities**

Antiterrorism and Effective Death Penalty Act of 1996    4, 13

Proposition 36                                            12

EDMUND G. BROWN JR.
Attorney General of the State of California
DANE R. GILLETTE
Chief Assistant Attorney General
GERALD A. ENGLER
Senior Assistant Attorney General
PEGGY S. RUFFRA
Supervising Deputy Attorney General
ARTHUR P. BEEVER
Deputy Attorney General
State Bar No. 242040
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 703-5865
  Fax: (415) 703-1234
  Email: Arthur.Beever@doj.ca.gov

Attorneys for Respondent

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| **JOE RANDEL JOHNSON,**<br><br>                                        Petitioner,<br><br>              v.<br><br>**ANTHONY KANE, Warden,**<br><br>                                        Respondent. | C 07-4417 JF (PR)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT ANSWER** |

## STATEMENT OF THE CASE

On September 11, 2003, the Monterey County District Attorney charged petitioner in Counts I and II with home invasion robbery (Cal. Penal Code §§ 211, 213(a)(1)(A)), in count III with burglary (Cal. Penal Code § 459), in count IV with aggravated assault (Cal. Penal Code § 245(a)(1)), in count V with sale or transportation of a controlled substance (Cal. Health & Safety Code § 11352), in count VI with possession of cocaine base for sale (Cal. Health & Safety Code § 11351.5), in count VII with assault by force likely to produce great bodily injury (Cal. Penal Code § 245(a)(1)), and in count VIII with damage of a telephone or power line (Cal. Penal Code § 591). Exh. 1, Clerk's Transcript ("CT") 99-108. The District Attorney also alleged that petitioner had

1  suffered two prior convictions for sale or transportation of a controlled substance (Cal. Health &

2  Safety Code §§ 11370, 11370.2), served three prior prison terms (Cal. Penal Code § 667.5(b)), and

3  suffered two prior "strike" convictions (Cal. Penal Code § 1170.12). CT 104-108.

4       A jury convicted petitioner in counts I and II of the lesser included offense of attempted

5  first degree robbery in concert (Cal. Penal Code § 211, 213(a)(1)(A), 664), in count III of burglary,

6  in count IV of aggravated assault, in count V of transportation of a controlled substance, and in

7  count VII of the lesser included offense of misdemeanor assault (Cal. Penal Code § 240). CT 227-

8  243. The charge of damaging a telephone or power line (count VIII) was dismissed on motion of

9  the prosecutor. CT 179. The trial court found the prior conviction allegations true. CT 246-250.

10      On June 22, 2004, the trial court sentenced petitioner to an aggregate sentence of 58 years

11 to life in prison. CT 330, 332.

12      On January 18, 2006, the California Court of Appeal affirmed the judgment of conviction,

13 but remanded the case for resentencing. Exh. 6. On April 12, 2006, the California Supreme Court

14 denied review. Exh. 8. Petitioner did not seek certiorari review in the United States Supreme Court.

15      On December 26, 2006, petitioner filed a petition for writ of habeas corpus in the

16 California Supreme Court. Exh. 9. The California Supreme Court denied the petition on June 13,

17 2007. Exh. 10.

18      On August 27, 2007, petitioner filed the current petition in this Court.

19                    **STATEMENT OF FACTS**

20      The California Court of Appeal summarized the facts of the crimes as follows. This

21 summary is presumed correct. *Hernandez v. Small*, 282 F.3d 1132, 1135 n. 1 (9th Cir. 2002); 28

22 U.S.C. § 2254(e)(1).

23      Defendant and Eugene Bell frequently "got high together." Bell also borrowed
   money from defendant. In late March 2002, Bell had been awake for a week using crack
24 cocaine, and he was not getting along with defendant. After a couple of days of verbal
   conflict between the two men about a debt that defendant alleged Bell owed him,
25 defendant came to Bell's Seaside residence after midnight on March 28 and asked Bell
   to repay him. Bell declined to do so. Bell initiated a mutual physical fight during which
26 Bell initially wielded a hammer and possibly a knife. During this fight, defendant threw
   Bell into a hot water heater.

27
        Kenneth Collins and Adrian Wilcoxen were present during the fight between
'8 defendant and Bell. Collins broke up the fight, and Bell "started yelling he was going to

1
2
3

call the police." Collins saw defendant grab Bell's telephone off the wall and take it with him when he left Bell's home. Bell suffered a black eye and cuts to his face and head, and he bled "real bad." Bell's telephone, a headset and the telephone cord were found in a paper bag outside a market near Bell's residence.

4
5
6

Defendant was interviewed by the police a day or so after the Seaside incident. He admitted that he had gone to Bell's residence seeking repayment of money Bell owed him. Defendant claimed that Bell had attacked him with a hammer and a knife and attempted to murder him, and he "got no choice but to turn around and defend myself." Defendant admitted he "won" the fight and "beat up" Bell. Defendant insisted he had not taken anything from Bell or from Bell's residence.

7
8
9
10
11
12
13

Emanuel Arzadon and defendant had been friends for about four months in February 2003 and frequently used drugs together. Arzadon knew defendant as "Joe-Joe." On February 2, 2003, Arzadon was mad at defendant because defendant had brought too many people to Arzadon's Monterey home to use drugs. Arzadon asked defendant to leave his home and take these people with him, but defendant just left the house and stayed in his van across the street. Defendant was waiting for a man named Paul, who was at Arzadon's home, to pay defendant $200 Paul owed defendant. A man named Angelo drove by and gave Arzadon $200 to give to Paul so Paul could repay defendant. Shortly thereafter, Arzadon and Paul were both arrested for being under the influence. Arzadon retained the $200 and did not give it to Paul. Arzadon was released that evening and returned to his home. He used some of the $200 to buy crack cocaine. Defendant came by in the early evening seeking the $200. Arzadon called 911 and demanded that defendant leave. Defendant left.

14
15
16
17
18
19
20

Well after midnight that night, Arzadon was in the bedroom of his home, and his daughter's friend Juan Matthews was watching television in Arzadon's living room. Yvonne Nelson came to visit Arzadon and went into his bedroom where the two used drugs. A black man, who neither Arzadon nor Matthews knew or could identify (hereafter X), came to the front door several times looking for Nelson, but he was sent away by Arzadon and Matthews. James Allen, who was friendly with both Arzadon and defendant, came by, and, while he and Arzadon were talking in the dining room, X came into the house. Then defendant rushed into the house through the front door and struck Arzadon in the shoulder with a chair. Arzadon ran into the kitchen and was knocked to the floor and punched in the face. One of the men said "[w]here's my money." Defendant and X held Arzadon down, and Arzadon "felt a hand going through my pocket." Arzadon still had some of the $200 he had received from Angelo in his pocket.

21
22
23
24
25

Matthews heard loud voices in the kitchen, and he went into the kitchen and saw Arzadon on his back on the floor. One man was holding Arzadon down, and the other two were watching. Matthews did not recognize any of the men and was unable to identify defendant or Allen as one of them. Matthews asked "what are you guys doing." The two men who were watching "rushed" Matthews, and Matthews threw down his leather jacket so that he could defend himself. The two men pushed Matthews to the ground in the living room and held him there. After less than a minute, the third man said "let's go," and the three men left the house. As they were leaving, one of the men who had held Matthews down grabbed Matthews's leather jacket and took it with him.

26
27
28

Arzadon suffered a black eye and a fractured shoulder, and the money he had in his pocket was gone. Arzadon and Matthews looked for Arzadon's telephone, which had been in the bedroom before the attack, so they could call the police, but they could not find the telephone. Arzadon went to a friend's house to call 911. Arzadon reported that a half-hour earlier "three, four black guys jumped me" and "took my phone so I couldn't call out." He identified one of the men who had assaulted him as "JoJo." Arzadon later

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  GERALD A. ENGLER
   Senior Assistant Attorney General
4  PEGGY S. RUFFRA
   Supervising Deputy Attorney General
5  ARTHUR P. BEEVER
   Deputy Attorney General
6  State Bar No. 242040
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-3664
     Telephone: (415) 703-5865
8    Fax: (415) 703-1234
     Email: arthur.beever@doj.ca.gov
9  Attorneys for Respondent

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                    SAN JOSE DIVISION

13

14  **JOE RANDEL JOHNSON,**                C 07-4417 JF (PR)

15                          Petitioner,    **ANSWER TO ORDER TO SHOW
                                           CAUSE**
16           v.

17  **ANTHONY KANE, Warden,**

18                          Respondent.

19        Respondent hereby provides this answer to the Order to Show Cause why the petition for

20  writ of habeas corpus should not be granted.

21                              **I.**

22                          **CUSTODY**

23        Petitioner is lawfully in the custody of the California Department of Corrections, as a

24  result of a conviction by a Monterey County jury of attempted robbery in concert, burglary,

25  aggravated assault, transportation of a controlled substance, and misdemeanor assault. The trial

26  court sentenced petitioner to 58 years to life in prison.

27  ///

28

Answer to Order to Show Cause  C 07-4417 JF (PR)

## II.

## PROCEDURAL ISSUES

The claims in the petition are exhausted. The petition is timely within the meaning of 28 U.S.C. § 2244(d).

## III.

## GENERAL AND SPECIFIC DENIALS

Respondent denies that the state court's ruling was based on an unreasonable determination of fact or was contrary to or involved an unreasonable application of clearly established United States Supreme Court law. Respondent specifically denies that petitioner (1) was denied due process by the trial court finding him competent to stand trial without conducting a hearing; (2) was denied due process by the admission of "tainted" testimony; (3) received ineffective assistance of counsel; (4) was denied due process because the trial judge was biased against him; (5) was denied due process by the trial court refusing to sever the charges; (6) was denied due process by the trial court not sentencing petitioner under California's Proposition 36; and (7) was denied due process because of insufficient evidence supporting his convictions for attempted first degree robbery.

## IV.

## LODGED DOCUMENTS

Respondent has lodged concurrently with this answer the following exhibits: (1) Clerk's Transcript (4 volumes); (2) Reporter's Transcript (7 volumes); (3) Appellant's Opening Brief; (4) Respondent's Brief; (5) Appellant's Reply Brief; (6) Opinion by California Court of Appeal; (7) Petition for Review; (8) Order denying review by California Supreme Court; (9) Petition for Writ of Habeas Corpus filed in California Supreme Court; (10) Order denying petition by California Supreme Court; and (11) Reporter's Transcript of Hearings Conducted Pursuant To *People v. Marsden*, 2 Cal.3d 118 (1970).

## V.

## INCORPORATION BY REFERENCE

Respondent hereby incorporates by reference the accompanying memorandum of points

1 | and authorities in support of this answer.

2 |                                    **VI.**

3 |                              **CONCLUSION**

4 |     Respondent respectfully requests that the petition for writ of habeas corpus be denied.

5 |     Dated: April 29, 2008

6 |                              Respectfully submitted,

7 |                              EDMUND G. BROWN JR.
                                 Attorney General of the State of California
8 |
                                 DANE R. GILLETTE
9 |                              Chief Assistant Attorney General

10 |                             GERALD A. ENGLER
                                 Senior Assistant Attorney General
11 |                             PEGGY S. RUFFRA
                                 Supervising Deputy Attorney General
12 |

13 |                             /s/ Arthur P. Beever
                                 ARTHUR P. BEEVER
14 |                             Deputy Attorney General

15 |                             Attorneys for Respondent

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

1    told the police that defendant had wanted $160 from him. He also stated that Nelson had
2    been holding his phone and calling him names when defendant attacked him and that
     Nelson took the phone with her when she left Arzadon's home.

