1
2
3
4
5
6
7

NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

JOE RANDEL JOHNSON,                )    No. C 07-04417 JF (PR)
                                   )
              Petitioner,          )    ORDER DENYING PETITION FOR
                                   )    WRIT OF HABEAS CORPUS
     vs.                           )
                                   )
                                   )
ANTHONY KANE, Warden,              )
                                   )
              Respondent.          )
                                   )
_____   )

     Petitioner, proceeding pro se, seeks a writ of habeas corpus pursuant to 28

U.S.C. § 2254.  In an order to show cause issued March 3, 2008, this Court found that

Petitioner had raised seven cognizable claims for federal habeas relief and ordered

Respondent to show cause why the writ should not be granted.  Respondent filed an

answer addressing the merits of the petition.  Petitioner filed a traverse.  Having

reviewed the papers and the underlying record, the Court concludes that Petitioner is

not entitled to federal habeas corpus relief and will deny the petition.

//

//

**FACTUAL AND PROCEDURAL BACKGROUND**

The following facts and procedural background are taken from the unpublished

opinion of the California Court of Appeal:

> Defendant and Eugene Bell frequently "got high together." Bell also
> borrowed money from defendant. In late March 2002, Bell had been
> awake for a week using crack cocaine, and he was not getting along with
> defendant. After a couple of days of verbal conflict between the two men
> about a debt that defendant alleged Bell owed him, defendant came to
> Bell's Seaside residence after midnight on March 28 and asked Bell to
> repay him. Bell declined to do so. Bell initiated a mutual physical fight
> during which Bell initially wielded a hammer and possibly a knife.
> During this fight, defendant threw Bell into a hot water heater.
>
> Kenneth Collins and Adrian Wilcoxen were present during the fight
> between defendant and Bell. Collins broke up the fight, and Bell "started
> yelling he was going to call the police." Collins saw defendant grab
> Bell's telephone off the wall and take it with him when he left Bell's
> home. Bell suffered a black eye and cuts to his face and head, and he
> bled "real bad." Bell's telephone, a headset and the telephone cord were
> found in a paper bag outside a market near Bell's residence.
>
> Defendant was interviewed by the police a day or so after the Seaside
> incident. He admitted that he had gone to Bell's residence seeking
> repayment of money Bell owed him. Defendant claimed that Bell had
> attacked him with a hammer and a knife and attempted to murder him,
> and he "got no choice but to turn around and defend myself." Defendant
> admitted that he "won" the fight and "beat up" Bell. Defendant insisted
> that he had not taken anything from Bell or from Bell's residence.
>
> Emanuel Arzadon and defendant had been friends for about four months
> in February 2003 and frequently used drugs together. Arzadon knew
> defendant as "Joe-Joe." On February 2, 2003, Arzadon was mad at
> defendant because defendant had brought too many people to Arzadon's
> Monterey home to use drugs. Arzadon asked defendant to leave his home
> and take these people with him, but defendant just left the house and
> stayed in his van across the street. Defendant was waiting for a man
> named Paul, who was at Arzadon's home, to pay defendant $200 Paul
> owed defendant. A man named Angelo drove by and gave Arzadon $200
> to give to Paul so Paul could repay defendant. Shortly thereafter,
> Arzadon and Paul were both arrested for being under the influence.
> Arzadon retained the $200 and did not give it to Paul. Arzadon was
> released that evening and returned to his home. He used some of the
> $200 to buy crack cocaine. Defendant came by in the early evening
> seeking the $200. Arzadon called 911 and demanded that defendant
> leave. Defendant left.
>
> Well after midnight that night, Arzadon was in the bedroom of his home,
> and his daughter's friend Juan Matthews was watching television in
> Arzadon's living room. Yvonne Nelson came to visit Arzadon and went
> into his bedroom where the two used drugs. A black man, who neither
> Arzadon nor Matthews knew or could identify (hereafter X), came to the
> front door several times looking for Nelson, but he was sent away by

Arzadon and Matthews.[1] James Allen, who was friendly with both Arzadon and defendant, came by, and, while he and Arzadon were talking in the dining room, X came into the house. Then defendant rushed into the house through the front door and struck Arzadon in the shoulder with a chair. Arzadon ran into the kitchen and was knocked to the floor and punched in the face. One of the men said "[w]here's my money." Defendant and X held Arzadon down, and Arzadon "felt a hand going through my pocket ." Arzadon still had some of the $200 he had received from Angelo in his pocket.

Matthews heard loud voices in the kitchen, and he went into the kitchen and saw Arzadon on his back on the floor. One man was holding Arzadon down, and the other two were watching. Matthews did not recognize any of the men and was unable to identify defendant or Allen as one of them. Matthews asked "what are you guys doing." The two men who were watching "rushed" Matthews, and Matthews threw down his leather jacket so that he could defend himself. The two men pushed Matthews to the ground in the living room and held him there. After less than a minute, the third man said "let's go," and the three men left the house. As they were leaving, one of the men who had held Matthews down grabbed Matthews's leather jacket and took it with him.

Arzadon suffered a black eye and a fractured shoulder, and the money he had had in his pocket was gone. Arzadon and Matthews looked for Arzadon's telephone, which had been in the bedroom before the attack, so they could call the police, but they could not find the telephone. Arzadon went to a friend's house to call 911. Arzadon reported that a half-hour earlier "three, four black guys jumped me" and "took my phone so I couldn't call out." He identified one of the men who had assaulted him as "JoJo." Arzadon later told the police that defendant had wanted $160 from him. He also stated that Nelson had been holding his phone and calling him names when defendant attacked him and that Nelson took the phone with her when she left Arzadon's home.