3        Defendant was arrested on the evening of February 3, 2003, and a small rock of
     cocaine was found in his hat. When he spoke with the police the next day, defendant said
4    that Arzadon had kept money that "Paul" owed defendant that Angelo had delivered to
     Arzadon to give to Paul to give to defendant. Defendant said that Allen had gone into
5    Arzadon's residence seeking the money. Then Arzadon came out into the front yard,
     refused to give defendant any money and provoked a fight. Arzadon "lost" this fight.
6    Meanwhile, Allen was fighting with another man in Arzadon's residence, and Nelson was
     "watchin'". Defendant denied that he had obtained any money from Arzadon or taken
7    anything from Arzadon's residence.

8    Exh. 6 at 2-5.

9                        **STANDARD OF REVIEW**

10       This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

11   ("AEDPA"), which imposes a "highly deferential" standard for evaluating state court rulings and

12   "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537

13   U.S. 19, 24 (2002) (per curiam). Under AEDPA, the federal court has no authority to grant habeas

14   relief unless the state court's ruling was "contrary to, or involved an unreasonable application of,"

15   clearly established Supreme Court precedent. 28 U.S.C. § 2254(d)(1). "The question under AEDPA

16   is not whether a federal court believes the state court's determination was incorrect but whether that

17   determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 127 S.Ct.

18   1933, 1939 (2007); *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (state court opinion must be

19   "objectively unreasonable" to warrant habeas relief). The petitioner bears the burden of showing

20   that the state court's decision was unreasonable. *Visciotti*, 537 U.S. at 25.

21                              **ARGUMENT**

22                                  **I.**

23   **PETITIONER WAS NOT DENIED DUE PROCESS BY THE TRIAL**
     **COURT FINDING HIM COMPETENT TO STAND TRIAL**
24

25       Petitioner contends he was denied a fair trial and due process as a result of the trial court

26   finding him competent to stand trial. Petition at 7.

27       During petitioner's motion to replace counsel under *People v. Marsden*, 2 Cal.3d 118

28   (1970), which occurred after the verdict, petitioner asserted, "I don't understand nothing going

1  around me, Your Honor. How many times I got to tell you this? I don't understand nothing." Exh.

2  11 at 1050-1051. The court then asked what the basis for petitioner's *Marsden* motion was, and

3  petitioner responded:

4          What my request is that my counsel, my public defender knew from hearing the tape
        that I was innocent of all these charges. He heard the tape when Arzadon was talking, but
5       he couldn't use that tape because he didn't know he was being taped when talking. Still
        proves my innocence of everything, but we couldn't use that tape. At this time, I don't
6       know if I could have got the dude to come in here and testify to that.

7  Exh. 11 at 1052-1053.

8          But now he is willing to come forward and testify to it that Arzadon called him and
        told him that I didn't do none of that but I'm being charged with this stuff. I'm innocent.
9       I'm being charged with something I didn't do. I never stole nothing in my life, and I ain't
        never robbed nobody in my life.
10
    Exh. 11 at 1053.
11
            I feel like I wasn't represented good. I feel like I wasn't represented. That's how
12      I'm feeling. There ain't no way in the world I should be facing all this time for something
        I didn't do. I feel like you wasn't really trying to find the truth out. You was against me
13      through the whole trial by asking people if I sold them drugs. I don't sell drugs. I don't
        do that.
14
    Exh. 11 at 1053-1054.
15
            The court asked defense counsel about petitioner's motion, and counsel responded:
16
            There is one part of that motion which I think is very valid, and that is the [California
17      Penal Code section] 1368 aspect and whether or not there should be some mental
        evaluation that was done. I thought about it. And I received some documentation as to
18      his brain injury and the scar on his head, and I did make an assessment, and my
        assessment was that I felt my client was competent. . . . That's something I did not bring
19      to any Court's attention because I didn't think it was an issue.

20  Exh. 11 at 1055-1056.

21          I seriously grappled with it. And to me, in all my meetings with my client and
        all the times we discussed the matters, I don't have a doubt. . . .
22
            There's a piece of paper where he actually receives money for his disability.
23      My client is disabled. The disability comes from him being stabbed and having some
        damage to his brain. But in my discussions with all the matters related to this case, I just
24      did not find in my assessment that his deficiencies rose to the level of being incompetent
        to stand trial.
25
    Exh. 11 at 1057.
26
            The court concluded that petitioner was competent, declaring:
27
            Well, from the Court's time with this case and the Court's hearing of the evidence
28      that was presented in this case and from the Court's own observations of the defendant

1    in this case, the Court finds the defendant is competent. There isn't any doubt in the
     Court's mind that he is competent within the meaning of [California Penal Code section]
2    1368. . . .

3        I've heard you speak today. There isn't anything that's been said or done that would
     suggest for a moment that you are not competent to stand trial and have not been
4    competent throughout the process. You are.

5    Exh. 11 at 1058.

6        Defense counsel indicated that he was capable of working with petitioner on the case.

7    Exh. 11 at 1059. The trial court then denied petitioner's *Marsden* motion. *Id.*

8        The California Supreme Court's denial of petitioner's claim of incompetence was not

9    objectively unreasonable. Petitioner appears to be raising both substantive and procedural claims

10   regarding competence, i.e., that he was in fact incompetent to stand trial, and that the trial court

11   failed to conduct an adequate hearing to determine whether he was competent. *See Boyde v. Brown,*

12   404 F.3d 1159, 1165 n. 6 (9th Cir. 2005). To be competent to stand trial, a defendant must have

13   "sufficient present ability to consult with his lawyer with a reasonable degree of rational

14   understanding," and have "a rational as well as factual understanding of the proceedings against

15   him." *Dusky v. United States,* 362 U.S. 402 (1960). "Requiring that a criminal defendant be

16   competent has a modest aim: It seeks to ensure that he has the capacity to understand the

17   proceedings and to assist counsel." *Godinez v. Moran,* 509 U.S. 389, 402 (1993); *United States v.*

18   *Hernandez,* 203 F.3d 614, 621 n. 8 (9th Cir. 2000) ("The standard for competence to stand trial

19   requires nothing more than that a defendant have some minimal understanding of the proceedings

20   against him."). The conviction of a legally incompetent person violates due process, and where the

21   evidence raises a bona fide doubt about the defendant's competency, due process requires that a full

22   competency hearing be held. *Pate v. Robinson,* 383 U.S. 376 (1966). The *Pate* hearing is not

23   required absent a "substantial" or "bona fide" doubt of competence. *Hernandez v. Ylst,* 930 F.2d

24   714, 716 (9th Cir. 1991). California follows the same standard, under Penal Code sections 1367 and

25   1368. *See People v. Stankewitz,* 32 Cal.3d 80, 92 (1982).

26       Here, the trial court declared it had no doubt of petitioner's competence, and therefore did

27   not refer petitioner for a mental evaluation. The state court's determination that a defendant is

28   competent is a factual finding that is presumed correct unless rebutted by clear and convincing

Memorandum of Points and Authorities. C 07-4417 JF (PR)

70

1  evidence. 28 U.S.C. § 2254(e)(1); *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam);

2  *Dennis v. Budge*, 378 F.3d 880, 891 (9th Cir. 2004). The state court's determination that the

3  evidence did not require a competency hearing is a factual determination that the federal habeas

4  court must defer to unless it is objectively unreasonable. 28 U.S.C. § 2254 (d)(2); *Davis v.*

5  *Woodford*, 384 F.3d 628, 644 (9th Cir. 2003); *Torres v. Prunty*, 223 F.3d 1103, 1105 (9th Cir. 2000).

6        The trial court's conclusion that petitioner was in fact competent was supported by the

7  court's own observations of petitioner, including petitioner's lucid explanation of the basis for his

8  *Marsden* motion. *See United States v. Myers*, 993 F.2d 713, 715 (9th Cir. 1993) (judge's personal

9  observations of defendant in court supported finding of competence). Moreover, defense counsel

10  indicated that he had no doubt of petitioner's competence. *Hernandez v. Ylst*, 930 F.2d at 718; *see*

11  *Medina v. California*, 505 U.S. 437, 450 (1992) ("defense counsel will often have the best-informed

12  view of the defendant's ability to participate in his defense"). Counsel had investigated petitioner's

13  mental health history, and seriously considered whether that history might suggest petitioner was

14  incompetent. Exhibit 11 at 1055-1057. Based on counsel's lengthy discussions with petitioner in

15  preparation for trial, he concluded that petitioner's deficiencies did not rise to the level of

16  incompetence. *Id.* That decision was not unreasonable. A defendant may be competent even where

17  he has cognitive impairment from brain damage, *United States v. Timbana*, 222 F.3d 688, 701 (9th

18  Cir. 2000), is mentally retarded, *Atkins v. Virginia*, 536 U.S. 304, 318 (2003), or has a diagnosed

19  mental disorder, *United States v. Leggett*, 162 F.3d 237, 244 (3d Cir. 1998). Indeed, counsel's

20  comments showed that petitioner was actually able to understand the proceedings and assist in his

21  defense. Exhibit 11 at 1056 ("we spent hours preparing for this case, hours literally. We worked

22  hard. We worked hard and we worked together to put together a defense for him.").

23        Petitioner offers no clear and convincing evidence, such as a current expert opinion, to

24  rebut the trial court's factual finding that he was competent. Nor has he shown on this record that

25  the trial court's decision not to refer petitioner for a mental health evaluation was unreasonable.

26  Accordingly, there is no basis to overturn the state court's denial of petitioner's claim.

27

28

## II.

## PETITIONER WAS NOT DENIED DUE PROCESS BY THE ADMISSION OF ARZADON'S TESTIMONY

Petitioner contends he was denied a fair trial and due process because the trial court admitted the "tainted" testimony of Arzadon. Petition at 8. He bases this assertion based upon a notarized statement in which Arzadon states that his trial testimony was false and constituted perjury. Exh. 9, Appendix H.

The state Supreme Court's rejection of petitioner's claim was not objectively unreasonable. The knowing use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see United States v. Agurs*, 427 U.S. 97, 103 (1976). However, subsequent recantation of trial testimony does not render the testimony false. Recantations are viewed with great suspicion, especially where, as here, the original testimony was consistent with the other evidence produced at trial. *Allen v. Woodford*, 395 F.3d 979, 994-995 (9th Cir. 2005); *see* RT 713-715 (out of fear of retaliation, Arzadon wrote letter to petitioner in jail, stating "about that legal matter, I will never go against you. How do you want me to go about this so everything will be dropped?"). In addition, the record of Arzadon's trial testimony refutes his after-the-fact contention that he was "hallucinating as well as hearing voices that where [*sic*] not there" when he testified. Exh. 9, Appendix H at 2. Arzadon responded appropriately at all times during his testimony. RT 555-737; *see* RT 729 ("I'm not hallucinating because I'm here right now clean and sober"). Moreover, even if Arzadon's trial testimony was false, petitioner makes no assertion that the prosecution knew of its falsity. *Id.* at 995; *Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004). The California Supreme Court's denial of petitioner's claim was therefore not objectively unreasonable.

## III.

## PETITIONER DID NOT RECEIVE INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner contends his counsel was ineffective in two respects. First, petitioner contends counsel "did not present any motion for expert witnesses as to [petitioner's] competency nor did he

1   present an effective argument to the court on the issue." Petition at 9. Second, counsel "did not

2   interview the victim and present to the court the fact that the victim was willing to [*sic*] may have

3   been blackmailed by the DA to testify as he did." Petition at 9.