Defendant was arrested on the evening of February 3, 2003, and a small rock of cocaine was found in his hat. When he spoke with the police the next day, defendant said that Arzadon had kept money that "Paul" owed defendant that Angelo had delivered to Arzadon to give to Paul to give to defendant. Defendant said that Allen had gone into Arzadon's residence seeking the money. Then Arzadon came out into the front yard, refused to give defendant any money and provoked a fight. Arzadon "lost" this fight. Meanwhile, Allen was fighting with another man in Arzadon's

---

[1]In their trial testimony, Arzadon and Matthews gave inconsistent recitations of the circumstances that preceded the altercation. Matthews testified that Nelson left the house and left the house's front door ajar. A few minutes later, two black men entered and went into the kitchen with Arzadon. Another black man rushed into the house through the front door and joined the other men in the kitchen. Arzadon, on the other hand, testified that Nelson "never left the house." James Allen arrived alone, knocked on the front door and was admitted by either Arzadon or Matthews. Arzadon had a conversation with Allen that was interrupted by the entry of a man who rushed in and immediately struck Arzadon. Arzadon testified that, after he was knocked to the floor, he thought he heard Allen say "get off of him."

residence, and Nelson was "watchin' ". Defendant denied that he had obtained any money from Arzadon or taken anything from Arzadon's residence.

People v. Johnson, No. H027648, slip op. at 2-5 (Cal. Ct. App. Jan. 18, 2006) (Resp't Ex. 6) (footnote in original).

Petitioner was convicted by a jury of two counts of attempted first-degree robbery in concert, which were lesser-included offenses of the charges of home-invasion robbery (counts 1 and 2) (Cal. Pen. Code §§ 211, 213(a)(1)(A), 664); first-degree burglary (count 3) (Cal. Pen. Code § 459); aggravated assault (count 4) (Cal. Pen. Cod § 245(a)(1)); transportation of a controlled substance (count 5) (Cal. Health & Safety Code § 11352); and misdemeanor assault, a lesser-included offense of the charge of assault by force likely to produce great bodily injury (count 7) (Cal. Pen. Code § 240).  (Resp't Ex. 1 at 99-108, 227-43.)  Petitioner was not convicted of charges of possession of cocaine base for sale (count 6) (Cal. Health & Safety Code § 11351.5) or damaging a telephone line (count 8) (Cal. Pen. Code § 591).  (Resp't Ex. 1 at 179, 227-43.)  The trial court also found true allegations that Petitioner had suffered two prior convictions for sale or transportation of drugs (Cal. Health & Safety Code § 11370.2), served three prior prison terms (Cal. Pen. Code § 667.5(a),(b)), and suffered two prior "strike" convictions (Cal. Pen. Code § 1170.12).  (Resp't Ex. 1 at 246-50.)  On June 22, 2004, the trial court sentenced Petitioner to a term of 58 years to life in state prison.  (Id. at 330-32.)

On January 18, 2006, the California Court of Appeal affirmed the conviction but remanded for resentencing.  (Resp't Ex. 6.)  On April 12, 2006, the California Supreme Court denied the petition for review.  (Resp't Ex. 8.)  Petitioner then filed a petition for a writ of habeas corpus in the California Supreme Court, which was denied on June 13, 2007.  (Resp't Exs. 9-10.)

//

//

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**DISCUSSION**

**A.    Standard of Review**

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings.  Under AEDPA, a federal court cannot grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or an involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).  "Under the 'unreasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  Id.  "[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411.

A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  Id. at 409.  The "objectively unreasonable" standard does not equate to "clear error"  because "[t]hese two standards . . . are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75

1 (2003).

2       A federal habeas court may grant the writ if it concludes that the state court's

3 adjudication of the claim "resulted in a decision that was based on an unreasonable

4 determination of the facts in light of the evidence presented in the state court

5 proceeding." 28 U.S.C. § 2254(d)(2). The court must presume correct any

6 determination of a factual issue made by a state court unless petitioner rebuts the

7 presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

8       Where the highest state court to consider Petitioner's claims issued a summary

9 opinion which does not explain the rationale of its decision, federal review under §

10 2254(d) is of the last state court opinion to reach the merits. See Ylst v. Nunnemaker,

11 501 U.S. 797, 801-06 (1991); Bains v. Cambra, 204 F.3d 964, 970-71, 973-78 (9th Cir.

12 2000). In this case, the last state court opinion to explain the rationale of its decision

13 on Petitioner's fifth and seventh claims, below, is the opinion of the California Court of

14 Appeal on direct review. (Resp't Ex. 6.) The only state court opinion to address

15 Petitioner's other claims is the summary opinion of the California Supreme Court

16 denying Petitioner's state habeas petition; there is no lower court decision on these

17 claims. (Resp't Ex. 10.) Where the state court gives no reasoned explanation of its

18 decision, and there is no reasoned lower court decision on the claims, a review of the

19 record is the only means of deciding whether the state court's decision was objectively

20 reasonable. See Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006).

21 Consequently, the Court applies the AEDPA standard for Petitioner's first, second,

22 third, fourth and sixth claims, below, by reviewing the record to determine whether the

23 state court's decision denying the claim was objectively reasonable.