4          A convicted defendant who alleges that he has received ineffective assistance of counsel

5   must demonstrate that counsel's performance was deficient and that the deficient performance

6   prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668 (1984).

7          The California Supreme Court, in denying petitioner's claim of ineffective assistance of

8   counsel, did not apply the *Strickland* standard to the facts of petitioner's case in an objectively

9   unreasonable manner. *See Visciotti*, 537 U.S. at 24-25. Petitioner has not established either prong

10  of the *Strickland* standard in regard to his first claim of ineffective assistance. Counsel did not

11  perform deficiently in investigating petitioner's competence, as he declared that he had "grappled"

12  with the issue after reviewing the documentary evidence of petitioner's brain damage. Exh. 11 at

13  1055-1057. Nor was any error prejudicial, since the court expressly declared it did not have a doubt

14  of petitioner's competence.

15         The state court also reasonably denied petitioner's second claim of ineffective assistance.

16  There is no evidence that the prosecution blackmailed Arzadon. Arzadon's post-trial statement,

17  attached by petitioner to his state court petition, indicates only that Arzadon "was feeling"

18  threatened by law enforcement and the District Attorney's office, and that the assistant district

19  attorney had "made clear" that a lack of cooperation would be "detramental [*sic*]" to Arzadon's

20  freedom. Exh. 9, Appendix H. As explained above, these allegations must be viewed with

21  suspicion. In any event, counsel was not ineffective because there is simply no way he could have

22  known at the time of trial that Arzadon would recant his testimony six months after testifying. The

23  state court therefore reasonably rejected his argument.

24                                          **IV.**

25         **PETITIONER WAS NOT DENIED DUE PROCESS BY A BIASED**
           **TRIAL JUDGE**

26

27         Petitioner contends he was denied a fair trial and due process because the trial judge was

28  biased against the defense. Petition at 10-11.

1      Petitioner notes that defense counsel disqualified the original judge assigned to petitioner's

2   case. Petition at 10; CT 122. Petitioner then describes a series of "media investigations" purporting

3   to have uncovered "bad" judges in Monterey County. Petition at 10-11. Petitioner alleges his trial

4   judge to be a "tag" partner of one of the "bad" judges. Petition at 11. He contends his trial judge

5   "denied the motion to sever when he knew that it was improper to do so. He also denied a

6   competency hearing in the fact [sic] of overwhelming evidence that such a hearing was necessary

7   for petitioner." Petition at 11.

8      The California Supreme Court's denial of petitioner's claim was not objectively

9   unreasonable. The Due Process Clause guarantees a defendant the right to a fair and impartial judge.

10  *In re Murchison*, 349 U.S. 133, 136 (1955). However, to overturn a conviction based on judicial

11  bias, a petitioner must "overcome a presumption of honest and integrity" on the part of the judge.

12  *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *Ortiz v. Stewart*, 149 F.3d 923, 938 (9th Cir. 1998).

13  Petitioner supports his claim of bias with newspaper clippings and charges his trial judge with bias

14  simply because the judge ruled against him on severance and did not conduct a competency hearing.

15  However, as discussed in Arguments I and V, such rulings were not indicative of unconstitutional

16  bias. Indeed, "judicial rulings alone almost never constitute a valid basis for a bias or partiality

17  motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994). Petitioner is therefore not entitled to

18  relief.

19                                      V.

20  **PETITIONER WAS NOT DENIED DUE PROCESS BY THE TRIAL
    COURT'S REFUSAL TO SEVER HIS TWO CASES**

21

22      Petitioner contends he was denied a fair trial and due process when the trial judge refused

23  to allow two trials, one for the charges relating to Bell, and another for the charges relating to

24  Arzadon. Petn. at 12-13.

25      On September 11, 2003, the trial court granted the prosecutor's motion to consolidate.

26  CT 110-111. On February 17, 2004, the trial court denied petitioner's motion to sever. CT 191.

27      The California Court of Appeal rejected petitioner's claim that the trial court erred by

28  refusing to sever the charges. Exh. 6 at 10-15. The court then rejected petitioner's argument that

1    he was denied due process by the joint trial, concluding that petitioner "has failed to establish that

2    there was a substantial danger of prejudice from a joint trial or that he was actually prejudiced by

3    the joint trial of the two cases." Exh. 6 at 15-17.

4    The state appellate court's conclusion was not objectively unreasonable. The United

5    States Supreme Court has held that "[i]mproper joinder does not, in itself, violate the Constitution."

6    *United States v. Lane*, 474 U.S. 438, 446, n.8 (1986). "Rather, misjoinder would rise to the level

7    of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth

8    Amendment right to a fair trial." *Id.* In *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2004), the

9    Ninth Circuit summarized the law relating to severance of charges as follows:

10   We may grant habeas relief on a joinder challenge only "if the joinder resulted in an unfair
     trial. There is no prejudicial constitutional violation unless 'simultaneous trial of more
11   than one offense . . . actually render[ed] petitioner's state trial fundamentally unfair and
     hence, violative of due process.'" *Sandoval v. Calderon*, 241 F.3d 765, 771-772 (9th Cir.
12   2001), *cert. denied*, 534 U.S. 847, 151 L. Ed. 2d 69, 122 S. Ct. 112 (2001) and *cert.
     denied*, 534 U.S. 943, 151 L. Ed. 2d 241, 122 S. Ct. 322 (2001) (quoting *Featherstone v.
13   Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991)) (omissions and modifications in original).
     The requisite level of prejudice is reached only "if the impermissible joinder had a
14   substantial and injurious effect or influence in determining the jury's verdict." *Sandoval*,
     241 F.3d at 772 (citing *Bean v. Calderon*, 163 F.3d 1073, 1086 (9th Cir. 1998)). In
15   evaluating prejudice, the Ninth Circuit focuses particularly on cross-admissibility of
     evidence and the danger of "spillover" from one charge to another, especially where one
16   charge or set of charges is weaker than another. *See, e.g., Sandoval*, 241 F.3d at 772;
     *Bean*, 163 F.3d at 1084.

17

18   Here, the state appellate court reasonably found that there was no "spillover effect" that

19   unfairly strengthened the weaker case, because the jury found petitioner guilty only of the lesser

20   crimes of simple assault in count VII and attempted robbery in counts I and II. "The best evidence

21   of the jury's ability to compartmentalize the evidence is its failure to convict all defendants on all

22   counts." *United States v. Unruh*, 855 F.2d 1363, 1374 (9th Cir. 1987); *Park v. California*, 202 F.3d

23   1146, 1149-1150 (9th Cir. 2000) (defendant could not show trial was unfair due to consolidation of

24   charges because jury acquitted him of two counts).

25   In any event, any error was harmless because it had no substantial and injurious effect on

26   the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *see Fry v. Pliler*, 127 S.Ct. 2321

27   (2007). As noted, the jury acquitted appellant of aggravated battery and completed robbery, finding

28   him guilty only of lesser charges. The evidence supporting those convictions was compelling, and

1  there was little risk of one of the cases shocking or inflaming the jury into convicting on the other.

2  Accordingly, no prejudice resulted from the joinder of charges.

3  ### VI.

4  ### PETITIONER WAS NOT DENIED DUE PROCESS WHEN THE TRIAL COURT DID NOT SENTENCE HIM UNDER CALIFORNIA'S PROPOSITION 36

5

6  Petitioner contends the trial court erred by not considering the possibility of imposing a

7  sentence under California's Proposition 36 for his conviction of possession of transporting a

8  controlled substance. Petition at 15.

9  The California Supreme Court's rejection of this claim was not objectively unreasonable.

10  At the time of sentencing, petitioner was not eligible for probation under Proposition 36.

11  "Proposition 36 amended state law to require that certain adult drug offenders receive probation,

12  conditioned on participation in and completion of an appropriate drug treatment program, instead

13  of receiving a prison term or probation without drug treatment. [¶] Under new Penal Code section

14  1210.1, subdivision (a), a defendant convicted of a nonviolent drug possession offense 'shall'

15  receive probation, provided the defendant is not rendered ineligible under subdivision (b)." *People*

16  *v. Floyd*, 31 Cal.4th 179, 183 (2003). Petitioner falls squarely within California Penal Code section

17  1210.1(b)(1) and (2). He was therefore not entitled to probation under Proposition 36.

18  Even had the trial court misapplied state law, petitioner is not entitled to relief. "Absent

19  a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does

20  not justify federal habeas relief." *Christian v. Rhode*, 41 F.3d 461, 469 (9th Cir. 1994). Petitioner

21  has not alleged that the sentence he received is fundamentally unfair. Moreover, any such claim

22  must fail in light of petitioner's extensive criminal history.

23  ### VII.

24  ### PETITIONER WAS NOT DENIED DUE PROCESS WHEN THE TRIAL COURT SENTENCED HIM FOR COMMITTING ATTEMPTED ROBBERY IN CONCERT

25

26  Petitioner contends he was denied due process when the court failed to vacate the finding

27  that he acted "in concert" during the attempted robberies. Petn. at 16-20.

28  The California Court of Appeal rejected petitioner's claim. First, the court noted that

1    petitioner's claim was irrelevant, even if meritorious:

2         It is notable that the validity of the jury's in concert finding is completely irrelevant
3    in this case. The only difference between an "in concert" attempted first degree robbery
     and an attempted first degree robbery that was *not* "in concert" is that the "in concert"
     offense is punishable by 18 months, 3 or 6 years and the other is punishable by 18 months,
4    2 or 3 years. These punishment provisions had no impact on defendant's sentence
     because he was punished under Penal Code section 1170.12 and would have received the
5    same 25 years to life sentences for these offenses whether or not they were "in concert."

6

7    Exh. 6 at 18. The Court of Appeal then declared petitioner's claim meritless:

8         Defendant's assertion is that Allen's acquittal established that only two individuals
     committed the attempted robberies, and therefore the in concert finding was unsupported.
9    Not so. Although Allen was acquitted, there was evidence that X *and Nelson* participated
     in the attempted robbery of Arzadon. Nelson arrived in advance of the others, and X came
10   to Arzadon's door several times looking for her. While Nelson was talking to Arzadon
     and, according to Arzadon, Nelson remained in the house, X entered the house and then
11   defendant rushed in. One of the men said "[w]here's my money," and defendant and X
     held Arzadon down while one of them put his hand in Arzadon's pocket. At the same
12   time, according to Arzadon, Nelson held Arzadon's phone and called Arzadon names.
     Nelson then took the phone with her when she left Arzadon's home with defendant and
13   X. As they left, one of the men took Matthews's leather jacket.

14        A rational factfinder could have concluded that *Nelson* and X were defendant's co-
     participants in the attempted robberies of Arzadon and Matthews because each of them
15   assisted him in the crimes. X held Arzadon down, and Nelson encourage defendant and
     X and took the telephone to prevent Arzadon from summoning the police. A reasonable
16   inference could be drawn that Nelson, defendant and X were acting together when
     Matthews was assaulted and when Matthews's jacket was taken. The jury's "in concert"
17   finding was supported by substantial evidence.

18   Exh. 6 at 18-19.

19        The state appellate court's conclusion was not objectively unreasonable. The United

20   States Supreme Court has held that "the relevant question is whether, after viewing the evidence in

21   the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

22   elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

23   In *Juan H. v. Allen*, 408 F.3d 1262, 1274-1275 (9th Cir. 2005), the Ninth Circuit explained that

24   "[a]fter AEDPA, we apply the standards of *Jackson* with an additional layer of deference. . . . [W]e

25   must ask whether the decision of the California Court of Appeal reflected an 'unreasonable

26   application of *Jackson* . . . to the facts of this case."