24 **B.**    **Analysis of Legal Claims**

25       Petitioner has raised the following seven cognizable claims for federal habeas

26 relief: (1) the trial court violated Petitioner's right to due process by finding Petitioner

27 competent to stand trial without conducting a hearing; (2) Petitioner's right to due

28 process was violated because Arzadon's testimony against him was "tainted;" (3)

Petitioner received ineffective assistance of counsel, in violation of his Sixth Amendment rights; (4) the trial judge was biased against Petitioner, in violation of Petitioner's right to due process; (5) the trial court violated Petitioner's right to due process by failing to sever the trial on the two sets of charges arising out of different incidents; (6) the trial court violated Petitioner's right to due process by failing to consider California Proposition 36 in sentencing him on count 5; and (7) there was insufficient evidence to support Petitioner's conviction for attempted robbery "in concert" on counts 1 and 2, in violation of Petitioner's right to due process.

### 1.    **Competency to Stand Trial**

Petitioner alleges that his right to due process of law was violated when the trial court found that he was mentally competent to stand trial without conducting a hearing.

A criminal defendant may not be tried unless he is competent. <u>Godinez v. Moran</u>, 509 U.S. 389, 396 (1993). The conviction of a defendant who is legally incompetent violates due process. <u>Cacoperdo v. Demosthenes</u>, 37 F.3d 504, 510 (9th Cir. 1994). The test for competency to stand trial is whether the defendant demonstrates the ability "to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." <u>Godinez</u>, 509 U.S. at 396; <u>see also</u> <u>United States v. Friedman</u>, 366 F.3d 975, 981 (9th Cir. 2004) (upholding finding of incompetency where defendant's paranoid schizophrenia did not affect his understanding of the proceedings against him, but prevented him from working with his attorney to assist in his defense). The California standard is similar. <u>See</u> Cal. Penal Code § 1367 (defining defendants who are "unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner" as mentally incompetent). The standard for competency to stand trial is lower than the standard for capacity to commit a crime, and persons with limited or diminished mental capacity are not necessarily incompetent to stand trial. <u>Hoffman v. Arave</u>, 455 F.3d

926, 938 (9th Cir. 2006), <u>judgment vacated in part on other grounds by</u> <u>Arave v.</u> <u>Hoffman</u>, 552 U.S. 117 (2008) (per curiam).

Due process requires a trial court to order a psychiatric evaluation or conduct a competency hearing sua sponte if the court has a good faith doubt concerning the competency of a defendant.  <u>Pate v. Robinson</u>, 383 U.S. 375, 385 (1966); <u>Cacoperdo</u>, 37 F.3d at 510; <u>see also</u> <u>Davis v. Woodford</u>, 384 F.3d 628, 644 (9th Cir. 2004).  This standard is "clearly established Federal law, as determined by the Supreme Court" within the meaning of 28 U.S.C. § 2254(d)(1).  <u>Torres v. Prunty</u>, 223 F.3d 1103, 1107 (9th Cir. 2000) (citing <u>Pate</u>, 383 U.S. at 385).  A trial court's assessment that a competency hearing is not necessary, based on the lack of evidence of Petitioner's inability to understand and follow the proceedings, is a factual finding to which a federal habeas court must defer unless it is objectively reasonable.  <u>Davis</u>, 384 F.3d at 644 (citing 28 U.S.C. §2254(d)(2)).

A good faith doubt about the competency of a defendant arises only if there is substantial evidence of incompetency.  <u>Cacoperdo</u>, 37 F.3d at 510 (denial of motion for psychiatric evaluation did not render trial fundamentally unfair where petitioner made single conclusory allegation he suffered from mental illness); <u>see also</u> <u>Davis</u>, 384 F.3d at 645-46 (defendant's decision to wear jail clothing and to refuse to sit at counsel table during most of penalty phase of capital trial was not substantial evidence of incompetency, where defendant acknowledged risks of his behavior and rationally weighed those risks against likelihood he would prejudice himself by having an outburst if he sat at the table); <u>Odle v.Woodford</u>, 238 F.3d 1084, 1087-89 (9th Cir. 2001) (granting writ due to failure to conduct competency hearing, where reasonable jurist would have had good faith doubt of defendant's competency in light of a history of massive lobectomy, followed by severe personality change and series of psychiatric hospitalizations; a suicide attempt while in jail awaiting trial; and expert testimony describing defendant's extensive brain damage).

Several factors are relevant in determining whether a hearing is necessary,

1   including evidence of a defendant's irrational behavior, his demeanor at trial, and any

2   prior medical opinion on competency to stand trial.  United States v. Loyola-

3   Dominguez, 125 F.3d 1315, 1318 (9th Cir. 1997).  Even one of these factors standing

4   alone may, in some circumstances, be sufficient to create a reasonable doubt regarding

5   the competency of a defendant.  Id. at 1319 (due process required a hearing to ascertain

6   whether defendant was competent to stand trial where he attempted suicide on eve of

7   trial).  "In reviewing whether a state trial judge should have conducted a competency

8   hearing, we may consider only the evidence that was before the trial judge."