27        Here, the state court found sufficient evidence that petitioner had acted in concert. That

28   finding is entitled to deference and was not unreasonable. Further, there was no unreasonable

1  application of United States Supreme Court precedent. Although the state appellate court's opinion
2  does not provide a statement of the legal standard applied, California expressly follows the *Jackson*
3  standard. *People v. Johnson*, 26 Cal.3d 557, 575-578 (1980). More importantly, the reasoning and
4  conclusion of the state appellate court comport with *Jackson*. *See Early v. Packer*, 537 U.S. 3, 8
5  (2002) (per curiam) (neither citation to, nor awareness of, United States Supreme Court cases is
6  required, "so long as neither the reasoning nor the result of the state-court decision contradicts
7  them"). Petitioner is therefore not entitled to relief.

8  ///
9  ///
10 ///
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

**CONCLUSION**

2

Accordingly, respondent respectfully requests that the petition for writ of habeas corpus

3    be denied.

4          Dated: April 29, 2008

5                              Respectfully submitted,

6                              EDMUND G. BROWN JR.
                               Attorney General of the State of California
7

8                              DANE R. GILLETTE
                               Chief Assistant Attorney General

9                              GERALD A. ENGLER
                               Senior Assistant Attorney General

10                             PEGGY S. RUFFRA
                               Supervising Deputy Attorney General
11

12                             /s/ Arthur P. Beever
                               ARTHUR P. BEEVER
13                             Deputy Attorney General

                               Attorneys for Respondent

14    40244218.wpd
      SF2008400820
15

16

17

18

19

20

21

22

23

24

25

26

27

28

# County judiciary under fire

## TWO ALLEGE CORRUPTION, MISCONDUCT OF THREE JUDGES

**By VIRGINIA HENNESSEY
and GEORGE B. SANCHEZ**
*Herald Staff Writers*

An investigation by state court officials into allegations of wrongdoing by a local judge was triggered by two people who have separately pursued personal vendettas against the Monterey County judicial system.

The state Commission on Judicial Performance has removed Judge Michael Fields from a panel presiding over a disciplinary hearing for a Santa Barbara judge based on the declaration of a Monterey woman who said Fields expressed prejudgment of the case to her during a rendezvous at a Ventura hotel.

The woman, former Monterey County Superior Court clerk Crystal Powser, was at the root of charges that forced her former fiance, Traffic Commissioner Richard Rutledge, to resign in late September. She has now apparently joined forces with Eugene Forte, a former Salinas resident who has alleged corruption and misconduct in a series of lawsuits against members of the Monterey County



**Michael Fields**
The Monterey County judge was presiding over a three-judge panel hearing allegations of whether a Santa Barbara judge violated judicial ethics.

**A12**   THE MONTEREY COUNTY HERALD, SUNDAY, DECEMBER 4, 2005

# Judge

*From page A1*

judicial system. Court records indicate they, in turn, have questioned his mental stability and labeled him a "vexatious litigant," limiting his ability to file future lawsuits.

The convergence of Powser and Forte's mutual scorn for the local court system has thrown into disarray a state hearing to determine whether Santa Barbara Judge Diana Hall violated judicial ethics. It has also raised serious questions about the judgment and ethics of at least two Monterey County Superior Court judges, Fields and Russell Scott, for whom Powser worked as a clerk for more than 10 years.

Fields was presiding over a three-judge panel hearing allegations that Hall, 55, failed to report a $20,000 campaign contribution from her live-in girlfriend; improperly questioned a prosecutor who attempted to dismiss her from a case; and was convicted of drunken driving.

That hearing, being conducted in Ventura, was abruptly suspended Nov. 17, one day after Forte filed Powser's declaration in an unrelated lawsuit. According to the declaration, Powser traveled at Fields' request to his Ventura hotel room, where Fields, who is married, made sexual advances and discussed the case against Hall.

Unknown to Fields, according to the declaration, Powser accepted his invitation at the suggestion of Forte, who traveled with her to Ventura "so that it could be verified that this meeting took place."

During the rendezvous, Powser said, Fields told her he and the other two judges on the panel had discussed the case against Hall over breakfast, lunch and dinner, and had "already decided she was guilty of all three allegations."

Fields also told her, Powser said, that Hall concealed her girlfriend's campaign contribution because she did not want people to know she was a lesbian, and he made fun of the girlfriend's surname, Hannant.

Fields, who continues to hear cases on the Monterey County bench, declined comment Friday, saying he couldn't discuss pending litigation.



**Crystal Powser**
She has accused Judge Fields of prejudgment in the judicial ethics case.



**Richard Rutledge**
The ex-traffic commissioner resigned in late September after Powser's allegations of ticket fixing.



**Russell Scott**
Powser has accused the county judge of helping prosecutors question witnesses.



**Robert O'Farrell**
The judge is the target of a lawsuit by a man whom he held in contempt.

hear the case, according to spokeswoman Victoria Henley. That request is pending.

Henley wouldn't comment about the allegations against Fields.

"Complaints to the commission and investigations are confidential," Henley said when asked if Fields was being investigated. "I can't confirm or deny a complaint or allegation made against any California judge."

She declined comment on allegations in Powser's declaration about Scott.

Over dinner in Ventura, Powser said, she and Fields discussed Scott's alleged habit of telling her to call local prosecutors who were trying cases in his courtroom to give them direction on questions they should ask of witnesses.

Fields "sat back" with this disgusted look on his face, crossed his arms and said he totally thought that was wrong and he would never have, or never has had his clerk do such a thing," Powser wrote.

Scott did not respond to requests for comment.

While judges are free to ask witnesses questions during a trial, privately directing a prosecutor on how to conduct a trial would raise questions of judicial bias. Such a revelation could prompt defense attorneys to challenge the judge's appointment to a case or, if they did not, open subsequent verdicts to appeal.

## Powser's past allegations

It is not the first time accusations by Powser have shaken the Monterey County court-

between him and a court clerk. It is unclear whether any action was ever taken on that revelation.

Powser's e-mail regarding Rutledge prompted a criminal investigation by the Monterey County District Attorney's Office, which concluded there was insufficient evidence to warrant criminal charges

> "Complaints to the commission and investigations are confidential. I can't confirm or deny a complaint or allegation made against any California judge."
>
> — Victoria Henley, spokeswoman, Commission on Judicial Performance

against the commissioner.

In a blistering statement during a news conference, however, District Attorney Dean Flippo said there was evidence of actions by Rutledge that raised "the specter of favoritism" and "undermine the confidence of the public in the administration of justice and our court system."

Rutledge resigned that afternoon.

## Forte's case with the courts

Shortly thereafter, Forte contacted Powser, an admittedly emotionally fragile woman who had managed in a matter of weeks to accomplish what he had failed to do in six years of lawsuits: bring down an officer of the Monterey County courts.

Forte's vendetta against the Monterey County judicial system stems from a lawsuit he filed over a soured real estate deal in 2000. Forte lost that case, as well as two subse-

courtroom in December 2003. Forte, who is not an attorney but who by then was representing himself in court, angered the judge by repeatedly interrupting him during a hearing for another lawsuit.

Transcripts of the hearing show Forte was trying to file a motion to disqualify O'Farrell for alleged bias. In a formal contempt hearing later that afternoon, O'Farrell said Forte had been given a chance to file the "challenge for cause" but instead, "loaded for bear," had taken the opportunity to grandstand with his two young children present in the courtroom.

After allowing Forte to carry on for several minutes about the issues in the case, according to a transcript, the judge said his comments had failed to mitigate or apologize for his actions.

"As a matter of fact, you're arrogant, you're defensive and you're, in fact, offensive," O'Farrell said. "Quite frankly, I believe I'm dealing with a certain pathology here, and I don't mean that in any pejorative way. But if you're not aware of some potential issues there yourself, perhaps you should look into them.

"Your conduct, not only today, and as it has led up to today, is really not terribly rational," O'Farrell added. "In fact, that's being generous."

## Vexatious litigants

It was in that lawsuit against O'Farrell and numerous additional defendants that Forte filed Powser's declaration on Nov. 16. The case against O'Farrell

For the latest
NEWS
montereyherald.com

# The Herald

www.montereyherald.com

Sunday, May 28, 2006

SE

TEREY PENINSULA AND SALINAS VALLEY $1.50

## CHAMPIONSHIP SATURDAY

Carmel wins baseball title; Notre Dame takes softball crown

Story on page B1

Herald question of the c
Do you think banning salons shou
outlawed for health reasons?

☐ Yes     ☐ No
Go to: montereyherald.com
to place you vote
Herald's rev sun
Story on page B1

# Judge Scott subject of probe

## FORMER CLERK'S ALLEGATIONS SPUR INVESTIGATION

By VIRGINIA HENNESSEY
Herald Salinas Bureau

While the Commission on Judicial Performance pursues formal misconduct charges against Judge Jose Velazquez, it is investigating allegations of misconduct by at least one other Monterey County judge.

Lawyers who spoke on the condition of anonymity confirmed in recent weeks that the commission, the state's disciplinary panel for judges, is investigating allegations against Judge Russell Scott. The allegations were originally contained in sworn statements filed by Crystal Powser, Scott's former court clerk, whose earlier allegations led to the resignation of Traffic Commissioner Richard Rutledge in September.

Attorneys interviewed by the commission's investigators said they were asked about Powser's allegations that Scott had her make telephone calls to coach prosecutors who were in trial in his courtroom.

Through his court clerk Friday, Scott declined comment, saying that a judge is prohibited from making comment on an investigation.

**Inside**
Judge questions cornerstone of legal system. A16

Judge files response to misconduct charges. A16

The attorneys said they were asked about an alleged arrangement in the Monterey County Superior Court, whereby attorneys who "papered" Scott had their cases assigned to Judge Robert Moody, and those who challenged Moody without cause were assigned to Scott.

Under section 170.6 of the state Code of Civil Procedure, attorneys are given one chance on each case to challenge a judge without cause.

The process is commonplace
Defense lawyers have long complained that Scott and Moody, both former prosecutors, are pro-prosecution. Lawyers, however, frequently papered the judges—particularly Scott, to have them removed to another courtroom.

At some point, according to one's declaration, the presiding judge Terrance Duncan met

Please see Judges page A16

Judge
Scott

Please see Judges page A16



# Judges

From page A1

system whereby all of Scott's papered cases went to Moody and vice versa.

Duncan did not return a phone call Friday.

Many defense attorneys said the purported system, which they view as retaliatory, has continued under Presiding Judge Stephen Sillman.

Sillman denied the allegation last week.

"One, nothing can be said about an investigation, and, two, it's not a policy," he said.

## Reasons for assignments

Sillman said he reviews each case that comes to him for reassignment on an individual basis. In many cases, he said, it made sense to assign Scott's and Moody's cases to each other because they have the same pretrial schedules.



**Judge Michael Fields**

Ex-clerk alleges Fields made overtures to her in Ventura.

Investigations by the Commission on Judicial Performance are confidential and can lead to several levels of discipline, some of which are confidential.

Victoria Henley, the commission's chief counsel, said she couldn't confirm or deny an investigation of Scott or any other judge on Monterey County's bench. Speaking generally, she said there are no state regulations dictating how a case must be reassigned after a judge has been papered.

However, three sources who spoke to The Herald on the condition of anonymity said they were interviewed by commission investigators who questioned whether the practice, coupled with the allegation of coaching the prosecution, indicated a broader pro-prosecution bias on Scott's part.

The state Code of Judicial Ethics requires that a judge be impartial in carrying out his judicial duties.