9   McMurtrey v. Ryan, 539 F.3d 1112, 1119 (9th Cir. 2008).

10      Petitioner raised the issue of his incompetency at a post-verdict hearing on his

11   Marsden[2] motion.  (Resp't Ex. 11.)  Petitioner complained that he did not understand

12   and could not follow the proceedings.  (Id. at 1052, 1054, 1057-58.)  Defense counsel

13   and Petitioner informed the court that Petitioner had suffered an unspecified brain

14   injury in the past from a stabbing incident.  (Id. at 1055, 1057-58.)  Petitioner did not

15   indicate precisely when this injury occurred, but from his papers submitted in

16   connection with the instant petition, it appears to have occurred sometime between

17   1980 and 1990.  (Attachment to Petition at 2; Traverse at 38.)  Defense counsel also

18   informed the court that Petitioner had been on disability due to the brain injury.

19   (Resp't Ex. 11 at 1057.)

20      In response, the trial court asked defense counsel whether he was raising the

21   question of Petitioner's competency, and defense counsel responded that he did not

22   "have a doubt" that Petitioner was competent.  (Id.)  Defense counsel informed the

23   court that he had met with Petitioner between five and ten times prior to trial, and that

24   they "worked hard and worked together" and "spent hours" preparing for trial.  (Id. at

25   1056.)  Defense counsel told the court that notwithstanding Petitioner's injury, "in my

26   discussions with all the matters related to this case, I just did not find in my assessment

27

28      [2]People v. Marsden, 2 Cal.3d 118 (1970).

that his deficiencies rose to the level of being incompetent to stand trial." (<u>Id.</u> at 1057.)

The trial court then concluded as follows:

> Well, from the Court's time with this case and the Court's hearing of the evidence that was presented in this case and from the Court's own observations of the defendant in this case, the Court finds the defendant is competent.  There isn't any doubt in the Court's mind that he is competent within the meaning of 1368.
> . . .
> I've heard you speak today.  There isn't anything that's been said or done that would suggest for a moment that you are not competent to stand trial and have not been competent throughout the process.  You are.

(<u>Id.</u> at 1058.)

Although Petitioner may have suffered from some form of brain injury a number of years prior to the trial in this case, that fact alone does not establish that he was incompetent to stand trial.  <u>See</u> <u>Hoffman</u>, 455 F.3d at 938 (persons with limited or diminished mental capacity are not necessarily incompetent to stand trial).  Here, the evidence before the trial court was insufficient to raise a good faith doubt as to Petitioner's competency.  <u>See</u> <u>Cacoperdo</u>, 37 F.3d at 510.  The trial court's lack of "any doubt" of Petitioner's competency was based on its own observations of Petitioner throughout the trial and presentation of evidence.  This assessment is supported by the record in which there was no evidence of Petitioner acting irrationally or his demeanor suggesting incompetence.  At the <u>Marsden</u> hearing, for example, Petitioner was able to articulate the basis of both his <u>Marsden</u> motion, which he had filed pro se, and his incompetency argument.  (Resp't Ex. 11 at 1052-54, 1057-58).  There was also no prior medical opinion on Petitioner's incompetency to stand trial either in this case or in connection with his numerous prior convictions.  In addition, defense counsel described Petitioner's able assistance trial preparation.  Based on this record, the state court could reasonably determine that, notwithstanding Petitioner's injury, there was sufficient evidence that Petitioner could understand the proceedings and assist his attorney that a competency hearing was not necessary to ensure a fair trial and protect Petitioner's right to due process.

Accordingly, the California Supreme Court's decision denying Petitioner's

1    claim that the trial court violated his right to due process by finding him competent

2    without a hearing was not contrary to, or an unreasonable application of, clearly

3    established Supreme Court precedent, nor was the state court decision based on an

4    unreasonable determination of the facts.  <u>See</u> 28 U.S.C. § 2254(d).

5              **2.**    **<u>Arzadon's Testimony</u>**

6          Petitioner claims that the admission of Arzadon's testimony violated his right to

7    due process because Arzadon changed his testimony after trial.  Petitioner has

8    submitted a document written by Arzadon on August 10, 2004, approximately two

9    months after Petitioner was sentenced, in which he stated that his trial testimony and

10   statements to the police were false in part.  (Attachment to Traverse at 1-2.)  Arzadon

11   states that he and Petitioner engaged "in mutual combat," but that Petitioner did not

12   steal anything from him.  (<u>Id.</u> at 3.)  Arzadon also states that he lied about the incident

13   at trial because he was under the influence of drugs and was "hallucinating as well as

14   hearing voices" at trial; that the prosecutor coached his testimony; and that the

15   prosecutor and police told him that his failure to cooperate would be "detrimental to his

16   freedom."  (<u>Id.</u> at 2-3.)

17         "[A] conviction obtained by the knowing use of perjured testimony is

18   fundamentally unfair, and must be set aside if there is any reasonable likelihood that

19   the false testimony could have affected the judgment of the jury."  <u>United States v.</u>

20   <u>Agurs</u>, 427 U.S. 97, 103 (1976); <u>see</u> <u>United States v. Bagley</u>, 473 U.S. 667, 678-80

21   (1985) (same).  Even a conviction based in part on perjured testimony or false evidence

22   presented in good faith does not comport with fundamental fairness.  <u>Hayes v. Brown</u>,

23   399 F.3d 972, 980 (9th Cir. 2005).  A witness's later recantation of his trial testimony

24   does not by itself render the trial testimony false, however.  <u>Allen v Woodford</u>, 395

25   F.3d 979, 994 (9th Cir. 2005).  Where the trial testimony is consistent with the other

26   evidence presented at trial, and the subsequent recantation is not, the trial testimony is

27   not false and there has been on due process violation.  <u>Id.</u> at 994-95.