"The integrity and independence of judges depend ... upon their acting without fear or favor. The code reads, "Violations of this code diminish public confidence in the judiciary

performance of judicial duties, engage in speech, gestures or other conduct that would reasonably be perceived as bias or prejudice."

Powser's allegation that Scott had her call prosecutors with tips during trials is the far more serious allegation.

The code states a judge "shall not initiate, permit or consider ex parte communications" — discussions outside the courtroom without the presence of both attorneys in the case.

In Powser's declaration, which contained allegations against Judge Michael Fields and Velasquez, the former clerk relates a conversation she had with Fields in which she said Scott had her "contact the DAs and tell them what to ask in jury trials, because Judge Scott told me that it would be wrong for him to do it, but not for me to do it for him, and (he) told me not to tell the (prosecutor) how to do it."

Powser said Fields "sat back with a disgusted look on his face, crossed his arms and said he totally thought that was wrong and he would never have, and never has had, his clerk do such a thing."

Assistant District Attorney Berkley Brannon said he did not know if his office had been contacted by the commission, because the inquiries would be confidential. He said the Monterey County Public Defenders Office questioned several deputies in his office.

"I have discussed it with a number of attorneys and in my opinion it's false," he said of Powser's allegation.

Former public defender Michael Lawrence said the allegations are "of grave concern to every defense attorney."

"The allegations that on occasion he would communicate indirectly with prosecutors and provide assistance to them is, of course, extremely disturbing and raises implications about the integrity of the criminal justice," he said, "and these questions should be resolved."

## Denies existence of system

Lawrence, who has gone into private practice since retiring in December, said he has no cases before Scott. In the future, he said, he would have to weigh a specific case to determine if he wants to paper Scott, challenge him for cause or do nothing.

Moody said he regularly is assigned papered cases from many judges on the bench and denied there was a system to reassign Scott's cases to him or

commission is investigating the conduct of Moody, Duncan or Sillman.

Sillman denied rumors that the commission issued private letters of censure to him and Scott.

Several defense attorneys said the alleged practice of reassigning Scott's and Moody's cases to each other was unfair, if not unethical.

"I think it's terrible," said Monterey attorney Larry Biegel. "It shouldn't be done like that, like a punishment. It should be done on a revolving basis."

Salinas defense attorney Richard Rosen, who is president of the Monterey County Bar Association, objected to the idea.

"I don't want to comment about Judge Moody or Judge Scott," he said. "However, as a general proposition, (California Code of Civil Procedure) 170.6 was enacted to ensure fairness to all sides in both civil and criminal litigation. If the response to any lawyer filing a 170.6 against one particular case is to always assign the case to another judge to create a loop, then that's wrong.

"It has the appearance of impropriety because it looks like the judges are in collusion with one another to defeat the very purpose of 170.6," he said. "If it's going on, it's a bad practice and it ought to be stopped."

Other attorneys, such as acting Public Defender Glenn Nolte and Salinas lawyer Tom Worthington, said it was their impression the system to reassign cases was based on ease of scheduling.

"I frankly thought it was because of a matter of convenience," said Worthington, noting that Scott's and Moody's courtrooms were previously located next to each other and they used similar schedules. "I really didn't have a problem with it and I especially didn't have a problem when I heard it was Judge Sillman's decision."

Worthington said he has not seen pro-prosecution bias on Scott's part.

"I can only say that I have had dozens of cases in Judge Scott's department, and if I had thought anything like that was going on, I certainly would have made it known and I have seen nothing

for a cavalcade of scandal that has rocked the Monterey County Superior Court bench and beyond in the past year.

In her sworn statement, Powser alleged that she was invited to Ventura to visit Fields, who was presiding over a commission disciplinary hearing against Santa Barbara Judge Diana Hall. In graphic detail, Powser recounted alleged sexual overtures Fields made to her in his hotel room and said Fields had discussed the case over which he was presiding.

## Powser's allegations

In his hotel room and during dinner, she said, Fields described the charges against Hall: that she secretly accepted a $20,000 campaign donation from her live-in girlfriend, was convicted of drunken driving, and improperly questioned a prosecutor who papered her to remove her from a case.

According to Powser, Fields told her he and the panel's other two judges discussed the case during meals and had already decided she was guilty.

Upon receiving a copy of Powser's declaration, the commission removed Fields from the panel, then dismissed the panel altogether. A new panel was appointed and the case is set for final arguments June 14.

It is unknown if Fields was, or will be, further disciplined by the commission. Its disciplinary actions can range from private admonishments to public censure to removal from the bench.

Powser caused the resignation of Rutledge, her former fiance, who resigned in September after she sent e-mails to dozens of people in the Monterey County Superior Court system detailing her sexual encounters with Rutledge in his Marina chambers and elsewhere in Salinas' courthouse.

The e-mail, prompted by Powser's breakup with Rutledge and the Superior Court's refusal to let her withdraw a resignation she filed in anger, contained far more serious allegations that Rutledge fixed tickets for friends and co-workers.

Prosecutors did not find sufficient evidence to file criminal charges, partly because of the statute of limitations. But District Attorney Dean Flippo expressed serious concerns about Rutledge's judicial behavior, particularly that he had acted "in a manner in conflict or in the interest" of friends. Flippo said Rutledge's actions "undermined the



**Judge Richard Rutledge**

Resigned after former fiancee sent out damning e-mails.

# Judge Moody's comments termed unsettling

## JURIST CALLS CORNERSTONE OF U.S. JUSTICE SYSTEM A 'LEGAL FICTION' DURING SENTENCING

By VIRGINIA HENNESSEY
Herald Salinas Bureau



Moody said his comments aimed attorneys were misinterpreted, that what he meant was that all attorneys were advocating for their clients and should not be viewed as impartial.

# Defense attorney wants Judge Scott off case over allegations clerk coached prosecutors

**By VIRGINIA HENNESSEY**
*Herald Salinas Bureau*

A defense lawyer on Tuesday moved to disqualify Judge Russell Scott from a Salinas shooting case on the grounds that the judge is biased toward the prosecution.

Jerome Mullins of San Jose based his motion on a sworn declaration by Scott's longtime court clerk, who alleged that Scott had her coach prosecutors during trials, among other alleged misconduct.

Scott left the bench for about 20 minutes to review the motion, which also contained declarations by the former public defender and a deputy public defender. On his return, he said he would file a written response to the motion within 10 days.

The judge can either answer the allegations and recuse himself, or ask that another judge hear the motion and rule. In a telephone call Tuesday night,

Scott reiterated that he will answer all of the issues raised in the challenge in a "verified answer."

Mullins said he "absolutely" believes his client cannot receive a fair trial in Scott's courtroom based on the allegations in the declarations.

The motion was filed in the case of Gabriel Cadena, 31, who is accused of attempted murder, firearm and gang charges in connection with a July 25

shooting in Salinas. The case was continued until Sept. 26.

It is the first time that a criminal defense attorney has responded in court to the declaration that former court clerk Crystal Powser filed in November in an unrelated case. In that declaration, Powser alleged wrongdoing by judges Michael Fields, Jose Velasquez and

*Please see Scott page A12*



**Russell Scott** Defense in attempted-murder case contends he favors the prosecution.

# Move to disqualify judge rejected

## DEFENSE PLANS TO CHALLENGE RULING

**By VIRGINIA HENNESSEY**
*Herald Salinas Bureau*

With little comment, a Santa Clara County judge has denied a motion to disqualify Judge Russell Scott from a Salinas case for alleged pro-prosecution bias.

Judge Rene Navarro said the attorney for Gabriel Cadena had "failed to meet (his) burden of establishing facts that would lead a person to reasonably entertain a doubt about Judge Scott's impartiality or that Judge Scott was biased or prejudiced toward an attorney or the defendant involved in the pending proceeding."

The motion to recuse Scott was filed by Jerome Mullins, defense attorney for Cadena, 31, who is charged with attempted murder in a July 25 Salinas gang shooting. Mullins, who is from Santa Clara County, based his motion on a sworn declaration by Scott's former longtime court clerk, Crystal Powser, who has alleged that Scott encouraged her to convey his suggestions to prosecutors who were in trial before him, among other things.

Navarro, who was assigned by the state Judicial Council to review the motion, could have initiated a hearing to consider witness testimony before ruling on it. Instead, he based his decision purely on declarations filed by Scott and attorneys on both

*Please see **Scott** page A12*

## Scott

*From page A1*

sides of the legal table.

The motion was also supported by declarations by former Public Defender Michael Lawrence and Deputy Public Defender Art Kaufmann, who said Powser had discussed Scott's actions with them.

In addition to coaching prosecutors, Powser asserted that she had reviewed police reports for Scott and that Scott inappropriately spoke with prosecutors about their performances on cases outside of the presence of the respective defense attorneys.

Three members of the Monterey County District Attorney's office filed sworn declarations indicating that Powser contradicted her assertions in their own interview with her and that

no one in their office had ever been coached by or for Scott.

In his own answer to the motion, Scott has denied the allegations, describing Powser as an emotionally unstable woman seeking revenge against him for failing to intervene on her behalf when court administrators refused to let her withdraw a resignation she filed in anger in April 2005.

Powser had been Scott's clerk since his appointment to the bench in 1994.

Navarro said he based his ruling on the defense's points, which briefly detailed when state law requires a judge to be disqualified from a case, and the declarations by all parties.

The judge said he did not review "confidential" materials Scott filed in the case that dealt with Powser's "personal and private history."

In his answer to the motion, Scott said he and his wife had

become substitute parental figures to Powser after she faced years of "emotional turmoil" surrounding her childhood.

Mullins had hoped Navarro would schedule a hearing in the case, at which he would have called Powser, who continues to stand by her assertions.

"I'm disappointed because he did not call for an evidentiary hearing and in my mind it's a credibility issue," Mullins said of Navarro's ruling. "I do not think he ought to rule on it based on the declarations alone."

Mullins said he plans to challenge the ruling to the Sixth District Court of Appeal by the end of the week.

Powser has shaken the Monterey County Superior Court bench with allegations of sexual and judicial misconduct since August 2005, when she widely distributed an e-mail regarding her ex-fiance, Traffic Commissioner Richard

Rutledge.

In addition to courthouse trysts, Powser alleged Rutledge fixed tickets for friends. Rutledge resigned after the Monterey County District Attorney's office concluded there was some validity to her claims but no basis for criminal charges.

In November 2005, Powser filed her sworn declaration alleging wrongdoing by Scott, as well as Judge Michael Fields, who she said invited her for sexual purposes to Ventura, where he was presiding over disciplinary hearings against a Santa Barbara judge.

Powser said Fields discussed the ongoing case with her and told her and other judges on the disciplinary panel had already decided the judge was guilty of the charges against her.

The Commission on Judicial Performance is investigating both Scott and Fields in connection with Powser's declaration.

**A14**   THE MONTEREY COUNTY HERALD, FRIDAY, JUNE 9, 2006

# Judge

*From page A1*

Public Defender Glenn Nolte, said the additional comments to jurors inappropriately suggest that Trujillo was guilty and raise questions about Moody's impartiality on the bench.

Moody wrote: "In this case, you were transported to another world, where moral principles have been turned upside down, where young men otherwise normal in appearance can, and do, murder other young men they don't even know on the spur of the moment, returning 5 minutes later to what they were doing before, gaining respect of their peers in the process.

"Through it all, I hope you found your experience to be interesting, educational and valuable, and that now that you know, you will not hesitate to inform those around you of the realities of the gang culture."

Martinez said the reference to "young men otherwise normal in appearance" was an unmistakable reference to his clean-cut client. He said he's talked to two jurors, including Morales, and is aware of a third who felt they were being admonished for making a mistake in not convicting Trujillo, and that Moody had judged him guilty.