28         Arzadon's trial testimony, unlike the statement he made after trial, was

consistent with the other evidence at trial.  Arzadon does not recant his testimony that Petitioner was one of the men he fought that night.  (Attachment to Traverse at 3.)  Rather, Arzadon simply changes his testimony that the fight was not mutual and that Petitioner robbed him.  (Id.)  Arzadon's testimony about being assaulted in the kitchen by three men was corroborated by Matthews's testimony to the same effect.  (Resp't Ex. 6 at 4.)  Also, Arzadon told the 911 operator immediately after the incident, just as he testified at trial, both that his phone was missing and that Petitioner and other men had attacked him.  (Id. at 4-5.)  Matthews also corroborated Arzadon's testimony that Arzadon's phone was taken, as well as that the assailants stole his jacket.  (Id. at 4.)

Contrary to the statement by Arzadon after trial, at trial he specifically denied hallucinating or being under the influence of drugs at trial.  (Resp't Ex 1 at 555-737; id at 729.)  Moreover, there was evidence that Arzadon wrote to Petitioner from jail that he would offer to recant his statements to the police and trial testimony because he was afraid Petitioner would retaliate against him.  (Id. at 713-15.)  Under these circumstances, the state court reasonably could conclude that there was no grounds to find that Arzadon's trial testimony, as opposed to his subsequent recantation, was false.

Petitioner's right to due process was not violated by the use of Arzadon's testimony at Petitioner's trial.  Accordingly, the California Supreme Court's decision denying Petitioner's claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

### 3.   Ineffective Assistance of Counsel

Petitioner claims that trial counsel was ineffective in three respects: (1) that he failed to investigate and present to the trial court evidence that Petitioner was not competent to stand trial; (2) that he failed to present evidence that Arzadon "may have been blackmailed by" the prosecutor to testify as he did; and (3) that he failed to present evidence of the trial judge's bias against Petitioner.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of

the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of counsel.  <u>Strickland v. Washington</u>, 466 U.S. 668, 686 (1984). In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, Petitioner must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. <u>Strickland</u>, 466 U.S. at 687-88.  Petitioner must also establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  <u>Id.</u>

It is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the <u>Strickland</u> test if the petitioner cannot even establish incompetence under the first prong.  <u>Siripongs v. Calderon</u>, 133 F.3d 732, 737 (9th Cir. 1998).  Conversely, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged deficiencies.  <u>Strickland</u>, 466 U.S. at 697.

Petitioner has not established that counsel acted unreasonably in failing to further investigate the issue of Petitioner's competency.  A defense attorney has a general duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.  <u>Id.</u> at 691.  Defense counsel was aware of the evidence, to the extent it existed, of the brain injury that Petitioner had sustained some time in the past.  (Resp't Ex. 11 at 1055-58.)  However, after considering the issue of incompetency, counsel reasonably rejected it because of Petitioner's ability to assist him in preparing for trial over the course of numerous meetings spanning many hours.  (<u>Id.</u>)  The other reasons discussed above, including Petitioner's conduct during trial and his prior convictions without any finding of incompetency, further supported counsel's reasonable decision not to pursue the issue of Petitioner's incompetency. Moreover, Petitioner has not established prejudice from the failure to investigate the

competency issue further.  Petitioner has presented no evidence that if counsel had contacted an expert, that such an expert would have been reasonably likely to find him incompetent, let alone that the trial judge, who, as described above, did not have "any doubt" about Petitioner's incompetence based on his observations of Petitioner's conduct at trial, would have found Petitioner incompetent.

Nor has Petitioner established that counsel acted unreasonably in failing to investigate the possibility that the prosecutor blackmailed Arzadon.  Petitioner's speculation that Arzadon "may have been blackmailed" is based on Arzadon's allegations that he was on probation at the time he testified and the prosecutor stated that his failure to cooperate would be "detrimental to his freedom."  (Pet. at 4A; Attachment to Traverse at 3.)  There is no evidence that this exchange, if true, would amount to "blackmail," as opposed to an ordinary offer of leniency in exchange for the cooperation of a prosecution witness.  In addition, there is no evidence that defense counsel had any reason to suspect at the time Arzadon testified that approximately six months later he would claim coercion by the prosecutor and recant his testimony.

Finally, for reasons discussed below, there is no evidence that the trial judge was biased against Petitioner.  Thus, there is no reasonable likelihood that any argument to that effect by defense counsel would have succeeded, and Petitioner was not prejudiced by counsel's failure to argue and present evidence that the trial judge was biased.

Petitioner's Sixth Amendment right to the effective assistance of counsel was not violated.  Accordingly, the California Supreme Court's decision denying Petitioner's claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was it based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

### 4.   **Judicial Bias**

Petitioner claims that his right to due process was violated because the trial judge was biased against him.  The Due Process Clause guarantees a criminal

1    defendant the right to a fair and impartial judge.  See In re Murchison, 349 U.S. 133,

2    136 (1955).

3         In support of his allegation that the trial judge, Judge Scott, was biased against

4    him, Petitioner cites news articles describing allegations pertaining to another judge,

5    Judge Moody, who originally was assigned to Petitioner's case before it was

6    transferred to Judge Scott at the outset of the proceedings on defense motion.

7    (Traverse, Attachment A.)  According to these articles, allegations had been made that

8    Judge Moody and Judge Scott favored the prosecution in criminal cases and transferred

9    criminal cases to each other whenever defense counsel requested a new judge.  (Id.)