"I interpret the letter as a comment on the facts and also as to the guilt of my client and I don't think it's appropriate," Martinez said.

## Unusual to comment

Daisy Yee, a spokeswoman for the California Judicial Council, said the council suggests that judges write letters of appreciation to jurors, but "it is unusual for a judge to comment on the facts of the case."

Through his court clerk, Moody declined to comment.

Questions about the letter come on the heels of a Herald report regarding allegations of pro-prosecution bias on the part of Moody and Judge Russell Scott, who reportedly is being investigated by the Commission on Judicial Performance for directing his court clerk to coach prosecutors who were in trial in his courtroom.

The report also detailed comments Moody has made in recent months, both to The Herald and on the court record, which raise questions about his impartiality.

In one case, Moody told The Herald that a document filed by a defense attorney should not be given credence because defense attorneys do not speak the truth and they only say what is in the best interests of their clients.

In the second case, Moody told Martinez in open court that the presumption of innocence in criminal courts is "a legal fiction."

That comment also involved Trujillo's murder case. While the majority of that jury was not convinced of Trujillo's guilt on the murder charge, it convicted him of an unrelated weapon-possession charge. In sentencing Trujillo on that charge, Moody used the unadjudicated murder charge to elevate his sentence to the maximum term of seven years in prison.

Martinez complained that his client's only previous conviction was for a misdemeanor prowling charge and was presumed innocent of the murder charge. Moody rejected the argument and said the presumption was "a legal fiction."

After the hearing, Moody said that the phrase was a legal term that referred to the fact that the courts require juries to presume innocence when it may not be a fact.

Martinez disagreed on Thursday. He said he has heard the phrase used before — such as when a defendant pleads guilty to a crime he didn't commit to achieve a specific outcome in another charge — but that it doesn't apply to the presumption of innocence.

"I don't see that as a legal fiction at all. It's a rule. All rules of law are a legal fiction if you use that theory," he said. "In my opinion it's not a legal fiction."

## Prejudgment

Martinez said he believes the letter to jurors is indicative of Moody's prejudgment in the case.

"He expressed that already when he sentenced my client on the weapons charge) and his comments in the letter seem to be consistent with that," Martinez said.

Moody is in the process of setting a new trial date in the Trujillo case, over which he will presumably preside.

The California Code of Judicial Ethics, adopted by the state Supreme Court in 1996, requires judges to be impartial. It also prohibits them from commending or criticizing jurors for their verdict or from making public comment on pending cases.

According to the Supreme Court Advisory Committee on Judicial Ethics, "Commending or criticizing jurors for their verdict may imply a judicial expectation in future cases and may impair a juror's ability to be fair and impartial in a subsequent case."

Moody began the letter by expressing appreciation for the personal sacrifices jurors made in serving on the panel.

"I can honestly tell you that no jury in my 34 years of experience has ever worked harder or sacrificed more than this one," he said.

## Felt chastised

Morales, the juror who spoke with The Herald, said she was initially impressed to receive a letter from the judge. However, by the end of the letter, she said, she was left feeling the judge was chastising them for their error.

"We broke everything apart," Morales said of the jury's deliberations. "We really dug into everything,

pinpointing every little thing we could think of. It was like he was saying, in all his career, how could we have taken so much time to come to the wrong decision?

"The judge said if there was one thread of reasonable doubt, we were not to convict," she added, "and there was a lot of it."

Nolte, the public defender, said he was aware of the facts of the case and had seen a copy of the letter.

"It's troubling," he said. "It seems to me it's asking people to prejudge the case and that's inappropriate."

Martinez and his investigator said it was clear to them that Moody was referring to the clean-cut Trujillo when he referred to normal-looking young men committing brutal, random slayings.

"The only one he could be talking about in this case is the defendant, the one sitting there," said investigator Glenn Rouse.

"I can't imagine who he was referring to in this case who's normal looking," Martinez said. "It's clear he's referencing my client."

The Salinas attorney said there are other problems with the suggestions Moody makes in the letter.

"I just don't know if commenting on the case and (the jury's) deliberations is appropriate," he said. "After all, these jurors are going to be jurors again in the future. You hope that when they come in, they will come in with same open-mindedness as the first time."

Nolte also questioned the effect on the jurors' future service.

"It certainly seems to suggest they made the wrong decision and they're now educated in these things and if they came back in the future, they would make the right decision," he said.

*Virginia Hennessey can be reached at 753-6751 or vhennessey@montereyherald.com*

Joe Johnson v. Warden                    CV07 - 4417 JF (PR)

PROOF OF SERVICE BY MAIL

STATE OF CALIFORNIA, CITY OF SOLEDAD:

I am an inmate at California State Prison at SOLEDAD the within Traverse to

Respondent's Answer to my Petition for Writ of Habeas Corpus was served on the below listed

parties by placing a true copy in a sealed envelope with postage thereon fully prepaid and gave it

to a correctional officer to be placed in the United States mail at Soledad, California, addressed

as follows:

UNITED STATES DISTRICT COURT
 FOR THE NORTHERN  DISTRICT OF California
450 Golden Gate Ave
San Francisco, CA  94102

Arthur Beever
California State Deputy Attorney General,
455 Golden Gate
San Francisco, CA 94102-7004

I declare that under penalty of perjury under the laws of the State of California

that the foregoing is true and correct.

Executed on _____ 2008 at Soledad, California.

_____

Joe Johnson V - 46926
Attorney Per Se
CSP - CTF
P.O. Box 705
Soledad, CA  93960

# APPENDIX



# County judiciary under fire

## Two allege corruption, misconduct of three judges

**By VIRGINIA HENNESSEY and GEORGE B. SANCHEZ**
*Herald Staff Writers*

An investigation by state court officials into allegations of wrongdoing by a local judge was triggered by two people who have separately pursued personal vendettas against the Monterey County judicial system.

The state Commission on Judicial Performance has removed Judge Michael Fields from a panel presiding over a disciplinary hearing for a Santa Barbara judge based on the declaration of a Monterey woman who said Fields expressed prejudgment of the case to her during a rendezvous at a Ventura hotel.

The woman, former Monterey County Superior Court clerk Crystal Powser, was at the root of charges that forced her former fiance, Traffic Commissioner Richard Rutledge, to resign in late September. She has now apparently joined forces with Eugene Forte, a former Salinas resident who has alleged corruption and misconduct in a series of lawsuits against members of the Monterey County



**Michael Fields**

The Monterey County judge was presiding over a three-judge panel hearing allegations of whether a Santa Barbara judge violated judicial ethics.

**A12**    THE MONTEREY COUNTY HERALD, SUNDAY, DECEMBER 4, 2005

# Judge

*From page A1*

judicial system. Court records indicate they, in turn, have questioned his mental stability and labeled him a "vexatious litigant," limiting his ability to file future lawsuits.

The convergence of Powser and Forte's mutual scorn for the local court system has thrown into disarray a state hearing to determine whether Santa Barbara Judge Diana Hall violated judicial ethics. It has also raised serious questions about the judgment and ethics of at least two Monterey County Superior Court judges, Fields and Russell Scott, for whom Powser worked as a clerk for more than 10 years.

Fields was presiding over a three-judge panel hearing allegations that Hall, 55, failed to report a $20,000 campaign contribution from her live-in girlfriend; improperly questioned a prosecutor who attempted to dismiss her from a case; and was convicted of drunken driving.

That hearing, being conducted in Ventura, was abruptly suspended Nov. 17, one day after Forte filed Powser's declaration in an unrelated lawsuit. According to the declaration, Powser traveled at Fields' request to his Ventura hotel room, where Fields, who is married, made sexual advances and discussed the case against Hall.

Unknown to Fields, according to the declaration, Powser accepted his invitation at the suggestion of Forte, who traveled with her to Ventura "so that it could be verified that this meeting took place."

During the rendezvous, Powser said, Fields told her he and the other two judges on the panel had discussed the case against Hall over breakfast, lunch and dinner, and had "already decided she was guilty of all three allegations."

Fields also told her, Powser said, that Hall concealed her girlfriend's campaign contribution because she did not want people to know she was a lesbian, and he made fun of the girlfriend's surname, Pokman.

Fields, who continues to hear cases on the Monterey County bench, declined comment Friday, saying he couldn't discuss pending litigation.



**Crystal Powser**
She has accused Judge Fields of prejudgment in the judicial ethics case.



**Richard Rutledge**
The ex-traffic commissioner resigned in late September after Powser's allegations of ticket fixing.



**Russell Scott**
Powser has accused the county judge of helping prosecutors question witnesses.



**Robert O'Farrell**
The judge is the target of a lawsuit by a man whom he held in contempt.

hear the case, according to spokeswoman Victoria Henley. That request is pending.

Henley wouldn't comment about the allegations against Fields.

"Complaints to the commission and investigations are confidential," Henley said when asked if Fields was being investigated. "I can't confirm or deny a complaint or allegation made against any California judge."

She declined comment on allegations in Powser's declaration about Scott.

Over dinner in Ventura, Powser said, she and Fields discussed Scott's alleged habit of telling her to call local prosecutors who were trying cases in his courtroom to give them direction on questions they should ask of witnesses.

Fields "sat back" with this disgusted look on his face, crossed his arms and said he totally thought that was wrong and he would never have, or never has had his clerk do such a thing," Powser wrote.

Scott did not respond to requests for comment.

While judges are free to ask witnesses questions during a trial, privately directing a prosecutor on how to conduct a trial would raise questions of judicial bias. Such a revelation could prompt defense attorneys to challenge the judge's appointment to a case or, if they did not, open subsequent verdicts to appeal.

## Powser's past allegations

It is not the first time accusations by Powser have shaken the Monterey County court-

between him and a court clerk. It is unclear whether any action was ever taken on that revelation.

Powser's e-mail regarding Rutledge prompted a criminal investigation by the Monterey County District Attorney's Office, which concluded there was insufficient evidence to warrant criminal charges

> ## "Complaints to the commission and investigations are confidential. I can't confirm or deny a complaint or allegation made against any California judge."
>
> — **Victoria Henley, spokeswoman, Commission on Judicial Performance**

against the commissioner.

In a blistering statement during a news conference, however, District Attorney Dean Flippo said there was evidence of actions by Rutledge that raised "the specter of favoritism" and "undermine the confidence of the public in the administration of justice and our court system."

Rutledge resigned that afternoon.

### Forte's case with the courts

Shortly thereafter, Forte contacted Powser, an admittedly emotionally fragile woman who had managed in a matter of weeks to accomplish what he had failed to do in six years of lawsuits: bring down an officer of the Monterey County courts.

Forte's vendetta against the Monterey County judicial system stems from a lawsuit he filed over a court ordered state hall in 1999. Forte lost that case as well as two subse-

courtroom in December 2003. Forte, who is not an attorney but who by then was representing himself in court, angered the judge by repeatedly interrupting him during a hearing for another lawsuit.

Transcripts of the hearing show Forte was trying to file a motion to disqualify O'Farrell for alleged bias. In a formal contempt hearing later that afternoon, O'Farrell said Forte had been given a chance to file the "challenge for cause" but instead, "loaded for bear," had taken the opportunity to grandstand with his two young children present in the courtroom.

After allowing Forte to carry on for several minutes about the issues in the case, according to a transcript, the judge said his comments had failed to mitigate or apologize for his actions.

"As a matter of fact, you're arrogant, you're defensive and you're, in fact, offensive," O'Farrell said. "Quite frankly, I believe I'm dealing with a certain pathology here, and I don't mean that in any pejorative way. But if you're not aware of some potential issues there yourself, perhaps you should look into them.