10   Petitioner also cites articles describing misconduct charges based on statements by a

11   former clerk that Judge Scott had helped the prosecution in certain criminal cases.  (Id.)

12   Petitioner includes an article that states that the misconduct charges against Judge Scott

13   were dismissed.  (Id.)  Moreover, the articles do not describe allegations of any

14   misconduct in Petitioner's case, and Petitioner alleges that he contacted the former

15   clerk, who, while she remembered Petitioner, did not recall not any instances of

16   misconduct in Petitioner's case.  (Pet. at 5A.)

17        Petitioner claims that Judge Scott's bias in his case is evidenced by the denial of

18   Petitioner's request for a competency hearing and his motion to sever the trial.

19   However, judicial rulings almost never constitute a valid basis for a bias or partiality

20   motion.  Liteky v. United States, 510 U.S. 540, 555 (1994).  "[O]pinions formed by the

21   judge on the basis of facts introduced or events occurring in the course of the current

22   proceedings . . . do not constitute a basis for a bias or partiality motion unless they

23   display a deep-seated favoritism or antagonism that would make fair judgment

24   impossible."  Id.  In any event, for the reasons discussed in this order, both above and

25   below, Judge Scott's rulings on the issues of competency and severance were not

26   erroneous.  Consequently, Judge Scott's denial of Petitioner's motions does not

27   indicate any bias against Petitioner.

28        Accordingly, the California Supreme Court's decision denying Petitioner's

claim that his right to due process was violated by having a biased trial judge was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor was the state court's decision based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

### 5.    **Motion to Sever**

Petitioner claims that the trial court violated his right to due process by granting the prosecution's motion to consolidate, and denying the defense motion to sever, the trial on the two sets of charges, one arising from the Seaside incident with Bell and the other arising from the Monterey incident with Arzadon.

A joinder, or denial of severance, of counts may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997). The risk of prejudice from the joinder of two sets of charges is enhanced when the evidence is not cross-admissible, and when the evidence of one crime is substantially weaker than the evidence of the other crime.  Bean v. Calderon, 163 F.3d 1073, 1084-85 (9th Cir. 1998).  Joinder generally does not result in prejudice if the evidence of each crime is simple and distinct even if the evidence is not cross-admissible, and the jury is properly instructed so that it may compartmentalize the evidence.  Id. at 1085-86.  Similarly, joinder generally does not result in prejudice if the jury did not convict on all counts because it presumably was able to compartmentalize the evidence.  Park v. California, 202 F.3d 1146, 1149-50 (9th Cir. 2000).  If the petitioner shows that the joinder violated his right to due process, he must also establish that the joinder had a substantial and injurious effect or influence in determining the jury's verdict.  Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

Petitioner argued in the state courts, as he does here, that joinder rendered the trial unfair because there was no cross-admissible evidence and because both cases were weak and would be bolstered by being tried together.  (Resp't Ex. 6 at 6.) Petitioner cited the fact that the incidents occurred nearly a year apart and in different

1  cities, that the victims were unrelated, that there were with no common percipient

2  witnesses, and that the Seaside charges had originally been dismissed for insufficient

3  evidence and were refiled after the Monterey charges were filed.  (Id.)  On the other

4  hand, there were a number of similarities between the two incidents, as noted by the

5  California Court of Appeal: "(1) the victims were both crack cocaine addicts who had

6  frequently used crack with defendant; (2) the victims lived in residences frequented by

7  crack cocaine addicts including defendant; (3) the victims either owed defendant

8  money or held money for another that was owed to defendant; (4) defendant came to

9  the victims' residences and demanded the money; (5) the victims refused to give

10  defendant any money; (6) defendant responded by beating up the victims; and (7)

11  defendant took the victims' telephones with him when he left their residences after

12  beating them."  (Id. at 12.)

13      The Court of Appeal found that, notwithstanding these similarities, the evidence

14  of the two incidents was not cross-admissible under California law on the issues of

15  identity, a common design or plan, or intent.  (Id. at 12-14 (citing California Evidence

16  Code § 1101(b) and discussing California cases).)  The Court of Appeal went on to

17  find that the lack of cross-admissibility did not render the joinder sufficiently

18  prejudicial either to violate state law or to render the trial fundamentally unfair because

19  this was not a case in which "both cases were weak and had been joined in the hope

20  they would buttress each other."  (Id. at 14-17.)  The Court of Appeal reasoned as

21  follows:

22          Nothing about the Seaside case was unusually inflammatory in
      comparison to the Monterey case. If anything, the Seaside case was less
23      aggravated than the Monterey case. Defendant's entire prejudice
      contention is premised on his argument that both cases were weak and
24      had been joined in the hope that they would buttress each other.

25          While each case had certain weaknesses, it is difficult to see how
      the evidence in the Seaside case could have buttressed any weaknesses in
26      the Monterey case. Evidence of defendant's assault on Bell nearly a year
      before his assault on Arzadon had no significant tendency to buttress the
27      prosecution's assertion that defendant had committed an aggravated
      assault on Arzadon. This is especially true since defendant admitted
28      engaging in physical altercations with both men and simply claimed that

he was defending himself against Bell and had been provoked by Arzadon. Evidence of the Bell assault also did not tend to show that defendant intended to steal anything from Arzadon's home or person since defendant took nothing from Bell's person and only temporarily detained Bell's telephone. Defendant has not met his burden of clearly establishing a substantial danger of prejudice at the time the court denied his severance motion. ( People v. Bean, supra, 46 Cal.3d 919, 938.)