"Your conduct, not only today, and as it has led up to today, is really not terribly rational," O'Farrell added. "In fact, that's being generous."

### Vexatious litigants

It was in that lawsuit against O'Farrell and numerous additional defendants that Forte filed four separate appeals Nov. 16. The case against O'Farrell

For the latest

**LOCAL NEWS**

montereyherald.com

# The Herald

www.montereyherald.com

Sunday, May 28, 2006

MONTEREY PENINSULA AND SALINAS VALLEY $1.50

## CHAMPIONSHIP SATURDAY
Carmel wins baseball title; Notre Dame takes softball crown
Story on page 1C

**Herald question of the day**
Do you think tanning salons should be outlawed for health reasons?

☐ Yes    ☐ No
Go to: montereyherald.com to place your vote.
Today's result in A section
Story on page B1

# Judge Scott subject of probe

## FORMER CLERK'S ALLEGATIONS SPUR INVESTIGATION

**By VIRGINIA HENNESSEY**
*Herald/Salinas Bureau*

While the Commission on Judicial Performance pursues formal misconduct charges against Judge Jose Velazquez, it is investigating allegations of misconduct by at least one other Monterey County judge.

Lawyers who spoke on the condition of anonymity confirmed in recent weeks that the commission, the state's disciplinary panel for judges, is investigating allegations against Judge Russell Scott.

The allegations were originally contained in sworn statements filed by Crystal Powser, Scott's former court clerk, whose earlier allegations led to the resignation of Traffic Commissioner Richard Rutledge in September.

Attorneys interviewed by the commission's investigators said they were asked about Powser's allegations that Scott had her make telephone calls to coach prosecutors who were in trial in his

---

**Inside**

Judge questions cornerstone of legal system. **A10**

Judge files response to misconduct charges. **A10**

---

courtroom./

Through his court clerk Friday, Scott declined comment, saying that a judge is prohibited from making comment on an investigation.

The attorneys said they were papering a judge.

Defense lawyers have long complained that Scott and Moody, both former prosecutors, are pro-prosecution. Lawyers have frequently papered the judges, particularly Scott, to have their cases assigned to Judge Robert Moody, and those who challenged Moody without cause were assigned to Scott.

Under section 170.6 of the state Code of Civil Procedure, attorneys are given one chance on each case

to challenge a judge without giving a reason.

The process is commonplace.

"... papering a judge ..."

... former prosecutors, are pro-prosecution. Lawyers have frequently papered the judges, particularly Scott, to have their cases removed to another courtroom.

At some point, according to ... declaration, ... Judge Terrance Duncan ...


Judge Scott

*Please see JUDGES page A10*

# Judges

*From page A1*

system whereby all of Scott's papered cases went to Moody and vice versa.

Duncan did not return a phone call Friday.

Many defense attorneys said the purported system, which they view as retaliatory, has continued under Presiding Judge Stephen Sillman.

Sillman denied the allegation last week.

"One, nothing can be said about an investigation, and, two, it's not a policy," he said.

### Reasons for assignments

Sillman said he reviews each case that comes to him for reassignment on an individual basis. In many cases, he said, it made sense to assign Scott's and Moody's cases to each other because they have the same pretrial schedules.



**Judge Michael Fields**
Ex-clerk alleges Fields made overtures to her in Ventura.

Investigations by the Commission on Judicial Performance are confidential and can lead to several levels of discipline, some of which are confidential.

Victoria Henley, the commission's chief counsel, said she couldn't confirm or deny an investigation of Scott or any other judge on Monterey County's bench. Speaking generally, she said there are no state regulations dictating how a case must be reassigned after a judge has been papered.

However, three sources who spoke to The Herald on the condition of anonymity said they were interviewed by commission investigators who questioned whether the practice, coupled with the allegation of coaching the prosecution, indicated a broader pro-prosecution bias on Scott's part.

The state Code of Judicial Ethics requires that a judge be impartial in carrying out his judicial duties.

"The integrity and independence of judges depend ... upon their acting without fear or favor," the code reads. "Violations of this code diminish public confidence in the judiciary

performance of judicial duties, engage in speech, gestures or other conduct that would reasonably be perceived as bias or prejudice."

Powser's allegation that Scott had her call prosecutors with tips during trials is the far more serious allegation.

The code states a judge "shall not initiate, permit or consider ex parte communications" — discussions outside the courtroom without the presence of both attorneys in the case.

In Powser's declaration, which contained allegations against Judge Michael Fields and Velasquez, the former clerk relates a conversation she had with Fields in which she said Scott had her "contact the DAs and tell them what to ask in jury trials, because Judge Scott told me that it would be wrong for him to do it, but not for me to do it for him, and (he) told me not to tell the (prosecutor) who told me to do it."

Powser said Fields "sat back with a disgusted look on his face, crossed his arms and said he totally thought that was wrong and he would never have, and never has had, his clerk do such a thing."

Assistant District Attorney Berkley Brannon said he did not know if his office had been contacted by the commission, because the inquiries would be confidential. He said the Monterey County Public Defenders Office questioned several deputies in his office.

"I have discussed it with a number of attorneys and in my opinion it's false," he said of Powser's allegation.

Former public defender Michael Lawrence said the allegations are "of grave concern to every defense attorney."

"The allegations that on occasion he would communicate indirectly with prosecutors and provide assistance to them is, of course, extremely disturbing and raises implications about the integrity of the criminal justice," he said, "and these questions should be resolved."

### Denies existence of system

Lawrence, who has gone into private practice since retiring in December, said he has no cases before Scott. In the future, he said, he would have to weigh a specific case to determine if he wants to paper Scott, challenge him or recuse himself from demanding.

Moody said he regularly is assigned papered cases from many judges on the bench and denied there was a system for a given Scott's cases to him or

commission is investigating the conduct of Moody, Duncan or Sillman.

Sillman denied rumors that the commission issued private letters of censure to him and Scott.

Several defense attorneys said the alleged practice of reassigning Scott's and Moody's cases to each other was unfair, if not unethical.

"I think it's terrible," said Monterey attorney Larry Biegel. "It shouldn't be done like that, like a punishment. It should be done on a revolving basis."

Salinas defense attorney Richard Rosen, who is president of the Monterey County Bar Association, objected to the idea.

"I don't want to comment about Judge Moody or Judge Scott," he said. "However, as a general proposition, (California Code of Civil Procedure) 170.6 was enacted to ensure fairness to all sides in both civil and criminal litigation. If the response to any lawyer filing a 170.6 against one particular case is to always assign the case to another judge to create a loop, then that's wrong.

"It has the appearance of impropriety because it looks like the judges are in collusion with one another to defeat the very purpose of 170.6," he said. "If it's going on, it's a bad practice and it ought to be stopped."

Other attorneys, such as acting Public Defender Glenn Nolte and Salinas lawyer Tom Worthington, said it was their impression the system to reassign cases was based on ease of scheduling.

"I frankly thought it was because of a matter of convenience," said Worthington, noting that Scott's and Moody's courtrooms were previously located next to each other and they used similar schedules. "I really didn't have a problem with it and I especially didn't have a problem when I heard it was Judge Sillman's decision."

Worthington said he has not seen a pro-prosecution bias on Scott's part.

"I can only say that I have had dozens of cases in Judge Scott's department, and if I had thought anything like that was going on, I certainly would have made it known and I never saw anything

for a cavalcade of scandal that has rocked the Monterey County Superior Court bench and beyond in the past year.

In her sworn statement, Powser alleged that she was invited to Ventura to visit Fields, who was presiding over a commission disciplinary hearing against Santa Barbara Judge Diana Hall. In graphic detail, Powser recounted alleged sexual overtures Fields made to her in his hotel room and said Fields had discussed the case over which he was presiding.

### Powser's allegations

In his hotel room and during dinner, she said, Fields described the charges against Hall: that she secretly accepted a $20,000 campaign donation from her live-in girlfriend, was convicted of drunken driving, and improperly questioned a prosecutor who papered her to remove her from a case.

According to Powser, Fields told her he and the panel's other two judges discussed the case during meals and had already decided she was guilty.

Upon receiving a copy of Powser's declaration, the commission removed Fields from the panel, then dismissed the panel altogether. A new panel was appointed and the case is set for final arguments June 14.

It is unknown if Fields was, or will be, further disciplined by the commission. Its disciplinary actions can range from private admonishments to public censure to removal from the bench.

Powser caused the resignation of Rutledge, her former fiance, who resigned in September after she sent e-mails to dozens of people in the Monterey County Superior Court system detailing her sexual encounters with Rutledge in his Marina chambers and elsewhere in Salinas' courthouse.

The e-mail, prompted by Powser's breakup with Rutledge and the Superior Court's refusal to let her withdraw a resignation she filed in anger, contained far more serious allegations that Rutledge fixed tickets for friends and co-workers.

Prosecutors did not find sufficient evidence to file criminal charges, partly because of the statute of limitations. But District Attorney Dean Flippo expressed serious concerns about Rutledge's judicial behavior, specifically that he did not periodically return to conflict of interest cases. Flippo said Rutledge's actions besmirched the



**Judge Richard Rutledge**
Resigned after former fiancee sent out damning e-mails.

Case ... Document ... Filed 07/13/200 ... Page 94 of 99

# Judge Moody's comments termed unsettling

## JURIST CALLS CORNERSTONE OF U.S. JUSTICE SYSTEM A 'LEGAL FICTION' DURING SENTENCING

By VIRGINIA HENNESSEY
Herald Salinas Bureau

For years, many Monterey County defense attorneys have complained that judges Russell D. and Robert Moody are pro-prosecution. Recent statements Russell Moody may shed light on high concerns.

Speaking in court and in legal briefs, Moody has made comments questioning the merits of defense lawyers and some of the basic tenets of the American justice system — the presumption of innocence.

In April, in a Salinas courtroom, Moody questioned The Herald's request to view the file of one of three Toro Park teenagers charged with a defense attorney in the case by Salinas attorney Juliet Peck, a defense attorney in the case.

Moody said the lengthy documents, which contained dozens of letters in support of the young man, was one-sided.



Moody said his comments about attorneys were misinterpreted, that what he meant was that a court session Thursday morning.

Perhaps more significant were comments that Moody made during a court session Thursday morning.

Trujillo, 20, was in court for sentencing on convictions for possession of a weapon from which the serial number had been removed, and for gang enhancement. Trujillo was convicted of the charge in September by a jury which hung 8-4 for acquittal on an unrelated murder charge.

Prosecutor Carol Reed argued for a prison sentence based on Trujillo's gang affiliation. Trujillo's lawyer, Eugene Martinez, asked for probation, arguing that his client's only prior conviction was for a misdemeanor providing defense.

Neither attorney, nor the probation officer, mentioned the murder charge in their sentence.

Moody, however, cited the murder charge as a factor in much stronger position, depending on the outcome, Riordan said.

But another legal expert said Moody's ruling, "Clearly" reversible error.

Jeff Adachi, San Francisco's public defender, said the rules of court prevent a judge from applying facts from an unrelated crime in enhancing the sentence in another.

Beyond the legal ruling, Adachi said, Moody's comments were disturbing.

"The judge's comments regarding the presumption of innocence are potentially wrong, but ethically wrong," said. "As a judge, it's his responsibility to uphold the law, including the presumption of innocence. For a judge to display such willful disregard for one of

it is, however the cornerstone of our system...