Defendant alternatively contends that the joint trial of the two cases resulted in an unfair trial even if the denial of the severance motion was not an abuse of discretion. . . . Defendant complains about the prosecutor's argument to the jury linking the two cases, but we see no likelihood that this argument inflamed the jury or resulted in the Seaside case supplementing weaknesses in the Monterey case in light of the fact that the jury concluded that defendant was guilty of only simple assault in the Seaside case and it also rejected the completed robbery counts in the Monterey case and convicted him of only attempted robberies. These verdicts tend to indicate that the jury was not improperly influenced by the prosecutor's argument.

. . .

No [] inferences about defendant's disposition were likely here. Defendant admitted that he had fought with Bell and Arzadon. There was no dispute about whether he was the perpetrator of the assaults, but only about whether he acted in self-defense and whether the assaults were aggravated. The assault on Bell did not suggest that defendant was not provoked by Arzadon or that he intended to take property from Arzadon. Hence, defendant's propensity for fighting, as demonstrated by the Bell assault, had little likelihood to influence the jury's resolution of the Monterey offenses.

As the lack of cross-admissibility alone is not sufficient to demonstrate prejudice, and defendant has failed to establish that there was a substantial danger of prejudice from a joint trial or that he was actually prejudiced by the joint trial of the two cases, we reject his challenge to the trial court's denial of his severance motion and his contention that his trial was unfair due to the consolidation of the two cases.

(Id.)

The California Court of Appeal explained persuasively why the joinder did not unduly prejudice Petitioner notwithstanding the lack of cross-admissibility of the evidence of the two incidents.[3]  To begin with, the jury did not convict Petitioner of all

---

[3]The Court of Appeal's conclusion that the evidence was not cross-admissible under California Evidence Code § 1101(b) is a determination of state law that is binding on federal habeas review.  See Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (holding that state court's interpretation of state law, including one announced on direct appeal of challenged

of the charges arising from the incidents, specifically of aggravated assault in the Seaside incident or completed robbery in the Monterey incident.  This verdict indicates that the jury was able to compartmentalize the evidence of the two incidents and that Petitioner was not so prejudiced by their joinder to render the trial fundamentally unfair.  See Park, 202 F.3d at 1149-50 (holding that joinder generally does not result in prejudice if jury did not convict on all counts because it presumably was able to compartmentalize evidence).  Moreover, the Court of Appeal reasonably found that the evidence of the two incidents was unlikely to buttress each other.  The fact that Petitioner assaulted Bell did not tend to indicate that he had not been provoked by Arzadon in an incident occurring nearly a year later.  Nor did the Seaside incident tend to indicate that Petitioner robbed Arzadon or Matthews because Petitioner did not rob Bell.  Conversely, Petitioner's assault of Arzadon did not have a tendency to indicate that Bell did not attack or threaten Petitioner first and cause Petitioner to act in self-defense, as Petitioner claimed.  Based upon this record, the Court of Appeal reasonably concluded that the evidence of the two incidents was not likely to be buttressed by the joint trial, and that the joinder did not prejudice Petitioner so as to render the trial fundamentally unfair.

Accordingly, the state courts' decisions denying Petitioner's claim were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d)(1),(2).

### 6.   **Proposition 36**

Petitioner claims that the trial court violated his right to due process by failing to consider imposing probation pursuant to California Proposition 36 on his conviction for possession or transporting a controlled substance pursuant to count 5.

conviction, binds federal court sitting in habeas corpus).

1   Petitioner was not eligible for probation under Proposition 36. "Proposition 36

2   amended state law to require that certain drug offenders receive probation, conditioned

3   on participation in and completion of an appropriate drug treatment program, instead of

4   receiving a prison term or probation without drug treatment. Under new Penal Code

5   section 1210.1, subdivision (a), a defendant convicted of a nonviolent drug possession

6   offense 'shall' receive probation provided the defendant is not rendered ineligible

7   under subdivision (b)." People v. Floyd, 31 Cal.4th 179, 183 (2003). Section

8   1210.1(b) excludes from probation "any defendant who, in addition to one or more

9   nonviolent drug possession offenses, has been convicted in the same proceeding of . . .

10   any felony." Cal. Pen. Code § 1210.1(b)(2). Here, Petitioner was convicted in the

11   same proceeding of numerous felonies, and therefore he was not eligible for probation

12   under Proposition 36. Petitioner appears to concede as much insofar as he argues only

13   that the trial court should have considered a sentence of Proposition 36 on count 5 if

14   the convictions on the other counts are vacated. For the reasons discussed in this order,

15   Petitioner has presented no basis for vacating his felony convictions on the other

16   counts, and consequently his argument for a sentence pursuant to Proposition 36 fails.

17   Petitioner's right to due process was not violated by the trial court's failure to

18   consider imposing a sentence pursuant to Proposition 36. Accordingly, the California

19   Supreme Court's decision denying Petitioner's claim was not contrary to, or an

20   unreasonable application of, clearly established Supreme Court precedent, nor was the

21   state court's decision based on an unreasonable determination of the facts. See 28

22   U.S.C. § 2254(d).

23   **7.      Sufficiency of Evidence of Robbery "In Concert"**

24   Petitioner claims that his right to due process was violated because there was

25   insufficient evidence to support a the jury's finding that he committed the two

26   attempted robberies in counts 1 and 2 "in concert" with others, pursuant to Section

27   213(a)(1)(A) of the California Penal Code.