"I've never seen a case where it ... a client is still pending for trial,

# Defense attorney wants Judge Scott off case over allegations clerk coached prosecutors

BY VIRGINIA HENNESSEY
Herald Salinas Bureau

A defense lawyer on Tuesday moved to disqualify Judge Russell Scott from a Salinas shooting case on the grounds that the judge is biased toward the prosecution.

Jerome Mullins of San Jose based his motion on a sworn declaration by Scott's longtime court clerk, who alleged that Scott had her coach prosecutors during trials, among other alleged misconduct.

Scott left the bench for about 20 minutes to review the motion, which also contained declarations by the former public defender and a deputy public defender. On his return, he said he would file a written response to the motion within 10 days.

The judge can either answer the allegations and recuse himself, or ask that another judge hear the motion and rule. In a telephone call Tuesday night,

Scott reiterated that he will answer all of the issues raised in the challenge in a "verified answer."

Mullins said he "absolutely" believes his client cannot receive a fair trial in Scott's courtroom based on the allegations in the declarations.

The motion was filed in the case of Gabriel Cadena, 31, who is accused of attempted murder, firearm and gang charges in connection with a July 25

shooting in Salinas. The case was continued until Sept. 26.

It is the first time that a criminal defense attorney has responded in court to the declaration that former court clerk Crystal Powser filed in November in an unrelated case. In that declaration, Powser alleged wrongdoing by judges Michael Fields, Jose Velasquez and

*Please see* Scott *page A12*

10-25-06



**Russell Scott** Defense in attempted-murder case contends he favors the prosecution.

# Move to disqualify judge rejected

## DEFENSE PLANS TO CHALLENGE RULING

**By VIRGINIA HENNESSEY**
*Herald Salinas Bureau*

With little comment, a Santa Clara County judge has denied a motion to disqualify Judge Russell Scott from a Salinas case for alleged pro-prosecution bias.

Judge Rene Navarro said the attorney for Gabriel Cadena had "failed to meet (his) burden of establishing facts that would lead a person to reasonably entertain a doubt about Judge Scott's impartiality or that Judge Scott was biased or prejudiced toward an attorney or the defendant involved in the pending proceeding."

The motion to recuse Scott was filed by Jerome Mullins, defense attorney for Cadena, 31, who is charged with attempted murder in a July 25 Salinas gang shooting. Mullins, who is from Santa Clara County, based his motion on a sworn declaration by Scott's former longtime court clerk, Crystal Powser, who has alleged that Scott encouraged her to convey his suggestions to prosecutors who were in trial before him, among other things.

Navarro, who was assigned by the state Judicial Council to review the motion, could have initiated a hearing to consider witness testimony before ruling on it. Instead, he based his decision purely on declarations filed by Scott and attorneys on both

*Please see* **Scott** *page A12*

## Scott
*From page A1*

sides of the legal table.

The motion was also supported by declarations by a woman seeking revenge against him for failing to intervene on her behalf when court administrators refused to let her withdraw a resignation she filed in anger in April 2005.

Powser had been Scott's clerk since his appointment to the bench in 1994.

Navarro said he based his ruling on the defense's points, which briefly detailed when state law requires a judge to be disqualified from a case, and the declarations by all parties.

The judge said he did not review "confidential" materials Scott filed in the case that dealt with Powser's "personal and private history."

In his answer to the motion, Scott said he and his wife had

no one in their office had ever been coached by or for Scott.

In his own answer to the motion, Scott has denied the allegations, describing Powser as an emotionally unstable woman seeking revenge against him for failing to intervene on her behalf when court administrators refused to let her withdraw a resignation she filed in anger in April 2005.

Powser had been Scott's clerk since his appointment to the bench in 1994.

Navarro said he based his ruling on the defense's points, which briefly detailed when state law requires a judge to be disqualified from a case, and the declarations by all parties.

The judge said he did not review "confidential" materials Scott filed in the case that dealt with Powser's "personal and private history."

In his answer to the motion, Scott said he and his wife had

become substitute parental figures to Powser after she faced years of "emotional turmoil" surrounding her childhood.

Mullins had hoped Navarro would schedule a hearing in the case at which he would have called Powser, who continues to stand by her assertions.

"I'm disappointed because he did not call for an evidentiary hearing and in my mind it's a credibility issue," Mullins said of Navarro's ruling. "I do not think he ought to rule on it based on the declarations alone."

Mullins said he plans to challenge the ruling to the Sixth District Court of Appeal by the end of the week.

Powser has shaken the Monterey County Superior Court bench with allegations of sexual and judicial misconduct since August 2005, when she widely distributed an e-mail regarding her evidence. Traffic Commissioner Richard

Rutledge.

In addition to courthouse trysts, Powser alleged Rutledge fixed tickets for friends. Rutledge resigned after the Monterey County District Attorney's office concluded there was some validity to her claims but no basis for criminal charges.

In November 2005, Powser filed her sworn declaration alleging wrongdoing by Scott, as well as Judge Michael Fields, who she said invited her for sexual purposes to Ventura, where he was presiding over disciplinary hearings against a Santa Barbara judge.

Powser said Fields discussed the ongoing case with her and told her he and other judges on the disciplinary panel had already decided the judge was guilty of the charges against her. The Commission on Judicial Performance is investigating both Scott and Fields in connection with Powser's declaration.

# Judge

*From page A1*

Public Defender Glenn Nolte, said the additional comments to jurors inappropriately suggest that Trujillo was guilty and raise questions about Moody's impartiality on the bench.

Moody wrote: "In this case, you were transported to another world, where moral principles have been turned upside down, where young men otherwise normal in appearance can, and do, murder other young men they don't even know on the spur of the moment, returning 5 minutes later to what they were doing before, gaining respect of their peers in the process.

"Through it all, I hope you found your experience to be interesting, educational and valuable, and that now that you know, you will not hesitate to inform those around you of the realities of the gang culture."

Martinez said the reference to "young men otherwise normal in appearance" was an unmistakable reference to his clean-cut client. He said he's talked to two jurors, including Morales, and is aware of a third who felt they were being admonished for making a mistake in not convicting Trujillo, and that Moody had judged him guilty.

"I interpret the letter as a comment on the facts and also as to the guilt of my client and I don't think it's appropriate," Martinez said.

## Unusual to comment

Daisy Yee, a spokeswoman for the California Judicial Council, said the council suggests that judges write letters of appreciation to jurors, but "it is unusual for a judge to comment on the facts of the case."

Through his court clerk, Moody declined to comment.

Questions about the letter come on the heels of a Herald report regarding allegations of

pro-prosecution bias on the part of Moody and Judge Russell Scott, who reportedly is being investigated by the Commission on Judicial Performance for directing his court clerk to coach prosecutors who were in trial in his courtroom.

The report also detailed comments Moody has made in recent months, both to The Herald and on the court record, which raise questions about his impartiality.

In one case, Moody told The Herald that a document filed by a defense attorney should not be given credence because defense attorneys do not speak the truth and they only say what is in the best interests of their clients.

In the second case, Moody told Martinez in open court that the presumption of innocence in criminal courts is "a legal fiction."

That comment also involved Trujillo's murder case. While the majority of that jury was not convinced of Trujillo's guilt on the murder charge, it convicted him of an unrelated weapon-possession charge. In sentencing Trujillo on that charge, Moody used the unadjudicated murder charge to elevate his sentence to the maximum term of seven years in prison.

Martinez complained that his client's only previous conviction was for a misdemeanor prowling charge and was presumed innocent of the murder charge. Moody rejected the argument and said the presumption was "a legal fiction."

After the hearing, Moody said that the phrase was a legal term that referred to the fact that the courts require juries to presume innocence when it may not be a fact.

Martinez disagreed on Thursday. He said he has heard the phrase used before — such as when a defendant pleads guilty to a crime he didn't commit to achieve a specific outcome in another charge — but that it doesn't apply to the presumption of innocence.

"I don't see that as a legal

fiction at all. It's a rule. All rules of law are a legal fiction if you use that theory," he said. "In my opinion it's not a legal fiction."

## Prejudgment

Martinez said he believes the letter to jurors is indicative of Moody's prejudgment in the case.

"He expressed that already when he sentenced my client on the (weapons charge) and his comments in the letter seem to be consistent with that," Martinez said.

Moody is in the process of setting a new trial date in the Trujillo case, over which he will presumably preside.

The California Code of Judicial Ethics, adopted by the state Supreme Court in 1996, requires judges to be impartial. It also prohibits them from commending or criticizing jurors for their verdict or from making public comment on pending cases.

According to the Supreme Court Advisory Committee on Judicial Ethics, "Commending or criticizing jurors for their verdict may imply a judicial expectation in future cases and may impair a juror's ability to be fair and impartial in a subsequent case."

Moody began the letter by expressing appreciation for the personal sacrifices jurors made in serving on the panel.

"I can honestly tell you that no jury in my 34 years of experience has ever worked harder or sacrificed more than this one," he said.

## Felt chastised

Morales, the juror who spoke with The Herald, said she was initially impressed to receive a letter from the judge. However, by the end of the letter, she said, she was left feeling the judge was chastising them for their error.

"We broke everything apart," Morales said of the jury's deliberations. "We really dug into everything,

pinpointing every little thing we could think of. It was like he was saying, in all his career, how could we have taken so much time to come to the wrong decision?

"The judge said if there was one thread of reasonable doubt, we were not to convict," she added, "and there was a lot of it."

Nolte, the public defender, said he was aware of the facts of the case and had seen a copy of the letter.

"It's troubling," he said. "It seems to me it's asking people to prejudge the case and that's inappropriate."

Martinez and his investigator said it was clear to them that Moody was referring to the clean-cut Trujillo when he referred to normal-looking young men committing brutal, random slayings.

"The only one he could be talking about in this case is the defendant, the one sitting there," said investigator Glenn Rouse.

"I can't imagine who he was referring to in this case who's normal looking," Martinez said. "It's clear he's referencing my client."

The Salinas attorney said there are other problems with the suggestions Moody makes in the letter.

"I just don't know if commenting on the case and (the jury's) deliberations is appropriate," he said. "After all, these jurors are going to be jurors again in the future. You hope that when they come in, they will come in with same open-mindedness as the first time."

Nolte also questioned the effect on the jurors' future service.

"It certainly seems to suggest they made the wrong decision and they're now educated in these things and if they came back in the future, they would make the right decision," he said.

*Virginia Hennessey can be reached at 753-6751 or in messval moodyschoolcase*

Joe Johnson v. Warden                           CV07 - 4417 JF (PR)

PROOF OF SERVICE BY MAIL

STATE OF CALIFORNIA, CITY OF SOLEDAD:

I am an inmate at California State Prison at SOLEDAD the within Traverse to

Respondent's Answer to my Petition for Writ of Habeas Corpus was served on the below listed

parties by placing a true copy in a sealed envelope with postage thereon fully prepaid and gave it

to a correctional officer to be placed in the United States mail at Soledad, California, addressed

as follows:

UNITED STATES DISTRICT COURT
 FOR THE NORTHERN  DISTRICT OF California
450 Golden Gate Ave
San Francisco, CA  94102

Arthur Beever
California State Deputy Attorney General,
455 Golden Gate
San Francisco, CA 94102-7004

I declare that under penalty of perjury under the laws of the State of California

that the foregoing is true and correct.

Executed on  6-17  2008 at Soledad, California.

Joe Johnson V - 46926
Attorney Per Se
CSP - CTF
P.O. Box 705
Soledad, CA  93960

Joe Johnson V-48926
P.O. Box 705
Soledad, CA 93760

U.S. Dist Court
for the No. Dist of CA
450 Golden Gate Ave
San Francisco, CA 94102