28   The Due Process Clause "protects the accused against conviction except upon

proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a constitutional claim, which, if proven, entitles him to federal habeas relief.  Jackson v. Virginia, 443 U.S. 307, 321, 324 (1979).

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  See id. (quoting Jackson, 443 U.S. at 319).  Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be granted.  See Jackson, 443 U.S. at 324.  On habeas review, a federal court evaluating the evidence under Winship and Jackson should take into consideration all of the evidence presented at trial.  LaMere v. Slaughter, 458 F.3d 878, 882 (9th Cir. 2006).

Section 213(a)(1) of the California Penal Code provides:

Robbery of the first degree is punishable as follows:
(A) If the defendant, voluntarily acting in concert with two or more other persons, commits the robbery within an inhabited dwelling house, ... by imprisonment in the state prison for three, six, or nine years.
(B) In all cases other than that specified in subparagraph (A), by imprisonment in the state prison for three, four, or six years.

Petitioner argues that because his co-defendant Allen was acquitted of the charges of attempted robbery in the Monterey incident, there was insufficient evidence for the jury to find that Petitioner acted "in concert" with at least two other people in attempting to rob Arzadon and Matthews.  The California Court of Appeal rejected this argument based on the following reasoning:

Defendant's assertion is that Allen's acquittal established that only two individuals committed the attempted robberies, and therefore the in

concert finding was unsupported. Not so. Although Allen was acquitted, there was evidence that X and Nelson participated in the attempted robbery of Arzadon. Nelson arrived in advance of the others, and X came to Arzadon's door several times looking for her. While Allen was talking to Arzadon and, according to Arzadon, Nelson remained in the house, X entered the house and then defendant rushed in. One of the men said "[w]here's my money," and defendant and X held Arzadon down while one of them put his hand in Arzadon's pocket. At the same time, according to Arzadon, Nelson held Arzadon's phone and called Arzadon names. Nelson then took the phone with her when she left Arzadon's home with defendant and X. As they left, one of the men took Matthews's leather jacket.

    A rational factfinder could have concluded that Nelson and X were defendant's co-participants in the attempted robberies of Arzadon and Matthews because each of them assisted him in the crimes. X held Arzadon down, and Nelson encouraged defendant and X and took the telephone to prevent Arzadon from summoning the police. A reasonable inference could be drawn that Nelson, defendant and X were acting together when Matthews was assaulted and when Matthews's jacket was taken. The jury's "in concert" finding was supported by substantial evidence.

(Resp't Ex. 6 at 18-19.)[4]

    The evidence described by the Court of Appeal was sufficient for the jury to find that Petitioner was working with at least two other people in carrying out the attempted robberies.  There was evidence that when "X"[5] gained entry to the house, Petitioner rushed in behind him and assaulted Arzadon; that X helped Petitioner hold Arzadon down while they searched his pockets for money; that Nelson was insulting

---

[4]The Court of Appeal also noted that the "in concert" finding had no impact on Petitioner's case:

    It is notable that the validity of the jury's in concert finding is completely irrelevant in this case. The only difference between an "in concert" attempted first degree robbery and an attempted first degree robbery that was not "in concert" is that the "in concert" offense is punishable by 18 months, 3 or 6 years and the other is punishable by 18 months, 2 or 3 years. These punishment provisions had no impact on defendant's sentence because he was punished under Penal Code section 1170.12 and would have received the same 25 years to life sentences for these offenses whether or not they were "in concert." Nevertheless, we will address the contention if only to forestall an argument that it might have some conceivable future impact on defendant.

(Resp't Ex. 6 at 18.)

[5]The Court of Appeal identified the unidentified man who participated in the crimes as "X."  For the sake of simplicity, he will be identified in this order as "X" as well.

Arzadon while the other men held him down; that Nelson and X left the house with Petitioner, with Nelson taking Arzadon's phone and either X or Petitioner taking Matthew's leather jacket.  A reasonable jury could have relied upon this evidence to find that Nelson and X participated in the attempted robberies with Petitioner. Even if the jury could have rationally rejected this evidence and drawn the conflicting inference that Nelson and X were not participants in the robbery does not mean that there was insufficient evidence to support the "in concert" finding.  When confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326.  Here, it must be presumed that the jury drew the reasonable inference that X and Nelson were acting with Petitioner, and this Court must defer to that decision.

Petitioner's right to due process was not violated because of insufficient evidence that Petitioner attempted the robberies "in concert" within the meaning of Section 213(a)(1)(A) of the California Penal Code.  Accordingly, the state courts' decisions denying Petitioner's claim were not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, nor were they based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).

## CONCLUSION

The Court concludes that Petitioner has not shown any violation of his federal constitutional rights in the underlying state criminal proceedings.  Accordingly, the petition for a writ of habeas corpus is denied.  The Clerk shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: ____4/2/10_____

_____
JEREMY FOGEL
United States District Judge

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

JOE RANDEL JOHNSON,

        Plaintiff,

  v.

ANTHONY KANE et al,

        Defendant.

_____/

Case Number: CV07-04417 JF

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on ___4/6/10_____, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Joe Randel Johnson V-46926
California State Prison - CTF
P.O. Box 705
Soledad, CA 93960

Dated: 4/6/10

/s/

Richard W. Wieking, Clerk
By: